# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

                 Plaintiff,                Case No. 15-CR-20382

      v.                             Honorable Victoria A. Roberts
                                        Magistrate Judge Elizabeth Stafford

D-1 Paul Nicoletti,

                 Defendant.

_____/

## Government's Brief in Opposition to
## Defendant's Motion for Bond Pending Appeal [R.172]

Craig A. Weier (P33261)
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313.226.9678
craig.weier@usdoj.gov

John K. Neal
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313.226.96
craig.weier@usdoj.gov

# Table of Contents

Index of Authorities  ........................................................................ iii

Controlling Authorities ..................................................................... iv

Statement of the Issue ...................................................................... v

Introduction ...................................................................................... 1

Argument........................................................................................... 2

    A. Nicoletti is unlikely to prevail on appeal.  ....................... 2

        1.  Sufficiency of the Evidence is Not a Close Question.  .......... 3

            a.  When properly understood, there is no question that the trial proofs established that Nicoletti and his accomplices intended to "obtain bank property."  .................................................... 5

            b.  The trial proofs established that Nicoletti and his accomplices obtained bank property "by means of" false statements.  ......................................... 12

        2.  Variance is not a close question.  .......................................... 20

        3.  Restitution issues are not ". . . substantial questions likely to result in a reversal, a new trial, or a reduced sentence" and challenging the restitution order for the first time in this motion is both frivolous and disingenuous.  ....................................................... 25

    B.  Nicoletti has not shown that he is *not* a danger to the community....27

Conclusion ...................................................................................... 29

# Index of Authorities

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)................................................. 1

*Dole Food Company v. Patrickson,* 538 U.S. 468 (2003)............................... 7

*Laughrin v. United States,* 573 U.S. 351 (2014)…………….... 4, 5, 12-13, 19

*United States v. Banyan,* 933 F.3d 548 (6th Cir. 2019) …………...….…4-8, 12

*United States v. Briggs,* 939 F.2d 222 (5th Cir. 1991) ………………….... 19-20

*United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) ................... 1

*United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011)............................ 3

*United States v. Hall,* 71 F.3d 569, 573 (6th Circuit 1995) …………………..25

*United States v. Barry Rene Isaacs*, Case No.1:19-cr-37
(SD Ohio, 4/7/2020), 2020 WL 1695155 at *3 ……………………………… 27

*United States v. Keuhne*, 547 F.3d 667, 683 (6th Cir. 2008) ........................ 21

*United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016) ............................ 21

*United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985)....................... 2

*United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) ............................ 3

*United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)......................... 3

*United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) …… 27

*United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)....................... 3

*United States v. Swafford*, 512 F3d 833, 842 (6th Cir. 2008) ……………… 22

*United States v. Webber*, 208 F.3d 545, 553 (6th Cir. 2000)........................... 3

18 U.S.C. § 1344(2) …………………………………………………………… 5

18 U.S.C. § 3143(b) (1)........................................................................................ 2

## Controlling Authorities

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

*Laughrin v. United States,* 573 U.S. 351 (2014)

*United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002)

*United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016)

*United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985)

18 U.S.C. § 3143(b)(1)

**Statement of the Issue**

Should the Court grant Nicoletti bond pending appeal where there is no substantial issue of law or fact likely to result in reversal of his conviction and absent clear and convincing evidence that he is not a danger to the community?

## Introduction

Defendant Paul Nicoletti [Nicoletti] stands convicted of conspiracy to commit bank fraud and three substantive counts of bank fraud, and is awaiting a report date to his designated correctional facility (Morgantown FCI) to begin serving his 70-month prison sentence. (R.133: Verdict Form; R.168: Judgment). In spite of a statutory presumption to the contrary, Nicoletti argues this Court should release him on bond pending appeal. (R.172: Def. Motion for Bond Pending Appeal). But it is extremely unlikely that the Court of Appeals will find that no rational trier of fact could have found the essential elements of his crimes beyond a reasonable doubt, a necessary condition for Nicoletti to prevail on appeal on the sufficiency challenge raised here. *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Nicoletti's variance argument is likewise insufficient to raise a close question on appeal because Nicoletti is unable to demonstrate variance, or any possible prejudice, necessary for the Court of Appeals to reverse his convicton. Lastly, Nicoletti has not presented clear and convincing evidence that he is not a danger to the community, especially in light of his recent perjury, also a condition precedent to bond pending appeal. Nicoletti's motion for bond pending appeal should therefore be denied.

1

## Argument

Under 18 U.S.C. § 3143, a Court must order the detention, pending appeal, of a person who has been sentenced to a term of imprisonment, except under very specific circumstances. Section 3143 "creates a presumption against release pending appeal." *Chilingirian*, 280 F.3d at 709. In order to grant Nicoletti bond pending appeal here, the Court must find: (1) by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community, and (2) that his appeal will raise a substantial question of law or fact likely to result in a reversal, a new trial, or a reduced sentence. 18 U.S.C. § 3143(b)(1). Nicoletti can demonstrate neither, and his motion should therefore be denied.

