MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT

SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | | District | Eastern District of Michigan | |
|---|---|---|---|---|
| Name *(under which you were convicted)*: <br> Paul J. Nicoletti | | | | Docket or Case No.: <br> 15-20382 |
| Place of Confinement: <br> Morgantown, WV | | | Prisoner No.: | |
| UNITED STATES OF AMERICA | | V. | Movant *(include name under which convicted)* <br> Paul J. Nicoletti | |

### MOTION

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:

    U.S. District Court
    231 W. Lafayette
    Detroit, MI 48226

    (b) Criminal docket or case number (if you know):  2015-20382

2.  (a) Date of the judgment of conviction (if you know):  5/7/2019

    (b) Date of sentencing:  1/30/2020

3.  Length of sentence: 70 Months

4.  Nature of crime (all counts):

    One count of conspiracy to commit bank fraud 18 USC 1349
    Three counts of aiding and abetting 18 USC 1344(2)

5.  (a) What was your plea? (Check one)
    (1) Not guilty ☐     (2) Guilty ☑     (3) Nolo contendere (no contest) ☐

6.  (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have? (Check one)     Jury ☑     Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ☑     No ☐

AO 243 (Rev. 09/17)

8.  Did you appeal from the judgment of conviction?          Yes ✓          No ☐

9.  If you did appeal, answer the following:

   (a) Name of court:  United States 6th Circuit Court of Appeals

   (b) Docket or case number (if you know):  20-1137

   (c) Result:  Pending

   (d) Date of result (if you know):

   (e) Citation to the case (if you know):

   (f) Grounds raised:

   Lack of subject matter jurisdiction since the Lender was not FDIC Insured at the time of the alleged offenses.

   (g) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☐     No ✓

      If "Yes," answer the following:

      (1) Docket or case number (if you know):

      (2) Result:

      (3) Date of result (if you know):

      (4) Citation to the case (if you know):

      (5) Grounds raised:

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

   Yes ☐     No ✓

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court:

      (2) Docket or case number (if you know):

      (3) Date of filing (if you know):

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

   Yes ☐     No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1)  Name of court: _____

(2)  Docket of case number (if you know): _____

(3)  Date of filing (if you know): _____

(4)  Nature of the proceeding: _____

(5)  Grounds raised:

(6)  Did you receive a hearing where evidence was given on your motion, petition, or application?

   Yes ☐     No ☐

(7)  Result: _____

(8)  Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1)  First petition:     Yes ☐     No ☐

(2)  Second petition:    Yes ☐     No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** Ineffective assistance of counsel in failing to issue court authorized subpoenas for the victim's bank records.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Attached as Exhibit 1 is a copy of the email dated October 29, 2018 including the subpoena attachment. Trial counsel provided ineffective assistance of court appointed counsel and failed to issue or serve the subpoena and attachment despite the fact that Docket Entry #75 and #76 authorized issuance. Paragraph 12 of the subpoena attachment would have established where the loan proceeds originated and the corporate source of the loan proceeds. The subpoena issuance was a key component to the Government's argument under 18 USC 1344(2) and would have proven that the bank accounts from which the funding came, were owned by Fifth Third Mortgage Company, a non-FDIC insured financial institution. Hence, Fifth Third Bank never had care, custody, or control of loan proceeds.

It is important to note that prior court appointed counsel, Michael Harrison, falsely told Defendant that "Subpoenas are out." To the contrary, Michael Harrison failed to issue the subpoenas. See Exhibit 2.

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

Ineffective assistance of counsel claims are reserved for 28 USC 2255.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☑

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐    No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes [ ]      No [ ]

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes [ ]      No [ ]

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:**  Defendant's Trial Counsel failed to object to the Government's proposed Exhibits and Jury Instructions.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Exhibit 3 is an email dated April 24, 2019. The email specifically articulates Defendant's concerns regarding the Government's proposed Exhibits and Jury Instructions. Defendant's Trial Counsel was adamant that FRE 404(b) would prevent the Government from presenting an additional three loan files as part of its case in chief since prior notice was never provided to the defense. At the time of trial, Defendant's Trial Counsel stipulated to all of the Government's Exhibits, some of which included the three additional loan files. Furthermore, the Government presented trial testimony from two of the additional loan file Borrowers. See Exhibit 4 detailing the concerns about the Government's presentment of trial testimony and evidence. Defendant's Trial Counsel, via Exhibit 3, was informed of the exact nature of the objections to the Government's Proposed Jury Instructions, yet he failed to object at the time of trial and the jury was instructed per the Government's request. It is a fact that as early as January 9, 2017, that Defendant instructed Court Appointed Counsel not to stipulate to the admission of records and exhibits. See Exhibit 5 and Exhibit 6.

(b)  **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes [ ]      No [✓]

    (2)  If you did not raise this issue in your direct appeal, explain why:

Ineffective assistance of counsel claims are reserved for 28 USC 2255.

(c)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☑

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

AO 243 (Rev. 09/17)

**GROUND THREE:** Defendant's Trial Counsel failed to object to the audio tapes made by Alan Lucia, on the basis they were made after the alleged crimes were completed.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

At trial, the Government relied upon audio tapes recorded by Alan Lucia. It is undisputed that the tapes were made approximately three months after the last loan file was closed and the alleged crimes were completed. To be admissible under Fed.R.Evid. 801(d)(2)(E) a statement must be made during the conspiracy and while the conspiracy is in progress. 5 Weinstein's Federal Evidence Sec.801.34[4][a] (2d ed. 2016). Statements made after the crime has been committed do not qualify. Id. The Government never argued at trial that the conspiracy continued after the last closing date in October of 2005 and until the tapes were made more that three months after the last closing.

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

AO 243 (Rev. 09/17)

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND FOUR:** Defendant's Trial Counsel refused to cross examine FBI Agent Christine Taylor, with regard to her perjury in the grand jury transcript as the basis for subject matter jurisdiction.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Defendant's Trial Counsel refused to cross examine FBI Agent Christine Taylor, with regard to her perjury in the grand jury transcript as the basis for subject matter jurisdiction. He felt that it was insulting to the FBI to accuse one its agents, of committing perjury. Not only did SA Christine Taylor commit perjury, but the Prosecuting Attorney, Craig Weier, induced her to lie about who the Lender was in a desperate attempt to get subject matter jurisdiction nearly 10 years after the alleged crimes occurred. The partial transcript (Exhibit 7) is clear and unambiguous when it states Fifth Third Bank was the Lender. It is undisputed that the Promissory Notes and Mortgage documents all identify the Lender as Fifth Third Mortgage-MI, LLC. Defense Counsel's refusal based upon possible future repercussions, to confront the FBI with the blatant false statement was inexcusable.

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why:

_____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐   No ☐

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐      No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐      No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐      No ☐

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

13.  Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

Defense counsel refused to present evidence at trial that served as the basis for explaining how the loan fraud occurred. Exhibit 8 is an Audit Report prepared by Fifth Third Bancorp. The failure to cross examine trial witnesses regarding this exhibit was erroneous and prejudicial to Defendant. Defense counsel's reason was that it was contrary to ECF Document #60, which specifically rules that fraud cannot be blamed on Fifth Third Bank. The Order does not say Defendant was barred from presenting evidence of malfeasance by Fifth Third Bancorp or for that matter Fifth Third Mortgage-MI, LLC, or Fifth Third Mortgage Company.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?　　Yes ☐　　No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

(b) At the arraignment and plea:

(c) At the trial:
James Howarth

(d) At sentencing:
Paul Stablein

(e) On appeal:
Tyler Yarbro

(f) In any post-conviction proceeding:
Paul Stablein

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?　　Yes ☑　　No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?　　Yes ☐　　No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?　　Yes ☑　　No ☐

AO 243 (Rev. 09/17)

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This motion is filed within one year of the 01/30/2020 Judgment of Conviction

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

New Trial  or  Set Aside Conviction

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion
under 28 U.S.C. § 2255 was placed in the prison mailing system on _____.