### A. Nicoletti is unlikely to prevail on appeal.

To remain on bond pending appeal, Nicoletti must show "that the appeal . . . raises a substantial question of law or fact likely to result in . . . reversal." 18 U.S.C. § 3143(b)(1)(B)(i). "[A]n appeal raises a substantial question when [it] presents a 'close question or one that could go either way' and the question 'is so integral to the merits of the conviction that it is more probable than not that reversal or a new trial will occur if the question is decided in the defendant's favor." *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985). Nicoletti has

2

filed a notice of appeal and, in this motion, argues that two "substantial questions" will be presented to the Court of Appeals which are "likely to result in reversal:" (1) sufficiency of the evidence; and (2) variance. The government agrees that if either of these questions is decided in Nicoletti's favor, reversal would follow. For the reasons that follow, however, neither of these issues will present a close question to the Court of Appeals.

### 1. Sufficiency of the Evidence is Not a Close Question.

On appeal, the court will review *de novo* whether sufficient evidence supports the convictions. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011). The court must and will affirm the conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court will draw "all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). This standard is difficult to overcome; it places a heavy burden on the defendant. *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000); *United States v. Webber*, 208 F.3d 545, 553 (6th Cir. 2000)(*citing United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999))("A defendant making such a challenge bears a very heavy

3

burden."). This standard is thus identical to that applied by this Court when determining Nicoletti's three prior motions for judgment of acquittal. (*See* Docket entries of 5/3/19 and 5/7/19; R.161: Order Denying Motion for Judgment of Acquittal).

Simply because an issue is complicated, or a record voluminous, does not mean the issue is "close." This Court, in determining whether the reviewing court "could go either way," must assume that it will be competent, will have a working knowledge of the necessary facts and a clear understanding of the applicable law. Indeed, Nicoletti does not argue that the appellate court could "go either way" because it might be mistaken. However, to make this issue seem close, Nicoletti simplifies and limits the evidence presented at his trial, and provides inadequate analysis and ignores the record of the case he says is controlling, *United States v. Banyan,* 933 F.3d 548 (6th Cir. 2019). But *Banyan* is easily distinguishable, in part because the government was aware it was pending before trial and presented its case to avoid the issues it posed. Thus, the elements of bank fraud and bank fraud conspiracy were fully satisfied by the proofs at Nicoletti's trial.

*Banyan* held that the government there failed to prove both that the defendants (1) intended to obtain "bank property" and (2) did so by means of false pretenses, which, relying on *Laughrin v. United States,* 573 U.S. 351 (2014), the

*Banyan* Court found were the two essential elements of bank fraud in violation of

18 U.S.C. § 1344(2). *Banyan* at 552.[1]

> **a. When properly understood, there is no question that the trial proofs established that Nicoletti and his accomplices intended to "obtain bank property."**

As to the first element, intent to obtain "bank property," an understanding of

the definition of "bank property" is crucial to the analysis. *Banyan* finds the

element in *Laughrin*, which explicitly defines "bank property" to include money in

the custody or control of an insured financial institution:

> First, the clause [§ 1344(2)] requires that the defendant
> intend "to obtain any of the moneys . . . or other property
> owned by, or under the custody or control of, a financial
> institution." (We refer to that element, more briefly, as
> intent to "obtain bank property.").

573 U.S. 351, 355. Thus, when reading *Banyan*, it is important to understand that,

whenever the court uses the term "bank property," it is referring to moneys owned

by *or* under the custody *or* control of a financial institution.

Nicoletti applies, as he has consistently in previous arguments, an

---

1 Although Nicoletti seems to argue "federal jurisdiction" as a separate issue,
jurisdiction is established by proof of *Laughrin*'s first element of the offense: the
intent to "obtain bank property" as the Supreme Court defines it. The case Nicoletti
relies on in support of this posisiton, *United States v. Slovacek,* 867 F.2d 842 (5th
Cir. 1989) involved the bank robbery statute and has nothing to do with 18 U.S.C.
§ 1344.

erroneous definition of "bank property." Instead of *Laughrin*'s definition, Nicoletti argues, without authority, that "bank property" means only property *owned by* the financial institution. (*See* R. 172: Motion for Bond at 7, 12; R.147: Reply to Government's Response to Defendant's Motion for Judgment of Acquittal at 5-6, 9, 11). But this construction amends 18 U.S.C. § 1344(2) itself, and would make it superfluous, limited only to conduct already proscribed by § 1344(1) (i.e., a scheme to defraud a financial institution). That is decidedly not the definition of bank property underlying *Banyan.* Rather, "intent to obtain bank property" means intent to obtain money or other property "owned by, or under the custody or control of, a financial institution." 573 U.S. at 355.