(month, date, year)

Executed (signed) on ___1/23/21_____ (date)

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

 Gmail

Paul Nicoletti <pauljnicoletti@gmail.com>

## SUBPOENA ATTACHMENT

**Paul Nicoletti** <pauljnicoletti@gmail.com>
To: James Howarth <james-howarth@att.net>
Bcc: Paul Nicoletti <pauljnicoletti@gmail.com>, ▓▓▓ Rose <rowrowa1@yahoo.com>

Mon, Oct 29, 2018 at 9:11 AM

Mr. Howarth, when we met last week you mentioned that we should serve the Subpoenas authorized by DE #76. Enclosed is the attachment we discussed. Thanks.

Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800

Email: pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

This e-mail message contains confidential privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (248) 203-7800 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you. This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.



📄 **Subpoena Attachment for FTB.pdf**
47K

EX 1

## ATTACHMENT FOR SUBPOENAS

1. Scorecards and Loan Analysis Binder

   a. Native Format of the contents of every document contained in the binder.
   b. Originals of all
      i. posted checks (front and back),
      ii. deposit slips,
      iii. bank statements,
      iv. emails,
      v. fax transmittals,
      vi. closing files,
      vii. HUD-1 statements,
      viii. title commitments,
      ix. title policies,
      x. property deeds,
      xi. Complete legible Unifi Screens for each loan, including the Audit-Modification screens.

2. The Rechel Group, originals of:
   a. Any and all Invoices from or to The Rechel Group, and Fifth Third Bank,
   b. Any and all reports, or documents from or to The Rechel Group, and Fifth Third Bank,
   c. Any and all emails from or to The Rechel Group, and Fifth Third Bank,
   d. Any and all payments from to The Rechel Group, from Fifth Third Bank,
   e. Any and all charts and link analysis charts from The Rechel Group, to Fifth Third Bank,
   f. Any and all time sheets from The Rechel Group, to Fifth Third Bank,

3. Ali Saad
   a. Original employee file for Ali Saad,
   b. Beth Holsbeke Audit of Ali Saad loans as referenced in 9/13/04 email from Phil Cooper to Cathy Podvin,

4. Email
   a. Any and all emails or documentation from December 2003 through December 2007 (native format) to or from:
      i. Phil Cooper
      ii. Bruce Baxter
      iii. Mortgage System Support
      iv. Anthony Weekly

     v. Kendra Merriman
     vi. Katy St. Charles
     vii. Anthony Reed
     viii. Robert Hance
     ix. Stephanie Rekuta
     x. Chad Parr
     xi. Christine Taylor
     xii. Jared Bowler
     xiii. Computer Forensic Services
     xiv. Neysa French
     xv. Chris Ling
     xvi. Keith Simon
     xvii. Robin Vandenberg
     xviii. Ann Marie St. Clair
     xix. Heather Maier
     xx. Heather Shields
     xxi. Beth Lushnat
     xxii. Sue Golembiewski
     xxiii. Carol Craw
     xxiv. Beth Holsbeke
     xxv. Paulette Jandura
     xxvi. Pat Ferhing
     xxvii. Stacey Morgan
     xxviii. State Bar of Michigan
     xxix. First American Title Insurance Company

5. Construction Loan Policy and Procedure Manual dated 2004/2005

6. Computer Forensic Services, originals of:
   a. Any and all Invoices from or to Computer Forensic Services, and Fifth Third Bank,
   b. Any and all reports, or documents from or to Computer Forensic Services, and Fifth Third Bank,
   c. Any and all emails from or to Computer Forensic Services, and Fifth Third Bank,
   d. Any and all payments from to Computer Forensic Services, from Fifth Third Bank,
   e. Any and all forensic images (bit stream images) including the ones from the Robert Hance Laptop and workstation.
   f. Any and all forensic images (bit stream images) including the ones from the Phil Cooper Laptop and workstation.
   g. Any and all forensic images (bit stream images) including the ones from the Anthony Weekly Laptop and workstation.
   h. Any and all time sheets from Computer Forensic Services, to Fifth Third Bank,

7. Original Bank Statement for Nicoletti & Associates, Account #90512904500026 dated October 2005.

8. Certificate of FDIC Insurance for Fifth Third Mortgage-MI, LLC for the years 2004-2005, including
   a. 2004 -2005 Corporate Meeting Minutes
   b. 2004-2005 Articles of Incorporation
   c. 2004-2005 IRS Tax Returns

9. Certificate of FDIC Insurance for Fifth Third Bank for the years 2004-2005, including
   a. 2004 -2005 Corporate Meeting Minutes
   b. 2004-2005 Articles of Incorporation
   c. 2004-2005 IRS Tax Returns

10. 2005/2006 FR-Y-10 forms as filed with the Board of Federal Reserves for Fifth Third Bancorp.

11. 2005/2006 Regulation Y forms as filed with the Board of Federal Reserves for Fifth Third Bancorp.

12. Any and all bank account information tracing the money trail showing that the construction loans in this case, were **funded** by Fifth Third Bank.

13. Unifi Modification History Screen for each construction loans referenced in Plaintiff's Complaint filed in 2005, Case Number 2005-070592-CZ, in Oakland County Circuit Court.

14. Hitachi Travelstar Hard Drive, S/N IC25N020ATMR04-0

15. Dell D600 Laptop S/N 100990577 (Hance)

16. Dell Computer Service Tag DZSWT21 (Reed)

17. Dell DHP Service Tag D21M411 (Cooper)

18. September 7, 2005 NT Backup for Exchange Data and Exchange Flat File

19. September 7, 2005 ArcServe Backup for Detroit Server

20. Any and all Responses to Requests for Bids submitted in the State of Michigan subsequent to April 2012 until present.

 **Gmail**

Paul Nicoletti <pauljnicoletti@gmail.com>

## Re: USA V. NICOLETTI - UPDATE

**Michael Harrison** <michael@harrisonlawplc.com>
To: "Paul J. Nicoletti" <pauljnicoletti@gmail.com>

Thu, May 17, 2018 at 3:02 PM

I am in trial, Paul. Subpoenas are out. Haven't heard about Puckett status. Have you? Were wrapping up so I will have
plenty of time to meet with you next week. 64 days in more time than I have ever had to prepare for a trial and we have
made a lot of progress already. Lets plan on speaking over the weekend or Monday at the latest and set up dates each
week to co-prepare. Mike