Viewing *Banyan* with this correct understanding of the term "bank property" demonstrates its substantial difference from this case. The court there held that the government failed to prove the defendants intended to obtain "bank property" (i.e., property owned by or under the custody or control of a financial institution because it was relying *entirely* on the lenders' status as wholly owned subsidiaries of the insured financial institutions, and inferences it claimed could be drawn from that status, which the court rejected as "nearly frivolous" based on " '. . .[a] basic tenant of American corporate law. . .that the corporation [here, the mortgage companies] and its shareholders [here, the banks] are distinct entities.' " *Banyan* at 552,

6

*quoting Dole Food Company v. Patrickson,* 538 U.S. 468 (2003). The *Banyan* court underscored that the government offered "no evidence, for example, that either of the parent banks funded the loans and that the defendants were aware of such funding." *Banyan* at 553. Rather, the court emphasized, the government argued that the parent banks "owned" the funds used in the loan because the parent banks "owned the companies" and because losses incurred by the mortgage companies flowed directly up to their parents. *Banyan* at 554. The court rejected these arguments, citing corporate law principles that shareholders do not own their corporation's assets and the statutory text that the defendants must intend to obtain bank property, not merely diminish its value. *Id.*

The dearth of evidence of the source of the loans on the record in *Banyan* is highlighted by the government's argument on the "custody or control" issue in that case. It argued only that "the jury could reasonably assume that the parent company has some duty to protect the funds of its wholly owned subsidiary and, moreover, has the power and authority to guide or manage those funds." *Id.* But the court noted that the government provided neither authority nor an evidentiary basis for these propositions. *Id.* Had there been direct evidence that the loan proceeds came from accounts at federally insured financial institutions, surely the government would have argued it to the court. Moreover, all three opinions in

7

*Banyan* (Judge Kethledge for the court, Judge Oliver's concurrence, and Judge Siler's dissent) reference only the scantest evidence to suggest that the proceeds came from an insured bank, specifically, a few checks issued to a bank to repay one of the loans, and a vague admission by a defendant's ex-wife that the money came "from a bank." This is the only evidence in the record of the source of the loans.

In sharp contrast to the trial record in *Banyan*, the government here never relied on the parent/subsidiary relationship of Fifth Third Bank and Fifth Third Mortgage Michigan. Rather, the record here is replete with both testimony and documentary evidence showing conclusively that the loan proceeds were in the custody of an insured bank at the time of their release from the bank to Nicoletti's title company. That evidence is summarized in the Government's Response to the Defendant's Motion for Judgment of Acquittal (R. 145 at 7-10), and includes:

- Testimony of Albert Cliffel, Corporate Tax Director for Fifth Third Bank, that all loan proceeds at issue were in the custody of either Fifth Third Bank Michigan or Fifth Third Bank Ohio when the proceeds were released to Continental Title;

- Government Exhibits 78 and 79 showing two cashier checks issued by "Fifth Third Bank (Eastern Michigan)" totaling $1,824,156.05 (verified by Cliffel as drawn on account of Fifth Third Bank Michigan), were used to fund the Scott Lucia Loan (Counts 1 and 4 of the indictment) with a deposit slip showing Nicoletti deposited the proceeds checks into his Continental Title account;

8

▪ Government Exhibits 15, 24 and 49 (Continental Title Fifth Third Bank Account Statements) showing proceeds of all six loans entering Continental Title Fifth Third Bank Michigan account (verified as a Fifth Third Michigan Bank account by Cliffel) and disbursement of loan proceeds.

There is even more evidence that Nicoletti intended to obtain bank property as that phrase is properly understood: Nicoletti himself distributed the loan proceeds from a Fifth Third Michigan bank account, pursuant to his role in the conspiracy, to himself and his co-conspirators/accomplices. A plethora of evidence showed that the loan proceeds flowed into his Continental Title account at Fifth Third Bank Michigan, and were then disbursed by Nicoletti, the title company owner, to himself and his accomplices/co-conspirators including Tyrone Hogan (dba Rockridge Holdings), Matthew Flynn (dba Flynn Financial), Alan Lucia (personally and dba Direct Financial), and Robert Hance (dba Executive Estate Builders). (*See*, R.152: Testimony of S.A. Christine Taylor at 14-49 (Page ID 1778-1813)(distribution of loan proceeds from Nicoletti's Continental Title account); Government Exhibits [GE] 14, 23, 35, 48, 64, 77 (partial disbursement charts)).

Nicoletti erroneously argues that the disbursements to himself and his accomplices/co-conspirators from the Continental Title account occurred "after the fraud had been completed," (R.172: Motion for Bond at 13). But just because the

loan proceeds had been transferred to Nicoletti's Continental Title Fifth Third account *as the title agent of the lender* does not mean that the fraud scheme was complete. Quite the contrary, these further disbursements were key to the scheme's success, which relied on the knowing assistance of the title agent (Nicoletti). As alleged in the indictment:

> It was part of the scheme and conspiracy that
> D-1 PAUL NICOLETTI would knowingly facilitate the
> fraudulent real estate transactions by acting as the title
> agent, coordinating and conducting the real estate
> closings, preparing the HUD-1 Settlement Statements,
> and *disbursing the proceeds of the mortgage loans*. . .