> On May 14, 2018, at 8:00 AM, Paul Nicoletti <pauljnicoletti@gmail.com> wrote:
>
> Michael, how you doing Biscuit? I think I have done well at staying out of your hair per your wishes. I am
> not trying to micro-mange, with that being said, are you planning on filing the FDIC and other motions so
> that we can get a ruling before trial in approximately 64 days? If you could be so kind, I would also like to
> get your feedback regarding the three items listed below:
>
> 1. Subpoena Documents
> 2. Plaintiff's failure to follow Standing Order
> 3. Puckett Appeal, Case #17-6493
>
> Best Regards,
>
> **NICOLETTI LAW, PLC**
> Paul Nicoletti  (P-44419)
> 33717 Woodward Avenue, Ste. #433
> Birmingham, MI 48009
> Landline: (248) 203-7800
>
> Email: pauljnicoletti@gmail.com
> http://www.nicolettilawplc.com
>
>> This e-mail message contains confidential privileged information intended solely for the addressee.
>> Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in
>> error, please call us (collect) at (248) 203-7800 and ask to speak with the message sender. Also, we
>> would appreciate your forwarding the message back to us and deleting it from your system. Thank
>> you. This e-mail and all other electronic (including voice) communications from the sender's firm are
>> for informational purposes only. No such communication is intended by the sender to constitute
>> either an electronic record or an electronic signature, or to constitute any agreement by the sender to
>> conduct a transaction by electronic means. Any such intention or agreement is hereby expressly
>> disclaimed unless otherwise specifically indicated.
>
> 
>
> On Tue, Feb 20, 2018 at 6:45 PM, Michael Harrison <michael@harrisonlawplc.com> wrote:
>> You are absolutely right. Puckett misses the point. FDIC insured is a necessary element. Especially in
>> 2005. I think they are fucked.
>>
>> Best,
>>
>> Biscuit Head

**EX 2**

 **Gmail**

Paul Nicoletti <pauljnicoletti@gmail.com>

## Re: Fw: Nicoletti Proposed Trial Documents

1 message

**Paul Nicoletti** <pauljnicoletti@gmail.com>                                 Wed, Apr 24, 2019 at 4:52 PM
To: James Howarth <james-howarth@att.net>
Bcc: ~~en Rose <rowrpwe1@yahoo.com>, "Paul J. Nicoletti" <pauljnicoletti@gmail.com>, Mary Ann Nicoletti~~
~~nnicoletti2@gmail.com~~

Jim, I have reviewed what Melinda sent and have the following comments:

1. The Exhibit List contains six loan files. I sure hope you are right about FRE 404(b). Weier sure plans to use all 6.

2. With regard to Weier's Proposed Instructions:

    a. The language in #14(3) exceeds the bounds of the written indictment and should not be allowed.

    b. The language in #15, 16, and 17, needs to reflect the fact that if bank fraud was not committed, you can not conspire to commit something that was not a crime!

    c. The modification in #20 is unacceptable. Fifth Third Bank must of had custody or control. Merely citing a "bank" is not acceptable.

    d. #21 is not acceptable. It is not a pattern instruction. It uses the term "mortgage lender" throughout and is Weier's attempt to circumvent the "federally insured" requirement.

    e. #22 is not acceptable. 18 USC Sec 2 is not mentioned in the Indictment. The phrase is used but not officially charged. Thoughts?

    f. #24(2)(B) exceeds the bounds of the written indictment and should not be allowed. It also uses the word "lender" as opposed to bank!

    g. #25(3) (Good Faith 10.04) exceeds the bounds of the written indictment and should not be allowed. It also says 'his plan to buy and sell real estate..." I didn't know I had a plan.

    h. #30 includes all 6 loans as well as the witnesses. Not acceptable.

    i. #31, summaries should not be admitted into evidence.

    j. #32 must be a joke. Scott Lucia says he erased the Hance Hard Drive. There is no basis at this juncture to warrant any such instruction.

    k. #33 needs to reference that a transcript is not needed before the jury can consider the evidence. I have not transcribed the 4-10-06 phone call with Fifth Third's Counsel or the tape of Matt Flynn.

Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti  (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800

Email: pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

This e-mail message contains confidential privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (248) 203-7800 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you. This e-mail and all other electronic (including voice) communications from the sender's firm are for

**EX 3**

informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.



On Wed, Apr 24, 2019 at 2:51 PM James Howarth <james-howarth@att.net> wrote:

----- Forwarded Message -----
**From:** StJohn, Jordynn (USAMIE) 1 <Jordynn.StJohn@usdoj.gov>
**To:** james-howarth@att.net <james-howarth@att.net>
**Cc:** Weier, Craig (USAMIE) <Craig.Weier@usdoj.gov>; Neal, John (USAMIE) 2 <John.Neal@usdoj.gov>
**Sent:** Tuesday, April 23, 2019, 3:16:59 PM EDT
**Subject:** Nicoletti Proposed Trial Documents

Good afternoon, Mr. Howarth –

Attached, please find the government's proposed jury instructions, voir dire, exhibit list, and witness list. Please let me know if you need anything further.

Best regards,

# Jordynn St. John

Legal Assistant, White Collar Crime

U.S. Attorney's Office – Eastern District of Michigan

211 W. Fort Street, Suite 2001

Detroit, MI 48226

Phone: (313) 226-0249

 Gmail

Paul Nicoletti <pauljnicoletti@gmail.com>

## Government Exhibits Cover 6 Loans

**Paul Nicoletti** <pauljnicoletti@gmail.com>
To: James Howarth <james-howarth@att.net>
Bcc: "Paul J. Nicoletti" <pauljnicoletti@gmail.com> Mary Ann Nicoletti <mnicoletti12@gmail.com>

Tue, Mar 26, 2019 at 2:00 PM

Jim, the AUSA Exhibits reflect 6 loans as opposed to the 3 mentioned in the Indictment. The Indictment identifies Borrowers, Glover (Count II Ex. 31-41), Maples (Count III Ex. 56-69), and Lucia (Count IV Ex. 70-91).

The AUSA's proposed Exhibits contain an additional 3 loans _**not**_ mentioned in the indictment:

Turon (Exhibits 9-18) 3320 Franklin, Close date 5-3-05
Langhorne (Exhibits 19-30) Lot 88 Brookside, Closing date 8-18-05
Bossenberry (Exhibits 42-55) 1645 Lochridge, Closing date 10-5-05

I think we need to discuss our strategy on this. Do we wait and object at trial or do we file a Motion In Limine? Paragraph 6(b) of the Court's 2-12-19 Order (DE 111) indicates that all reviewed exhibits are deemed admitted unless "defense counsel _files_ a notice with the court..." You and I both know that Weier will argue relevance under FRE 404(b) despite the fact that the 3 loans are not mentioned in the indictment. Please advise.

Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800

Email: pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

This e-mail message contains confidential privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (248) 203-7800 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you. This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.



EX 4

 Gmail

**Paul Nicoletti** <pauljnicoletti@gmail.com>

## Re: need to cancel

**Paul Nicoletti** <pauljnicoletti@gmail.com>                    Mon, Jan 9, 2017 at 2:16 AM
To: John Minock <jminock@cramerminock.com>
Bcc: Ken Rose <rowrgwa1@yahoo.com>, Mary Ann Nicoletti <mnicoletti12@gmail.com>, Paul Nicoletti
<pauljnicoletti@gmail.com>

John, I hope you feel better soon. I am not sure if I understand the relevance of the fact that Darrin Morgan still works for
FTB. The records we need will exist independent of Morgan's employment. Since we are so close to the trial date, Weir
and O'Reillly are only interested in delaying the trial date. The trial date can not be changed again. I specifically oppose
any further adjournments. Most importantly, shortly Weir will approach you with a request to stipulate to the admission of
records and exhibits. This entire case involves the fabrication and manipulation of documents. I specifically oppose and
refuse to stipulate to the admission of any exhibits, with the exception of legible Unifi Screens that we do not yet have.