(emphasis added)(R.1: Indictment at p.5, ¶11). Indeed, the scheme would have been entirely useless to Nicoletti and his accomplices were they unable to obtain the proceeds of the fraudulent loans. The disbursement by Nicoletti from the Continental bank account at Fifth Third Bank was the entire object of the scheme.

Additionally, as to intent to obtain bank property, although *Banyan* and *Loughrin* do not clearly require that a defendant know that the subject money was in the custody of a bank (as opposed to intending to obtain money which was, in fact, in the custody of a bank), even if they did, the evidence presented at trial established that Nicoletti clearly knew that the money funding the loan proceeds was in the custody of a bank. First, the funds he received for the Scott Lucia loan came directly to him from the insured institution in the form of two Fifth Third

Bank Michigan cashiers checks, which he personally deposited into his Continental Title account. (*See also* R.146: Nicoletti testimony at 83, page ID 1456). Thus, at a minimum, there is direct evidence that Nicoletti knew that this money which he and his accomplices intended to take, and the subject of Counts One and Four, was "bank property." The money funding the other loan transactions was directly wired into Nicoletti's Continental Title Account and, although the sources are not explicitly identified in the bank statements, it can be reasonably inferred that those funds, like the Lucia funding, came from a bank. Indeed, it is difficult to conceive of any way millions of dollars of loan funding could be transferred into a title company's bank account without involving the services of a bank.

Moreover, the trial evidence established that Nicoletti had been an attorney for 14 years leading up to these offenses who had "always been involved in real estate law" and had owned two title companies for approximately 16 months when these offenses occurred. (R.146: Nicoletti Testimony at 54-55, Page ID 1427-28, 11, Page ID 1384). From this evidence alone, any reasonable juror could infer that Nicoletti knew that the money funding mortgage loans was in the custody of banks before being released to the title company. Certainly, he knew beyond doubt that the money he disbursed from Continental's Fifth Third Bank account to himself and his accomplices as the corrupt title agent of the lender was in the custody of a

Fifth Third Bank.

### b. The trial proofs established that Nicoletti and his accomplices obtained bank property "by means of" false statements.

*Banyan* also found insufficient evidence on the second element of bank fraud: that the defendant obtained bank property "by means of" false pretenses or representations. *Banyan* at 555. Reading "by means of" in 18 U.S.C. § 1344(2) to include only "frauds in which a false statement will naturally reach a bank," *Banyan* held that the government failed to prove this element because it presented ". . . no evidence that any of the misrepresentations on the loan applications ever reached the ears of anyone in the parent banks." *Id.*

This gloss on "by means of" came from the Supreme Court's decision in *Loughrin*.[2] *Loughrin* involved a simple fraud scheme: the presentation of stolen, forged checks to a Target store (the false statements) for merchandise later refunded for cash. 573 U.S. at 353-54. The Court held that even this simple scheme satisfied the "by means of" element in § 1344(2). *Id* at 363, n.9. The Court recognized that any limiting definition of "by means of" must be flexible to fit

---

2 The discussion of the "by means of" clause limiting the scope of the statute arose only in response to the defendant's argument that the Court needed to inject a new element, "intent to defraud a bank," into 1344(2) to prevent its application to "pedestrian" frauds that did not involve banks at all. 573 U.S. at 363-64.

other, more complex, fraud schemes:

> Language like "by means of" is inherently elastic: It does not mean one thing as to all fact patterns—and certainly not in all statutes, given differences in contexts and purpose. All we say here is that the phrase, as used in    § 1344(2), is best read for the federalism-related reasons we have given. . .as drawing a line at frauds that have some real connection to a federally insured bank–namely, frauds in which a false statement will naturally reach such a bank (or custodian of the bank's property).

573 U.S. at 364, n.8.

Like the forged check presented to Target in *Loughrin*, and unlike the mortgage fraud scheme in *Banyan,* the mortgage fraud scheme here "had a real connection to [the] federally insured bank." Indeed, the scheme here had an even more direct connection to the bank. It involved false statements made directly to the bank in order to allow Nicoletti and his accomplices to obtain money in its custody.

A more detailed review of the record bears this out. As alleged and proven, the scheme involved real estate developers (Tyrone Hogan, Robert Schumake and Matthew Flynn) with the assistance of Robert Hance, a corrupted loan officer from Fifth Third Mortgage Michigan, a subsidiary of Fifth Third Bank Michigan, recruiting "straw buyers" to apply for multi-million dollar mortgage loans by false pretenses. The false statements included (1) the true buyers of the properties (the

13

straw buyers had no intent to exercise any ownership in the properties, but rather, allowed their names and credit histories be used as the "buyers" by the developers for a fee up front and promised return if/when the property was resold for a profit); (2) the income and assets of the buyers; (3) the intent of the buyers to occupy the properties; and (4) the fact that the "buyers" were making sizable down payments toward the purchase.[3] Nicoletti served as the title agent on these loans. He prepared and submitted false HUD-1's to Fifth Third Mortgage, Michigan, falsely showing sizable down payments by the straw buyers, which, as title agent, he was charged with collecting at the closings. His company, Continental Title, then obtained the loan proceeds from the lender's bank accounts—money that was in the custody of either Fifth Third Bank Ohio or Fifth Third Bank Michigan, both federally insured institutions. That money was sent to Continental, in preparation for the real estate closings, through either direct deposits into Continental's Fifth Third Bank Michigan bank account or, in the case of the Scott Lucia loan, by cashier's checks.