I am going to Florida on Friday, when can we get together? Can we do it via Facetime or Skype before Friday?

Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti  (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800
eFax: (248) 928-7051
Email:  pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

This e-mail message contains confidential privileged information intended solely for the addressee. Please do not
read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect)
at (248) 203-7800 and ask to speak with the message sender. Also, we would appreciate your forwarding the
message back to us and deleting it from your system. Thank you. This e-mail and all other electronic (including
voice) communications from the sender's firm are for informational purposes only. No such communication is
intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any
agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby
expressly disclaimed unless otherwise specifically indicated.



On Sat, Jan 7, 2017 at 11:39 AM, John Minock <jminock@cramerminock.com> wrote:
I came down with the flu on Thursday, still getting worse.

I had a conf call with Weier and a lawyer from O'Reilly on Thursday. Darrin Morgan still works at
5/3. They are going to see if 5/3 will cooperate in turning over info I requested.

**From:** "Paul Nicoletti" <pauljnicoletti@gmail.com>
**To:** "jminock" <jminock@cramerminock.com>
**Sent:** Saturday, January 7, 2017 8:58:49 AM
**Subject:** Re: need to cancel

Ok, but keep in mind that we have trial in 72 days.

On Saturday, January 7, 2017, John Minock <jminock@cramerminock.com> wrote:

**EX 5** 

I am sick as a dog and need to cancel our meeting this morning

John

--
Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti  (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800
eFax: (248) 928-7051
Email:  pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

This e-mail message contains confidential privileged information intended solely for the
addressee. Please do not read, copy, or disseminate it unless you are the addressee.  If
you have received it in error, please call us (collect) at (248) 203-7800 and ask to speak
with the message sender.  Also, we would appreciate your forwarding the message back to
us and deleting it from your system.  Thank you. This e-mail and all other electronic
(including voice) communications from the sender's firm are for informational purposes
only.  No such communication is intended by the sender to constitute either an electronic
record or an electronic signature, or to constitute any agreement by the sender to conduct a
transaction by electronic means.  Any such intention or agreement is hereby expressly
disclaimed unless otherwise specifically indicated.



 Gmail

Paul Nicoletti <pauljnicoletti@gmail.com>

## Objections to Govt. Exhibits

**Paul Nicoletti** <pauljnicoletti@gmail.com>                                      Thu, Apr 25, 2019 at 3:12 PM
To: James Howarth <james-howarth@att.net>
Bcc: "Paul J. Nicoletti" <pauljnicoletti@gmail.com>, ~~Ken Rose <cwrowa1@yahoo.com>, Mary Ann Nicoletti
maricoletti.12@gmail.com~~

Jim, enclosed are my objections that must be filed by 5.

Best Regards,

**NICOLETTI LAW, PLC**
Paul Nicoletti  (P-44419)
33717 Woodward Avenue, Ste. #433
Birmingham, MI 48009
Landline: (248) 203-7800

Email:  pauljnicoletti@gmail.com
http://www.nicolettilawplc.com

> This e-mail message contains confidential privileged information intended solely for the addressee. Please do not
> read, copy, or disseminate it unless you are the addressee.  If you have received it in error, please call us (collect)
> at (248) 203-7800 and ask to speak with the message sender.  Also, we would appreciate your forwarding the
> message back to us and deleting it from your system. Thank you. This e-mail and all other electronic (including
> voice) communications from the sender's firm are for informational purposes only.  No such communication is
> intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any
> agreement by the sender to conduct a transaction by electronic means.  Any such intention or agreement is hereby
> expressly disclaimed unless otherwise specifically indicated.



 **Objection to Govt Exhibits.docx**
123K

**EX 6**

Exhibit Number

1. Objection based on relevance and it is prejudicial under FRE 403. No relevance to Bar Certificate.
2. Objection based on relevance and it is prejudicial under FRE 403. No relevance to Esquire Title Agency
3. Objection based on relevance and it is prejudicial under FRE 403. Michigan Title Agency was not involved in any of the closings.
4. No objection.
5. Objection to foundation since COA Affidavit fails to identify that FDIC No. 993 was issued to "Fifth Third Bank Grand Rapids Michigan". Per the Certificate, the Insured Entity is "Fifth Third Bank Grand Rapids Michigan". You can not just say it was Fifth Third Bank that was located in a city named Grand Rapids, in the State of Michigan. The information printed on the Certificate is the entity insured. You can not pick and choose. Further the Affidavit Paragraph (3) includes language that has nothing to do with FRE 803 or 902. If the language in Par (3) is redacted, I have no objection.
6. Objection based on relevance and it is prejudicial under FRE 403.
7. Objection based on relevance and it is prejudicial under FRE 403.
8. Objection based on relevance and it is prejudicial under FRE 403.
9. (Both A & B) Objection based on relevance and it is prejudicial under FRE 403. Loan is outside scope of indictment.
10. And all the way through #30. Objection based on relevance and it is prejudicial under FRE 403. Loan is outside scope of indictment.
31. No objection.
32. Objection based on foundation and admissibility.
33. No Objection.
34. No Objection.
35. Objection based on foundation and admissibility.
36. Objection based on foundation and admissibility. Said record was disclosed without my consent and not via GJ Subpoena.
37. No objection.
38. No objection.
39. No objection.
40. Objection based on foundation and admissibility.
41. Objection based on foundation and admissibility.
42. All the way through #55. Objection based on relevance and it is prejudicial under FRE 403. Loan is outside scope of indictment.
56. No objection.
57. Objection based on foundation and admissibility.
58. Objection based on foundation and admissibility.
59. Objection based on foundation and admissibility.
60. No objection.
61. No objection.
62. No objection.
63. No objection.

64. Objection based on foundation and admissibility.

65. Objection based on foundation and admissibility. Said record was disclosed without my consent and not via GJ Subpoena.

66. jection based on foundation and admissibility. Said record was disclosed without my consent and not via GJ Subpoena.

67-69. jection based on foundation and admissibility. Said record was disclosed without my consent and not via GJ Subpoena.

70. No objection.

71. Objection as to foundation.

72. There is no #72. Objection in any event.

73. Objection based on foundation and admissibility.

74. Objection based on foundation and admissibility.

75. No objection.

76. No objection.

77. Objection based on foundation and admissibility.

78. Objection based on foundation and admissibility.

79. Objection based on foundation and admissibility.

80. No objection.

81. No objection.

82. Objection based on foundation and admissibility.

83. Objection based on foundation and admissibility.

84. Objection based on foundation and admissibility.

85. Objection based on foundation and admissibility.

86. Objection based on foundation and admissibility.

87. Objection based on foundation and admissibility.

88. Objection based on foundation and admissibility.

89. Objection based on foundation and admissibility.

90. Objection based on foundation and admissibility.

91. Objection based on foundation and admissibility.

92- Through the End of Exhibits. Objection based on foundation and admissibility.


Note: When I say no objection I mean as to foundation. I am not stipulating to admissibility.


Paul

THE UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

_____
                              )
In the Matter of:             )
                              )
     FEDERAL GRAND JURY       )
_____)

                         Case No. 15-1-071

               Proceedings had and testimony taken of

     SPECIAL AGENT CHRISTINE TAYLOR, taken before a Federal

     Grand Jury at Room C, Federal Building, Detroit,

     Michigan, on Tuesday, June 23, 2015.