In all of the charged loan transactions, Nicoletti fabricated the down payments by getting Fifth Third Bank Michigan to issue official checks, backed by

---

3  There is no evidence on the record that the first three false statements listed reached Fifth Third Bank. Rather, they were directed to Fifth Third Mortgage, Michigan, the uninsured subsidiary of Fifth Third Bank, Michigan.

Nicoletti's Continental Title account at Fifth Third Bank, falsely containing the names of the straw buyers as the "remitters" or "purchasers" of the official checks on the face of the checks to make it appear as though the straw buyers purchased the official checks presented for the down payments. The straw buyers brought no money to closing and did not purchase the official checks. Rather, these official checks were ultimately paid from the Continental account by the loan proceeds themselves. Once the official checks were re-deposited into Nicoletti's Continental account at Fifth Third Bank Michigan, Nicoletti distributed the loan proceeds to himself and his accomplices by issuing checks drawn on the Continental Title bank account.

The retention and use of official checks from the bank to falsely "document" down payments, a central part of the scheme, alone involved multiple false statements made directly to Fifth Third Bank, Michigan to obtain money in the bank's custody in furtherance of the scheme. The Court will recall that the government's proofs showed that Nicoletti obtained official checks from Fifth Third Bank Michigan (the branch in the same building as Nicoletti's office) using the proceeds of the loans in order to document the false "down payments" of the straw purchasers, none of whom brought money to closing or funded their own down payments. (R.152: Testimony of S.A. Christine Taylor at 14-49 (Page ID

15

1778-1813) (distribution of loan proceeds from Nicoletti's Continental Title account); GE 14, 23, 35, 48, 64, 77 (partial disbursement charts); GE 27 (Official Check falsely documenting Langhorne down payment), 38 (Official Check falsely documenting Glover down payment); 53 (Official Check falsely documenting Bossenbery down payment); 67 (Official Check falsely documenting Maples down payment); GE 81 (Two Official Checks falsely documenting Scott Lucia Down Payment)). Each of the official checks obtained to document the false down payments (save the Bossenbery official check[4]) contained a key false statement: the assertion on the face of the check that the "remitter" or "purchaser" of the official check was the straw buyer. Thus, to obtain the official checks, someone told the issuing bank officer to list the straw buyers' names as the purchasers of the checks, a lie to the bank to obtain official checks to document the false narrative of the scheme that the "buyers" made substantial down payments. Six of these false statements were made to the bank to obtain the six official checks entered into evidence. These false pretenses were then repeated directly to Fifth Third Bank Michigan when Nicoletti presented the false official checks to Fifth Third Bank for deposit into his Continental Title Fifth Third Bank account for distribution to

---

[4] The Bossenbery loan evidence was provided as evidence of conspiracy only and was not the basis of any substantive count of bank fraud.

16

himself and his accomplices.

Thus, for each of the six false official checks, at least two false statements were made to Fifth Third Bank as part of the scheme: first, to obtain the checks, Fifth Third Bank was told that the straw buyers funded the checks and thus listed them as "remitters" or "purchasers" on the checks themselves; and second, the false checks were presented to Fifth Third Bank for deposit, causing Fifth Third Bank to credit Nicoletti's Continental Title account, which was then used to distribute the proceeds to Nicoletti and the other participants of the fraud.

At trial, Nicoletti even admitted that false statements were made to the bank to obtain the official checks, though painting himself as an innocent dupe of the fraud. He said that an assistant branch manager at Fifth Third Bank floated the checks, that is, issued them without funds to back them up, in order to falsely fund the down payments. (R.146: Testimony of Nicoletti at 102-03, Page ID 1475-76; 107-08, Page ID 1480-81; 125-26, Page ID 1498-99; *See also,* GE 103 (tape of Nicoletti asserting that Reed lied about the remitters on the checks). The jury rejected Nicoletti's self-portrayal as an innocent dupe.[5]  The point here, though, is

---

5The jury heard Nicoletti joking in recorded conversations with Alan Lucia (Scott's brother) about the fact that Scott purportedly brought $1.17 million as a down payment, and otherwise admitting that he knew that the buyers did not bring down payments to closing. GE 103, 104A, 105.

that even under Nicoletti's version of events, *the scheme's false pretenses reached Fifth Third Bank directly* through the dishonest services of one of its employees, causing the issuance of non-sufficient-fund official checks, bearing false information about the remitters, required to close the loans.