PRESENT:

          Mr. Craig Weier
          Assistant United States Attorney

Reported by:

          Patricia J. Hankerd, CSR-5430

EX 7

```
                                                    Page 2
1                       Detroit, Michigan
2                       Tuesday, June 23, 2015
3                          —  —  —
4
5                       (Special Agent Christine Taylor entered
6                       the Grand Jury Room.)
7              THE FOREPERSON:  Do you solemnly swear that
8         the testimony you will give will be the truth, the
9         whole truth and nothing but the truth?
10             SPECIAL AGENT TAYLOR:  I do.
11                       EXAMINATION
12     BY MR. WEIER:
13     Q.   Say your name, please, for the record?
14     A.   My name is Christine Taylor.
15     Q.   And your occupation?
16     A.   I work for the Federal Bureau of Investigation as a
17          special agent.
18     Q.   How long have you had that job?
19     A.   18 years.
20     Q.   And do you have any special training -- well, first of
21          all, does your investigation -- or does your job or
22          duties include the investigation of mortgage and bank
23          fraud?
24     A.   Yes, it does.
25     Q.   And do you have any special training or any relevant
```

1     past training that would help you in that endeavor?

2  A.  I have an undergraduate in business.  I have a

3     master's in finance.

4  Q.  Did you have any employment background that would help

5     you with respect to bank fraud investigations?

6  A.  Yes.  I spent about five years working for a financial

7     institution.

8  Q.  Before the FBI, correct?

9  A.  That's correct.

10  Q.  All right.  And the FBI, I assume, would also provide

11     training with respect to investigations of fraud

12     offenses?

13  A.  Yes.

14  Q.  Let me ask you:  Based on your training and experience

15     then, if you will, explain to the Grand Jury what a

16     mortgage loan is and how it works.

17  A.  A mortgage loan is a loan offered with a security

18     interest.  So if you're interested in purchasing a

19     property for your primary residence or an investment,

20     you can purchase the property and use that property as

21     a collateral for the loan.

22  Q.  And when you say collateral for the loan, there would

23     be legal documents that would be signed that would

24     assign the lender a legal interest in that property

25     until the loan is paid off, right?

1  A.   Yes.  The lender would place a lien on the property.

2  Q.   All right.  And that means if the loan defaults, then

3       the lender would have certain rights relative to

4       possession and ownership of the property, right?

5  A.   Correct.

6  Q.   And what's a URLA?

7  A.   Uniform residential loan application.

8  Q.   And can you tell us how, in general terms, the

9       mortgage process works.  Like if I want to have a

10      residential loan -- for those Grand Jurors who haven't

11      been through it, even those who have, can you just in

12      general for the record tell us how that works?

13  A.   Okay.  You complete a loan application with the loan

14      officer typically.  The application will ask for your

15      personal information such as your name, your date of

16      birth, social security number, current address.  It

17      will also ask you about your assets:  how much you

18      have in bank accounts, financial assets, credits.

19      Your credit history will be pulled, and any liens that

20      you have outstanding, any outstanding loans that you

21      have -- all that information is taken into

22      consideration in addition to the value of the property

23      that you're going to be purchasing.

24  Q.   Okay.  Because the value, again, of the property is

25      important if it's going to be collateral to the amount

Page 5

1         of money that's being lent; is that right?

2    A.   That's correct.

3    Q.   All right.  So that brings me to the next question

4         which is:  In the course of your training and

5         experience in investigation of these cases, have you

6         come to determine what lending institutions in

7         general -- we'll talk more specifically later -- would

8         see as material information?  You've already mentioned

9         some of that?  But could we put that in two groups,

10        perhaps?  Would it be material any information having

11        to do with an ability to repay or likelihood of

12        repayment would be one of the things -- or some of the

13        things that they would see as material, right?

14   A.   Yes.

15   Q.   And that would include their credit scores, you've

16        mentioned, employment history, income, assets, whether

17        the property is going to be a primary residence or

18        not; is that correct?

19   A.   Correct.

20   Q.   Source of payment?

21   A.   Correct.

22   Q.   Amount of down payment?

23   A.   Yes.

24   Q.   Why would that be material?

25   A.   The lender would be interested in knowing what your

Page 6

1    interest is in purchasing the property.  The more

2    money you have into the property, the less likely you

3    are to just walk away from it.

4  Q.  Right.  Or to let it deteriorate, correct?

5  A.  That's correct.

6  Q.  And that would be true also if you're living in the

7    property as a primary resident?

8  A.  That's correct.

9  Q.  What about the value of the property?  How is that

10    generally determined by a lending institution looking

11    at lending you or I a loan for a house?

12  A.  The lending institution will hire an appraiser to go

13    out and value the property based on other properties

14    in the area, the structure, any additions the property

15    might have.  They'll pull public records.  It's an

16    independent objective view of the value of the

17    property that they then provide to the financial

18    institution.

19  Q.  You said the lender would go out and do that, but who

20    would appraise the property?

21  A.  I apologize, they hire an appraiser to do that.

22  Q.  Okay.  And, if you will, just walk us through the

23    kinds of documentation that you would find in most

24    mortgage loans.  What kind of documentation.  You've

25    already mentioned the application, the universal

Page 7

1          residential loan application?

2     A.   Correct.  You'll see the appraisal.  Depending on what

3          the lender is valuing their determination on, your

4          qualification if they're -- if they're focusing on

5          your assets, then there would be supporting

6          documentation to support your assets such as bank

7          statements, investment statements.  Any other

8          properties that you might own, there might be

9          documentation for that.

10              If you're receiving rent on an investment

11         property, that might be in the loan file.  Any other

12         documentation that would support your qualifications,

13         your credit history, credit report.  Copy of your

14         driver's license.  And then when it goes to closing,

15         the closing documentation which actually transfers the

16         ownership from one owner to the other, that

17         documentation.

18    Q.   What kind of documentation do you find in that

19         regard?

20    A.   The HUD-1 Settlement Statement which outlines incoming

21         money and outgoing money.  It also -- included with

22         that would be the warranty deed or any type of Quit

23         Claim Deed transferring title, ownership of the

24         property.

25    Q.   Okay.  So when you say the HUD-1 documents, monies

Page 8

1      coming in and going out, let me just ask you:  Monies

2      going out don't just go out to the seller of the

3      property.  There may be other liens that have to be

4      paid off and so forth, correct?

5   A.   That's correct.  The seller could walk away with some

6      money after everything else has been paid off.

7   Q.   Like prior mortgages and that sort of thing?

8   A.   Correct.

9   Q.   Okay.  So you might have a check that would be issued

10      to a bank for a prior mortgage.  You might have a

11      check that may be issued to a municipality for back

12      taxes.  That sort of thing would be disbursed from the

13      funds of the loan, perhaps, and that would be

14      reflected on the HUD-1, correct?

15   A.   Yes.

16   Q.   And any money that was coming in, that being down

17      payments, earnest money deposits.  Are those like down

18      payments?  Can you explain what that is?

19   A.   An earnest money deposit is typically presented by the

20      purchaser at the time that they enter into a sales

21      contract.  So if they have a real estate agent, they

22      may come to a property.  Determine they're interested

23      in purchasing it.  So they will put down an earnest

24      deposit which indicates that they are earnest to

25      purchase the property.  That money then will be held

Page 9

1    in escrow until closing at which time it will go

2    towards the purchase of the property.