Whether accomplished through the issuance of the official checks for the down payments after Continental Title received the loan proceeds, or before, through the issuance of checks without funds to back them up, these official checks were false documents requiring lies to Fifth Third Bank to obtain them, and repeated lies on presentment to the bank in order to accomplish the scheme. Those checks satisfied even the strictest readings of *Loughrin* and *Banyan* and, again, readily distinguishes this case from *Banyan,* where the government offered no evidence whatsoever that any false statement reached the subsidiaries' parent companies (the insured financial institutions). *Banyan* at 555.

Nicoletti ignores this evidence to argue that because the mortgage loan applications and HUD-1 settlement statements were not directed at Fifth Third Bank, but rather, to Fifth Third Mortgage Michigan, then he and his accomplices did not receive the loan proceeds "by means of" the fraudulent scheme. But *Loughrin* does not require direct false statements to the bank. Indeed, Nicoletti stipulated to charge the jury that "[i]t is not necessary that the government prove   .

18

. . that the false pretenses, representations or promises were made to Fifth Third Bank." Sixth Circuit Pattern Criminal Jury Instructions, 10.03B, ¶3(D) (2019). Nor does *Loughrin* require that every false statement made in furtherance of the scheme find its way to the bank. Rather, the Court recognized that the term "'by means of' is inherently elastic: it does not mean one thing as to all fact patterns . . .". 573 U.S. at 364, n.8. It was enough in *Loughrin* that a forged check presented to Target, to obtain merchandise from Target, which was later refunded to obtain cash from Target, ultimately found its way to a bank. Here, the much more complex scheme involved a myriad of false statements by various conspirators to multiple entities to accomplish the fraud. Many of the false statements, those surrounding the issuance and presentment of the official checks to falsely document down payments, a central part of the scheme as alleged in the indictment,[6] were made directly to Fifth Third Bank. No such evidence existed in *Bayan*.

Nicoletti's reliance on *United States v. Briggs,* 939 F.2d 222 (5th Cir. 1991) is misplaced. (R.172: Motion at 11-12). There, the court held that the mere act of ordering a wire transfer of funds "does not of itself necessarily constitute a

---

[6] The Indictment alleged: "It was futher part of the scheme and conspiracy that false information about the source of the down payments for the purchase of the properties was provided to 5/3 by one or more of the conspirators". Doc. 1: Indictment at 5, ¶9.

19

misrepresentation in all circumstances." 939 F.2d at 227. But, as demonstrated above, the record here is replete with evidence that a central misrepresentation used in the scheme, that the borrowers were making sizable down payments, reached the insured financial institution, Fifth Third Bank. Moreover, in *Briggs*, the court was careful to limit its holding to the bare act of ordering the transfer, and went on to note that:

> . . . our precedent makes clear that § 1344(a)(2) [sic]
> would encompass a wire transfer order containing
> an *actual* misrepresentation (e.g., a false recitation of the
> authority for its issuance). Thus, where the defendant
> falsely represents that she is acting under her employer's
> authority, we would have little trouble concluding that
> such conduct is squarely prohibited by the statute.

*Id.* Thus, *Briggs* actually supports a § 1344(2) conviction even though the funds are not "owned by" the bank and the bank suffers no loss, but rather, were owned by an employer and kept in the custody of a bank, a position diametrically opposed to Nicoletti's here. *Id.*

### 2.  Variance is not a close question.

Nicoletti argues that variance will also be a "close question" on appeal. Specifically, he argues that there was no mention of Fifth Third Mortgage Michigan in the indictment, suggests that the government relied on 18 U.S.C. § 1344(1) in grand jury and in the indictment, then shifted to § 1344(2) prior to

trial when Nicoletti challenged the basis for § 1344(1) as applied to a subsidiary of an insured institution, and alleges that this resulted in a fatal variance between the allegations in the indictment and the proofs at trial. (R.172: Motion for Bond at 26-27). Nicoletti's claim of prejudice is yet unclear (there was no articulable prejudice presented in his Motion for Judgment of Acquittal), but seems to involve a purported inability to properly defend himself at trial. (*Id.*).

The Court of Appeals will review the variance issue *de novo* if Nicoletti is found to have preserved the issue for appeal, and for plain error if he has not. *United States v. Mize*, 814 F.3d 401, 408 (6th Cir. 2016). For purposes of bond pending appeal only, the government will assume Nicoletti properly preserved the issue, and that it will be reviewed *de* novo.

A variance occurs "when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different than those alleged in the indictment." *United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016) (*quoting United States v. Keuhne*, 547 F.3d 667, 683 (6th Cir. 2008)). "A variance is not reversible error unless the defendant demonstrates prejudice." *United States v. Nance,* 481 F.3d 882, 886 (6th Cir. 2007). To demonstrate prejudice, the defendant must establish that "the variance prejudiced either his ability to defend himself or the overall fairness of the trial." *Mize*, 814 F.3d at 411. When a

defendant "is unable to present his case and is taken by surprise by the evidence offered at trial," the defendant has suffered a prejudicial variance warranting reversal. *Id* (*citing United States v. Swafford*, 512 F3d 833, 842 (6th Cir. 2008)).