3  Q.  Okay.  Thanks.  All right.  So those would be some of

4    the things that are in the HUD-1.

5         Is there something called a disbursement

6    sheet as well that you would find in a closing packet?

7  A.  That's typically maintained by the settlement company.

8    And that just indicates any money coming in and any

9    money going out.  It outlines all the checks and wire

10    transfers, yes.

11  Q.  Let's talk about the settlement company.  What do you

12    mean by that?

13  A.  When the buyer and seller are ready to execute the

14    transaction, the sale of the property, they typically

15    go to settlement at a title company which is a company

16    that is also independent -- works for both parties --

17    will effectively transfer the ownership from one

18    person to another by taking in the money, executing

19    all of the transfer paperwork, recording the deed with

20    the register of deeds, what have you.  Then they

21    provided that file to the lender once it's completed

22    is what they do.

23  Q.  Okay.  When you say they're objective.  They don't

24    work for the seller or the buyer.  But they are

25    obligated to the lender to some extent, correct?

Page 10

1   A.   They are.

2   Q.   And do they actually follow instructions from the

3        lender sometimes?

4   A.   The lender will issue what's called closing

5        instructions that have to be followed and signed off

6        by the title company.

7             MR. WEIER:  Okay.  Are there any questions

8        about just in general the kind of real estate

9        transactions we're talking about here?

10            (No questions were posed by the

11              Grand Jury.)

12  BY MR. WEIER:

13  Q.   I guess I should ask you one other thing.  In the

14       course of your career and your background and

15       experience and certainly in the course of your

16       investigation of this matter that brings us here

17       today, you have had some familiarity with construction

18       loans; is that correct?

19  A.   Yes.

20  Q.   And construction loans for residential properties?

21  A.   Yes.

22  Q.   Are those different at all?

23  A.   They are different.  They're a little more

24       complicated.  Typically you will purchase the property

25       at one price, and then draw down additional monies.

Page 11

1          So the purchase price might cover the purchase of the

2          property as it is right now.  Then you're going to

3          draw down additional money as part of your loan to

4          make the improvements on the property, the

5          construction.

6    Q.   Okay.  So there would be an initial disbursement for

7         sometimes the purchase of the property; and then

8         various progress payments towards construction.  Is

9         that right?

10   A.   That's correct.

11   Q.   And before the bank will authorize such a loan, there

12        would have to be some estimate of costs involved; is

13        that correct?

14   A.   Yes.

15   Q.   And do they call those sworn statements?

16   A.   Yes, they do.

17   Q.   All right.  And then the bank would review the sworn

18        statements; and if they seem to be reasonable or

19        however they do their due diligence, then they would

20        authorize the initial disbursement; and then they

21        would authorize additional payments once the

22        construction begins?

23   A.   Correct.

24   Q.   Okay.  During the course of your career as an FBI

25        agent now, have you come to investigate mortgage

Page 12

1       fraud?

2   A.  I have.

3   Q.  And various types?  Is it fair to say that mortgage

4       frauds comes in various forms?

5   A.  Yes, it does.

6   Q.  And so is one of those forms called origination

7       fraud?

8   A.  Yes.

9   Q.  Is that sort of a law enforcement term basically?

10  A.  I think it is, yes.

11  Q.  Perhaps and industry term?

12  A.  Yes.

13  Q.  Explain what an origination fraud is generally.

14  A.  What we mean by origination fraud is that the

15      fraudulent representations are found in the loan file

16      at the time prior to the purchase.  The documentation

17      provided to support the purchase contains

18      misrepresentations in order to qualify for the loan.

19      We call that origination fraud.

20  Q.  Okay.  I need to ask you something, too, about that.

21      The case that -- were you, at some point, assigned to

22      investigate a case of mortgage fraud involving a

23      series of loans funded by Fifth Third Bank?

24  A.  Yes.

25  Q.  And that would be somewhere in the late December 2005

Page 13

1         and then early 2006 time, correct?

2    A.   Correct.

3    Q.   And during that period of time, like in the recent

4         historical period of time, is it fair to say that the

5         real estate market was booming at that time?

6    A.   At that time, it certainly was.

7    Q.   And that people in the industry and people working

8         with real estate came to expect that real estate

9         values would continue to increase as opposed to go up

10        and down?

11   A.   Yes.

12   Q.   All right.  And also during that period of time, would

13        it be fair to characterize at least one practice in

14        the industry -- not necessarily Fifth Third, but one

15        practice in the industry which would be to make

16        mortgage loans, to take mortgages in exchange, and to

17        sell the promisory and add the mortgages to other

18        institutions?

19   A.   Yes.

20   Q.   That was pretty common, right?

21   A.   Yes.

22   Q.   And so the lender then is basically off the hook on

23        the loan?  They don't have any more risk involved if

24        they sell the loan to a different company?

25   A.   Depends on the agreement they have with the other

Page 14

1        company, correct.

2    Q.  The other company might be able to come back on them

3        if there was fraud, for example?

4    A.  Yes.

5    Q.  But other than that, they would sell their risk

6        upstream?

7    A.  Yes.

8    Q.  Let me ask you:  I guess, first, in this case, this

9        Fifth Third case that we're here on this morning, have

10       you reviewed the proposed indictment in this matter --

11       the proposed four count indictment against

12       Paul Nicoletti?

13   A.  Yes, I have.

14   Q.  In fact, were you instrumental in helping to draft

15       it?

16   A.  Yes.

17   Q.  Having reviewed it and having helped draft it, based

18       on your investigation which you say occurred -- began

19       in late '05, and I would assume continued on and off

20       until today's date even, right?

21   A.  That's correct.

22   Q.  Based upon your investigation, are you confident that

23       the allegations in the proposed indictment are

24       accurate and correct?

25   A.  Yes.

Page 15

1   Q.  And true?

2   A.  Yes.

3   Q.  Okay.  And we'll talk about how you came to that

4       conclusion a little bit later, but I also want to

5       direct your attention to a document that's in front of

6       you that's been labelled Grand Jury Exhibit Number 1

7       which is a PowerPoint presentation.  Do you see that

8       document?

9   A.  Yes, I do.

10  Q.  This, for the record, is a document that the ladies

11      and gentlemen of the Grand Jury have recently, just a

12      few minutes ago, received copies of; and you were

13      instrumental in putting that document together as

14      well, correct?

15  A.  Yes.

16  Q.  That document, that PowerPoint presentation or the

17      slides which that comprises, correct?

18  A.  Yes.

19  Q.  Are those slides in terms of their allegations of fact

20      and so forth to the best of your recollection based

21      on -- and based on your investigation.  Is that

22      PowerPoint presentation accurate?

23  A.  Yes.

24  Q.  Okay.  Well, let's talk about the investigation that

25      is documented -- not documented necessarily; but as

Page 16

1      described in the PowerPoint presentation.  If I direct

2      your attention to Slide 8 -- Slides 1 through 7 are

3      really law instructions.  If you look at Slide 8, does

4      that depict the person we're talking about or the

5      target of this, the proposed Defendant in the

6      indictment?

7   A.  Yes.

8   Q.  And that's Paul Joseph Nicoletti?

9   A.  Yes.

10  Q.  All right.  And then in this case you indicated that

11      Fifth Third Bank was the lender in these matters; is

12      that correct?