In this case, there was no material variance between the facts alleged in the indictment and the evidence presented at trial. Nicoletti is simply wrong to assert that the indictment did not allege violations of both 1344(1) and 1344(2). The statutory language of each of the two prongs of bank fraud were included in each count of the Indictment. Count One alleged that Nicoletti ". . . did knowingly and willfully . . . conspire . . . to knowingly execute a scheme to defraud 5/3 *and to* obtain money by material false and fraudulent pretenses and representations . . ." (emphasis added)(R.1: Indictment at 3). Counts Two, Three and Four all alleged in identical language that Nicoletti " . . . did knowingly execute . . . a scheme to defraud *and for* obtaining money from 5/3 by means of material false and fraudulent pretenses and representations . . ." (emphasis added)(*Id.* at 6-7). This language clearly accuses Nicoletti of violating both prongs of § 1344 and conspiring to do so. Nicoletti's contrary suggestion is just untrue.

Nor does the indictment's failure to identify Fifth Third Mortgage Michigan specifically as the lender create any material variance. Prior to trial, the government elected to proceed solely under prong two of Section 1344 so as to

22

remove from consideration the central issue raised in *Banyan*¸ that is, whether

defrauding a wholly owned subsidiary of an insured financial institution was

tantamount defrauding the insured institution itself under 18 U.S.C. § 1344(1), and

so advised Nicoletti and the Court. (R.117: Government's Motion in Limine at 3-

4). As shown, that statutory violation was plainly alleged in the indictment, and the

bank that was alleged to have had custody or control of the funds at issue was

clearly and correctly identified as Fifth Third Bank. The identity of the lender is

not an element of 1344(2), and the indictment's failure to specify the Fifth Third

corporate entity lending the funds was immaterial to the charge. There was thus no

variance between the indictment and the proofs at trial.

Moreover, even if a variance were found, Nicoletti has identified no

prejudice that resulted from this purported variance. Rather, he simply asserts that

the government presented "misleading testimony" to the grand jury which

inexplicably "prejudiced Mr. Nicoletti's ability to defend himself". (R.172: Brief in

Support of Motion for Bond at 26).[7] Nicoletti's inability to show prejudice is not

---

7 Nicoletti's allegations that the government intentionally misled the grand jury
are gratuitous in that they do not advance his variance argument or any other issue
he suggests will be a "close question" on appeal. The government therefore need
not respond at all, but will say that the proofs presented to the grand jury were
accurate in light of the prevailing law at the time of indictment which could be
reasonably construed with respect to both prongs of the statute, but especially with
respect to 18 U.S.C. § 1344(1), to equate a wholly owned subsidiary of an insured

surprising, because it is unclear what prejudice he could possibly allege that he

incurred from this supposed discrepancy between grand jury indictment and trial

proofs. The indictment clearly alleged the crime established by the proofs

presented to the grand jury and Nicoletti knew what charges he faced from the time

of his arraignment in 2015. Additionally, Nicoletti was keenly aware of the fact

that the lender was a subsidiary of Fifth Third bank after receiving the discovery in

this case, and referenced this issue repeatedly in pretrial motions. At trial, he raised

the issue of the identity of the lender regularly over the government's objections.

There is no case whatsoever that he was "taken by surprise" by the government's

proofs at trial, or that any defense was foreclosed to him, or that the fairness of the

proceedings were in any way compromised, or even that the indictment would not

---

lending institution with the lending institution itself. *See, e.g., United States v. Rabuffo*, 2017 WL 5565229, at \*5-\*7 (11th Cir. 2017) (unpublished) (rejecting argument that evidence insufficient to support Section 1344(1) and (2) convictions where fraud scheme aimed at SunTrust Mortgage, not SunTrust Bank); *United States v. Chittenden*, 848 F.3d 188, 200-01 (4th Cir. 2017) (upholding Section 1344(2) convictions of defendant who defrauded mortgage company that was wholly owned subsidiary of a federally insured bank), *abrogated on other grounds and vacated*, 138 S. Ct. 447 (2017); *United States v. Irvin*, 682 F.3d 1254, 1272-73 (10th Cir. 2012) (same); *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010) (upholding Section 1344 conviction based on fraud against wholly owned subsidiary of federally insured bank; opinion does not distinguish between statute's two clauses); *United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996) (upholding Section 1344 conviction where wholly owned subsidiary was "practically an alter ego" of federally insured bank).

protect him from double jeopardy. Even in the unlikely event that the Court of Appeals were to find some variance, it was completely harmless and there is therefore virtually no chance for Nicoletti to succeed on this issue.

### 3. Restitution issues are not ". . . substantial questions likely to result in a reversal, a new trial, or a reduced sentence" and challenging the restitution order for the first time in this motion is both frivolous and disingenuous.