13  A.  That's correct.

14  Q.  And were you able to determine through the course of

15      your investigation that Fifth Third's Bank's deposits

16      were insured by the Federal Deposit Insurance

17      Corporation?

18  A.  Yes.

19  Q.  And that essentially gives -- a number of things might

20      give the Federal government jurisdiction to prosecute

21      these offenses; but with respect to the Bank Fraud

22      Statute, that's pretty much your jurisdictional basis,

23      right, the fact that Fifth Third Bank is a financial

24      institution which is defined in part by having their

25      deposits insured by the Federal Deposit Insurance

Page 17

1              Corporation?  Is that right?

2    A.   Yes.

3    Q.   Stop me if I talk too much.

4              All right.  Going to the next slide,

5         Slide 10, we talked about the investigation coming to

6         your attention or coming to you on December 2005.  Can

7         you describe the circumstances under which you became

8         involved in this investigation.

9    A.   We received a referral from Fifth Third Bank.  They

10        had identified a transaction that was brought to their

11        attention; and based on some representations in that

12        transaction, they reviewed several transactions and

13        identified an inside employee who was involved in each

14        of those transactions that contained

15        misrepresentations.

16   Q.   Okay.  And so they brought that to the FBI to further

17        the investigation?

18   A.   Correct.

19   Q.   And had they already investigated it at least

20        preliminarily?

21   A.   Yes, they had.

22   Q.   And did they continue to investigate it -- even though

23        they notified the FBI, did they continue to do their

24        own private investigation?

25   A.   Yep.  We had parallel investigations.



# Fifth Third Bancorp
## Audit Division Report

THIS DOCUMENT IS SUBJECT TO A
PROTECTIVE ORDER ENTERED ON

SEP 2 7 2006

### Subject to Attorney-Client Privilege
### Prepared in Contemplation of Litigation

To:      Therese Paul, VP and Legal Counsel                    Date: October 11, 2006

From:   Audit Division

Subject: Origination & Fulfillment                             Rating: Needs Improvement
         Fifth Third Bank-Eastern Michigan

---

#### Scope and Objectives

The Audit Division performed an audit of the Eastern Michigan affiliate Origination and Fulfillment processes as of May 31, 2006. The objectives of the audit were to understand, document and evaluate risks and related internal controls for significant processes within Mortgage Loan origination, processing, underwriting, closing and funding. The scope of this audit focused on loans in process and the controls surrounding the flow from origination to funding for the Eastern Michigan affiliate. As of May 31, 2006, there was a total of 792 booked retail loans totaling approximately $157MM.

Significant procedures included identification and documentation of key processes, risks, and related internal controls, and the following key testing procedures:

- Verified Unifi data to loan file documentation and product manual guidelines;
- Confirmed completeness, accuracy and order of loan files and supporting documents;
- Tested the construction draw process for accuracy and completeness;
- Verified that P.O.S. procedures aligned with Bancorp policy and procedures;
- Assessed compliance with the Bancorp's Negotiable Instruments Control Guidelines;
- Tested approved appraisers and title companies for insurance and license expirations;
- Reviewed Pipeline reporting to ensure credit decisions are made timely;
- Verified Post-Closing reviews are performed consistently and metrics are used to track affiliate performance; and
- Ensured proper segregation of funding and reconciliation functions.

Additionally, due to certain fraudulent activity that occurred within the Eastern Michigan Mortgage line of business, Audit partnered with Mortgage Risk Management to expand testing in certain areas such as construction lending, appraisal selection process and loan file reviews for a sample of high-dollar mortgage loans.

#### Conclusion and Summary of Findings

Based upon the procedures performed, the overall results are Needs Improvement. No prior Loan Origination & Fulfillment audit had been performed specifically for the Eastern Michigan affiliate.

The following items are considered significant audit findings:

- Blanket insured closing protection letters were not consistently obtained for approved title companies;
- A formal appraiser rotation process was not in place to prevent the use of directed appraisers; and
- Lack of a formal monitoring process for construction loans.

The audit observations have been categorized as internal control enhancements. A complete description of the Audit Division's observations and related recommendations is included as Exhibit I.

THIS DOCUMENT IS PRODUCED SUBJECT TO THE OBJECTIONS STATED
BY PLAINTIFFS IN RESPONSE TO CHRISTING MAYS' SECOND REQUEST
FOR PRODUCTION OF DOCUMENTS NO. 6

THIS DOCUMENT IS SUBJECT TO A
PROTECTIVE ORDER ENTERED ON

EX 8

Audit Division Observations                                    Exhibit I
Origination and Fulfillment – Eastern Michigan Audit

### Internal Control Enhancements

The following internal control-related observations were noted in connection with our procedures. By implementing the associated recommendations, we believe that the area's overall internal control environment would be enhanced.

### Insured Closing Protection Letters (Priority: High)
### Issue Owner: Bruce Balmas

Blanket Insured Closing Protection Letters (ICPL) are not consistently obtained for title companies approved for loan closings. Audit reviewed a sample of ten recently utilized title companies and noted that four did not have an ICPL on file at the time of loan funding. While current Eastern Michigan procedures allow ICPLs to be obtained for individual loan transactions, this practice is not recommended by Mortgage policies due to the additional inherent risk of needing to obtain this document for each transaction. In addition, Audit reviewed one recently funded loan from each of the ten sampled title companies and noted that individual ICPLs were not obtained for nine of the loans reviewed.

Failure to obtain a blanket ICPL can jeopardize the indemnification of the Bank in the event a loan closing is not conducted in accordance with the Bank's specifications; ultimately leading to financial loss.

Audit recommends that the affiliate perform a review of all approved title companies to verify the existence of a blanket ICPL. Missing ICPLs should be immediately obtained or the use of the title company should be discontinued.

*Management Response:*
FTEM Mortgage Management will review all approved title companies to verify the existence of a blanket ICPL. Title companies without a blanket ICPL will be required to provide one or they will be removed from the approved listing. Management will complete this review and will submit an Issue Closure form to Internal Audit by October 27, 2006.

THIS DOCUMENT IS SUBJECT TO A
PROTECTIVE ORDER ENTERED ON

### Rotation of Approved Appraisers (Priority: High)
### Issue Owner: Bruce Balmas

SEP 2 7 2006

At the time of the audit, a formal documented independent selection or rotation process for the use of approved appraisers was not in place to ensure that loan officers or processors do not direct or influence the use of any particular appraisers. Currently the processors do attempt to judgmentally rotate appraisers within the area of the homes; however, this process was not formally documented or monitored. Additionally, Audit reviewed appraiser usage data out of Unifi and identified 40 appraisers that were used only one time. While some of these were explainable as appraisers on VA loans (where the VA selects the appraiser) or out of market appraisers, several other single-use appraisers were not explainable and four were for higher dollar mortgages ($1MM or higher).

Without ensuring the independent selection of appraisers such as through the use of a preplanned rotation list for approved appraisers, the selection of appraisers could be inappropriately influenced resulting in a financial loss to the Bank.

Management should develop, document, and enforce a process for the independent selection of an appraiser such as from an established rotation list of appraisers. While developing this rotation list, management should consider locality, appraiser availability, and appraiser performance when determining the frequency of the appraiser's appearance on the list. Additionally, the use of one-time appraisers should be highly scrutinized and an approval procedure should be utilized when the need arises.