Nicoletti, for the first time, argues that the restitution order imposed by the Court was incorrect because it improperly included losses stemming from a loan involving a former federal probation officer. (R.172: Defendant's Brief at 28-29, PageID2384-85). The argument is both frivolous and disingenuous. First, it is frivolous because, even if true, the error would not raise a substantial question likely to result in reversal, a new trial or a reduced sentence, as the bond statute requires. Second, the argument is frivolous because Nicoletti agreed to the total amount of fraudulent transactions he was involved in, $8,442,930, prior to Fifth Third Bank's recoveries from forclosures, and that amount included a fraudulent loan of $1,258,740 obtained by that individual, who was clearly identified on the list provided to the defense well in advance of sentencing breaking down the losses per transaction. (*See* PSR Addendum at A-1). The issue will therefore be reviewed for plain error on appeal and will most likely fail. *See United States v. Hall,* 71 F.3d 569, 573 (6th Circuit 1995). Third, the argument is disingenuous because it

25

includes three false assertions by Nicoletti: (1) that he "had no involvement in [the probation officer's] fraudulent conduct;" (2) that the individual "was not charged because he worked for the U.S. Probation Department;" and (3) that the government never revealed this "apparent conflict of interest to the defense or to the Court." (R.172: Defendant's Brief at 28-29). In fact, Nicoletti closed this fraudulent loan as he did the others during the conspiracy period and as part of the conspiracy alleged in the indictment. In addition, F.B.I. Forms 302 pertaining to this transaction, as well as the underlying documentation surrounding it, were provided to Nicoletti many years ago, and, as his sentencing counsel acknowledges, identify him as a federal probation officer. Lastly, as this Court and Nicoletti well know, the government decided early in the investigation not to charge *any* of the straw buyers who were used and exploited by Nicoletti and his accomplices, and, thus, the decision not to charge this individual had nothing whatever to do with his status as a federal probation officer at the time. For Nicoletti to gratuitously raise this issue in a public filing, naming the former officer, and again accusing the government of impropriety, knowing that it will have no bearing on his motion for bond pending appeal, is difficult to understand. These recent, reckless choices, however, should be considered by the Court when determining whether Nicoletti has proven by clear and convincing evidence that he

is not a danger to the community.

**B. Nicoletti has not shown that he is *not* a danger to the community.**

The bond statute requires, as a condition precedent to bond pending
appeal, that Nicoletti demonstrate, and this Court find, by clear and convincing
evidence, that Nicoletti "is not likely to . . . pose a danger to the safety of . . . the
community if released . . ." 18 U.S.C. § 3143(b)(1)(A). The determination of
danger to the community is not limited to a defendant's potential for violence, but
rather, includes consideration of his potential to commit non-violent crimes against
the community while on bond. *United States v. Barry Rene Isaacs*, Case No. 1:19-
cr-37 (SD Ohio, 4/7/2020), 2020 WL 1695155 at *3, *citing United States v.
Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) ("A danger to
the community does not only include physical harm or violent behavior.") and
S. Rep. 98-225, 12, 1984 U.S.C.C.A.N. 3182, 3195 ("The Committee intends that
the concern about safety be given a broader construction than merely a danger of
harm involving physical violence.").

The only thing Nicoletti presents on this issue is the assertion that he did not
violate the law or the conditions of his release "in the fifteen years since the
incident" or "the five years since his indictment." (R.172: Motion at 2, ¶ 4). This
assertion, however, is not entirely accurate and, in any case, does not amount to

"clear and convincing proof" that he would not violate the law while his appeal is pending. It is not accurate because, as this Court heard at the trial, Nicoletti spent months, once Fifth Third investigators discovered the fraud, obstructing justice and counseling others to do the same. (*See Government's Sentencing Memorandum* (filed under seal) at 13-21, and the references cited there). In the years that followed, he perjured himself in a civil case based on the same subject matter, slandered his court-appointed attorneys (*Id.*), and, as the Court found at the time of sentencing, perjured himself while testifying on his own behalf. (*Id.* at 21-22; R.179: Sentencing Transcript at 39, 45, PageID2894, 2900). Even now, as part of his effort to avoid custody, he presents frivolous arguments based on lies to this Court, as set forth immediately above. Obstruction of justice and perjury are serious crimes, especially when committed by a licensed attorney, yet Nicoletti demonstrated a willingness, and even, as with the obstruction, an eagerness to violate the law when he found it beneficial to him. His assertion, then, that he has been law abiding since "the incident" is not true, and does not rise to the threshold of "clear and convincing proof" that Nicoletti will not violate the law while on bond. Having failed to make such a showing, Nicoletti is not entitled to bond pending appeal.

28

**Conclusion**

Nicoletti's motion for bond pending appeal should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

s/Craig A. Weier
Craig A. Weier (P33261)
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313.226.9678
craig.weier@usdoj.gov

s/John K. Neal
John K. Neal
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313.226.
craig.weier@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 1, 2020, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the following attorney for the defendant:

Paul Stablein

s/Craig A. Weier
Craig A. Weier (P33261)
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313.226.9678
craig.weier@usdoj.gov