*Management Response:*
FTEM Mortgage Management will formally document procedures regarding the appraiser rotation process and will reinforce this process with all employees. Appraisals are ordered from an approved list of appraisers familiar with the specific market. They are required to provide timely service and perform under th͟i͟s͟ ͟D͟O͟C͟U͟M͟E͟N͟T͟ ͟i͟s͟ ͟s͟u͟b͟j͟e͟c͟t͟ ͟t͟o͟ A Third
PROTECTIVE ORDER ENTERED ON

THIS DOCUMENT IS PRODUCED SUBJECT TO THE OBJECTIONS STATED
BY PLAINTIFFS IN RESPONSE TO CHRISTINE MAYS' SECOND REQUEST
FOR PRODUCTION OF DOCUMENTS NO. 5                         SEP 2 7 2006

Audit Division Observations                                              Exhibit I
Origination and Fulfillment – Eastern Michigan Audit

Bank. One time used appraisers will be approved by management before their appraisals are accepted. An exception tracking form will be created to document management's approval of the one-time appraisers and the reason for their use and will be retained in the loan file. An Issue Closure form will be submitted to Internal Audit by October 27, 2006.

### Review and Monitoring of Construction Loans (Priority: High)
**Issue Owner: Bruce Balmas**

The Mortgage area in Eastern Michigan appears to not be performing prudent monitoring of open construction loans where there has not been any recent draw activity. Due to fraudulent activity that was uncovered during 2005, Eastern Michigan instituted procedures to perform property inspections every 60 days if no draw activity has occurred. Ten construction loans were identified as being open but did not have an inspection in over 60 days.

Construction lending contains different risks then traditional mortgage lending that need specific controls over disbursements relative to the proportion of the project that is complete. When there are high initial draws at closing or inactivity for extended periods of time, risk of financial loss is increased.

Eastern Michigan should update their reviews of all open construction loans including performing inspections for those properties not receiving one recently and act on accordingly. In addition, stronger overall monitoring procedures should be implemented and documented to increase the level of scrutiny on these loans.

*Management Response:*
Management has implemented the policy that all open construction loans will be reviewed to ensure that all properties are actively being constructed. This will include physical inspections of any properties in which there has not been any communication or draw requests from the builder in excess of 60 days. Management will implement a formal review process to be complete once every 30 days to ensure that this policy is being followed. Documentation of management's review process will be included in the Issue Closure form and will be submitted to Internal Audit by October 27, 2006.

### Documenting and Tracking POS Reviews (Priority: Moderate)
**Issue Owner: Bruce Balmas**

Management oversight of loans underwritten using the Point of Sale (POS) product appears inadequate to ensure loans are approved in compliance with Bancorp policy. The POS product allows certain mortgage loan originators (MLO) to underwrite and approve loans after they have completed a certification process. While the certification process appears to be properly performed, management has not instituted formal monitoring procedures to assess MLO performance post certification. Specific monitoring procedures that should be performed are underwriter reviews of sampled POS loans.

Without a formal means of documenting reviews of MLOs approved for the POS product, performance issues can go undetected resulting in a financial loss to the Bancorp.

Audit recommends the Eastern Michigan Affiliate update their POS process to include documentation of POS loan file reviews conducted by the underwriter. In addition, a centralized means of tracking POS loan reviews and results should be implemented.

*Management Response:*
Management will institute a quality control process to regularly review all POS files of newly approved POS MLO's. The quality control process will include a review of the first ten POS loans originated after the MLO's approval. After the first ten loans are reviewed, management will continue reviewing 20% of all POS originated loans for compliance to Bancorp policy. An Issue Closure form with supporting documentation will be submitted to Internal Audit by October 27, 2006.

THIS DOCUMENT IS PRODUCED SUBJECT TO THE OBJECTIONS STATED BY PLAINTIFFS IN RESPONSE TO CHRISTINE MAYS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6

THIS DOCUMENT IS SUBJECT TO A PROTECTIVE ORDER ENTERED ON

SEP 2 7 2006

Audit Division Observations                                                    **Exhibit I**
Origination and Fulfillment – Eastern Michigan Audit

**Inadequate Loan File Documentation   (Priority: Moderate)**
**Issue Owner: Bruce Balmas**

Audit reviewed 35 mortgage files within various stages of the origination process and noted the following required documents or supporting documentation was missing from the files:

- 16 instances where a Document Responsibility Checklist (checklist) was either incomplete or not present in the file. This document is viewed as the primary control to ensure all required documentation is received and underwriting steps are properly performed;
- 1 instance in which no documentation was in place to support building progress on a construction loan in which no draws took place between September 13, 2005 and the date of Audit's review (June 9, 2006);
- 1 instance where customer deposits were not properly supported; and
- 1 instance where employment history for a SISA (Stated Income, Stated Assets) loan was only verified for three months instead of the required two years. In addition, no documentation was on file to support a review of the borrowers income that did not appear consistent with the customers experience or profession.

Management created the Responsibility Checklist to ensure loan files have been documented completely and position responsibilities from originator through closer have been fulfilled. Unsigned checklists pose a degree of operational risk that loan file documentation and loan application procedures are incomplete and/or inaccurate. Additionally, not having complete loan documentation could lead to increased credit risk as well as an inability to sell the loan to investors.

Management should reinforce the need to comply with the Responsibility Checklist to promote consistency and completeness of loan file documentation. This includes sign-off by mortgage loan originators through closers and inclusion of the correct and complete information within the loan file.

*Management Response:*
Management will re-educate all employees on the proper use of the Responsibility Checklist to ensure that proper documentation is verified and in the file before sign off. Management will insist that this procedure is consistent for all mortgage loans processed. Evidence of management's review of the Responsibility Checklist with the appropriate personnel will be submitted with an Issue Closure form to Internal Audit by October 27, 2006.

**Official Checks   (Priority: Moderate)**
**Issue Owner: Bruce Balmas**

Official checks are not being maintained in compliance with the Bancorp Negotiable Instruments policy. The policy violations identified were primarily related to the maintenance of the official check inventory control log. Specifically, the log did not provide a complete listing of all checks issued by the department and did not evidence daily management audits.

Proper maintenance of the check stock allows management to ensure the appropriate use of official checks. It is recommended that management review the Bancorp Negotiable Instruments policy and update the current official check processes to meet these policy requirements. Specific steps to be taken should include, but not be limited to, ensuring that all issued checks are properly listed on the inventory control log and ensuring the log is audited daily by management independent of the check custodian.

*Management Response:*
Management will review the Bancorp Negotiable Instruments policy with the appropriate personnel and will ensure that the Bancorp Negotiable Instruments policy is strictly adhered to. Audits of the inventory log will be performed as required by policy. An issue closure form will be submitted to Internal Audit by October 27, 2006.

THIS DOCUMENT IS PRODUCED SUBJECT TO THE OBJECTIONS STATED BY PLAINTIFFS IN RESPONSE TO CHRISTINE MAYS' SECOND REQUEST FOR PRODUCTION OF DOCUMENTS NO. 6

THIS DOCUMENT IS SUBJECT TO A PROTECTIVE ORDER ENTERED ON

SEP 2 7 2006

 Gmail

**Paul Nicoletti <pauljnicoletti@gmail.com>**

## LUCIA AUDIO TAPES

**Paul Nicoletti** <pauljnicoletti@gmail.com>
To: James Howarth <james-howarth@att.net>
Bcc: "Paul J. Nicoletti" <pauljnicoletti@gmail.com>

Thu, Mar 28, 2019 at 9:24 AM

Files have been shared using Link Sharing.
https://s.amsu.ng/Lo1F2LOZPVsN
(Expires: Mar 29, 2019)

**EX 9**