IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN _ SOUTHERN DIVISION

UNITED STATES OF AMERICA,

v.

PAUL NICOLETTI

F I L E D

FEB -7 2023

CLERK'S OFFICE
DETROIT

CASE NO. 15-20382

_____/

## EMERGENCY MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)

Now comes the Defendant, Paul Nicoletti, Pro Se, and moves this Honorable Court to grant his Emergency Motion for Compassionate Release/Reduction in Sentence pursuant to 18 U.S.C. §3582(c)(1)(A) for time served or in the alternative to add the remainder of sentence to supervised release term and/or impose a period of home confinement due to the COVID-19 crisis and serious health concerns:

### I. BACKGROUND

On January 30, 2020, Defendant was sentenced to 70 months of incarceration, with 2 years of supervised release to follow, for Count 1-Bank Fraud Conspiracy; Counts 2-4-Bank Fraud Aiding & Abetting. As of the future date when this motion may be argued, Defendant as of March 2023, Defendant has served 18 months of his sentence while incarcerated at FCI Morgantown, West Virginia. Defendant is eligible for home confinement in January of 2024 based upon First Step Credits. See Bureau of Prisons, Inmate Locator Utility, https://www.bop.gov/inmateloc.

Defendant argues that he is particularly vulnerable and has an increased risk of severe complications from the virus based upon: 1) Hemochromatosis; 2) High Blood Pressure; 3) Obesity; 4) Hyperlipidemia; 5) Cervical Disc Disorder. Defendant suggests that he should be released to home confinement based on these conditions.

1

## II. BASIS OF MOTION

First, Defendant request is seeking compassionate release from this Honorable Court to extend humanitarian relief to his family and him in the ongoing detrimental lethal and deadly Coronavirus Crisis. In a April 21, 2020 memorandum for inmate family and friends, Bureau of Prison ("BOP") Director M.D. Caravejal acknowledge the anxiety the pandemic is causing families and friends, exacerbated by the suspension of social visit and related measures. The Defendant's request is also based on the recent directive of the United States Attorney General wherein he urges the Bureau of Prison to screen high risk inmates with chronic care medical issues that put them at higher fatality rate. He also stated that those inmates deemed suitable to be given priority and release on compassionate release or home confinement. This acknowledges the danger of COVID-19 in a prison facility by the Department of Justice ("DOJ").

Secondly, Defendant's request is seeking compassionate release for "other reasons" in pursuant of the (2018) First Step Act allowing defendant's to motion court for extraordinary and compelling circumstances that are medical or non-medical.

## III. STANDARD OR REVIEW

Eighteen U.S.C. §3582(c)(1)(A) allows a court to modify a term of imprisonment where "extraordinary and compelling reasons warrant [modification]." Motion under that section have been called "motions for compassionate release." United States v. McMann, No. 13-cr-52, 2020 WL 1901089, at *1 (E.D. Ky. Apr. 17, 2020). "The compassionate release provisions were ... intended to be a 'safety valve' to reduce a sentence in the 'unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner.'" United States v. Ebbers, 432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020)(quoting S. Rep. 98-225, at 121 (1983)).

In the First Step Act, Congress amended 18 U.S.C. §3582(c)(1)(A) to allow a prisoner to file motion for compassionate release on his own behalf.

The commentary to the Policy Statement describes four categories of "extraordinary and compelling reason" that may justify compassionate release under §3582(c)(1)(A): **(A)** the medical condition of the defendant; **(B)** the age of the defendant; **(C)** family circumstances; and **(D)** other reasons. See U.S.S.G. §1B1.13, cmt. n.1**(A)-(D)**. The 'medical condition of the defendant" category allows compassionate release if, <u>inter alia</u>, the defendant is "suffering from a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." <u>Id</u>. cmt. n.1(A). The "family circumstance" category allows compassionate release if: (1) the caregiver of the defendant's minor child dies or is incapacitated, or (2) the defendant's spouse or registered partner is incapacitated and the defendant is the only available caregiver. <u>Id</u>. cmt. n.1(C). The "other reasons" category allows compassionate release if, "[a]s determine by the Director of Bureau of Prison, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." <u>Id</u>. cmt. n.1(D).

Section 3582(c)(1)(A) requires a defendant to exhaust his administrative remedies with the BOP before asking judicial relief. See <u>United States v. Alam</u>, 960 F.3d 831, 832-34 (6th Cir. 2020). A defendant may exhaust his administrative remedies in one of two ways: **(1)** by exhausting his "administrative right to appeal a failure of the [BOP] to bring a motion on the defendant's behalf," or **(2)** on "the lapse of 30 days from the receipt of such a request by the Warden of the defendant bears the burden of showing he has exhausted his administrative remedies and is entitled to compassionate release. See <u>Ebbers</u>, 432 F. Supp. 3d at 426-27 (citing <u>United States v. Butler</u>, 970 F.2d 1017, 1026 (2nd Cir. 1992)). Section 3582(c)(1)(A)'s exhaustion requirement is a mandatory claim-processing rule that is subject to waiver and forfeiture. See <u>Alam</u>, 960 F.3d at 834 (citing <u>United States v. Cotton</u>,

535 U.S. 625, 630 (2002)).

### 1. ADMINISTRATIVE EXHAUSTION

Before moving for compassionate release under 18 U.S.C. §3582(c)(1)(A), a defendant must ask the BOP to file a motion for compassionate release on his behalf, and then "fully exhaust[] all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or wait until "30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. §3582(c)(1)(A). "The earlier of these two dates controls; as soon as one of these requirement is met, the exhaustion requirement is satisfied." United States v. Scparta, No. 18-cr-578, 2020 WL 1910481, at *4 (S.D.N.Y. Apr. 20, 2020); see also Alam, 960 F.3d at 834 ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them.").

Defendant assert's that he has exhausted his administrative remedies. On 1/31/22  he filed for Compassionate Release/Reduction in Sentence with the Warden Bayless at FCI Morgantown facility. The Warden denied his request

Thirty days have passed since Defendant's initial request for compassionate release before he has filed this Motion to be granted.

Defendant has **demonstrated** that he has met the requirement of administrative exhaustion and his Motion for Compassionate Release is ripe for review. The Court has the discretion to review his motion and order relief.

### 2. EXTRAORDINARY AND COMPELLING REASONS

In reviewing a motion for compassionate release under §3582(c)(1)(A), a court must address whether "extraordinary and compelling reasons warrant [] a reduction" and whether "reduction is consistent with [the Policy Statement]." 18 U.S.C. §3582(c)(1)(A); U.S.S.G. §1B1.13(3). The court must also consider the §3553(a) factors, "to the extent that they are applicable." 18 U.S.C. §3582(c)(1)(A),

and must determine whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." U.S.S.G. §1B1.13(2).

District courts have received many compassionate release motion during the COVID-19 crisis. Court's approaches to those motions have varied. In assessing whether and when defendants have presented extraordinary and compelling reasons for release due to COVID-19, courts have considered whether a defendant has demonstrated "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." United States v. Feiling, No. 3:19-cr-112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020) (collecting cases); compare Miller v. United States, No. 16-cr-20222, 2020 WL 1814084, at *3-4 (E.D. Mich., Apr. 9, 2020)(granting compassionate release where defendant was 69 years old, had multiple serious medical conditions, and was in facility with a substantial number of COVID-19 cases). United States v. Muniz, 09-cr-199, 2020 WL 1540325, at *2 (finding extraordinary and compelling circumstances because "[d]efendant has been diagnosed with serious medical conditions that, according to reports from the Center[s] for Disease Control, make him particularly vulnerable to severe illness from COVID-19... includ[ing] inter alia, end stage renal disease, diabetes, and arterial hypertension."); United States v. Campagna, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020)(approving compassionate release for defendant where his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care").

Given those approaches, courts evaluating motions for compassionate release have considered factors like the defendant's age; the defendant's medical conditions; whether the defendant's sentence remains to be served. See, e.g., United States v. Zukerman, No. 16-cr-194, 2020 WL 1659880, at *4-6 (S.D.N.Y. Apr. 3, 2020)(granting

5

Case 2:15-cr-20382-VAR-MKM   ECF No. 264, PageID.4366   Filed 02/07/23   Page 6 of 37

compassionate release where defendant suffered from diabetes, hypertension, and obesity, placing him at "higher risk of severe illness from COVID-19"); United States v. Atwi, No. 18-cr-20607, 2020 WL 1910152, at *1, 4-6 (E.D. Mich., Apr. 20, 2020)(granting compassionate release where defendant had latent tuberculosis and was in a facility where inmates and staff members ... have been diagnosed with [COVID-19]).

Some courts that have granted motions for compassionate release due to COVID-19 have reasoned that defendants with serious underlying health conditions who face a significant risk of contracting COVID-19 satisfy the Policy Statement's "medical condition of the defendant" category for compassionate release because those defendants are unable to "provide self-care" effectively and protect themselves from the virus while in prison. See, e.g., United States v. Amarrah, No. 17-cr-20464, 2020 WL 2220008, at *4-6 (E.D. Mich., May 7, 2020)(granting compassionate release where defendant had diabetes, heart disease, and asthma and would be unable to "provide self-care within the environment of a correctional facility" were he to contract COVID-19. Other courts have reasoned that defendants who demonstrate that they are at significant risk both of contracting COVID-19 and of experiencing a severe reaction to it meet the requirements of the Policy Statement's **"other reason"** category for compassionate release. See, e.g., United States v. Rodriguez, No. 2:03-cr-00271, 2020 WL 1627331, at *1, 7-12 (E.D. Pa. Apr. 1, 2020)(granting compassionate release for **"other reason"** where defendant had diabetes, hypertension, and liver abnormalities, was in a facility that had insufficient testing and sanitation).

The COVID-19 crisis, when combined with heightened risks to a defendant both of contracting COVID-19 and of reacting severely to it, may constitute an extraordinary and compelling reason justifying compassionate release. The "extraordinary and compelling" standard remains a high bar, however, even under currect circumstances but risk of deaths tilts the scale in favor of those at high risk.

FCI Morgantown failed to get into CDC compliance in a timely manner neglecting preventative measures for inmate health.  As of 1/14/23, the BOP currently has 29 facilities operating at level 1 (minimal modifications); 49 facilities operating at level 2 (moderate modifications); and 19 facilities operating at level 3 (intense modifications).  https://www.bop.gov/coronavirus/

As of 1/14/23, the BOP had 167 federal inmates and 254 BOP staff who have tested positive for COVID-19.  There have been 312 inmate deaths and 7 BOP staff member deaths from COVID-19.  In Monongalia County, the county in which FCI Morgantown sits, COVID hospitalizations have tripled since January of 2023, with the new COVID variant being XBB.1.5.  DHHR Reports from West Virginia show 1079 current active COVID-19 cases statewide with 17 new deaths for a total of 7,778 deaths attributed to COVID-19.

The district courts and government can no longer use or rely on cases such as United States v. Raia, 954 F.3d 594, 597 (3rd Cir. 2020), for the theory that Defendant's request for release on home confinement is based upon nothing more than the mere possibility that COVID-19 will spread to his facility, a fear that is insufficient to justify release.

Early into the novel pandemic, one could perhaps conclude the same measures of determination to not grant release to a defendant.  But that method of measuring risk to the virus in those cases have been undisputably reduced to not enough caution measured.  The data from the novel coronavirus alone with the aftermath has revealed that Coronavirus anywhere is Coronavirus everywhere. No inch of the earth is exempt from the virus.  In the early stages of assessing where a defendant faces a particularized risk of contracting the disease, courts were adopting the (hopeful) recommendations of the United States Attorneys across the country arguing that a defendant is not at risk in a facility with no confirmed cases.  Even then this was especially troublesome knowing that the virus was an invisible enemy and highly contagious.

7

<u>United States v. Ray,</u> No. 18-cr-177 (August 17, 2020), Judge Leonie Brinkema stated. "courts need not wait until COVID-19 spreads to a facility, or until there is a COVID-19 outbreak at a facility, before granting relief." As Judge Brinkema stated, "there is a very real risk that COVID-19 will spread to and through FCI Morgantown as evidenced by the spread of COVID-19 throughout the BOP, and that risk is sufficient."

District courts have considered whether a defendant has demonstrated "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at FCI Morgantown." Id.

<u>United States v. Hughes</u>, 2021 U.S. Dist. LEXIS 13243, Case No. 2:13-cr-20142-SHM-13 (6th Cir. January 25, 2021), court ruling that defendant faces a particularized risk of contracting COVID-19 at FCI Morgantown and also that the facility has failed to take proper precautions to minimize the risk of a COVID-19 outbreak among the prison population.

<u>United States v. Agomuoh</u>, No. 16-20349, ECF No. 145 (E.D. Mich., March 21, 2020), recommending that the BOP release the 64 year old defendant with diabetes and hypertension to home confinement. FCI Morgantown refused <u>Doshi</u> to home confinement. <u>Doshi</u> refiled to the court and the court granted his motion for compassionate release.

<u>Segars v. United States</u>, 2020 U.S. Dist. LEXIS 103807, Case No. 16-20222-3 (E.D. Mich., June 15, 2020), the court states "Concern for Segars safety is not dissuaded by the fact that FCI Morgantown has reported no cases of COVID-19. The prisons report of zero confirmed cases is more likely a result of a lack of testing than a lack of the virus presence in the prison."

8

(BOP Action Plan/Vaccination)

United States Attorney's across the country have joined the same uniformly crusade of misleading federal courts into believing that the once in a century pandemic Coronavirus do not pose the same threat to the BOP inmate's health and life as it does the entire world. In abusing the public's trust and position of power, the government touts the BOP Action Plan for infectious viral control as a success tool which exempts inmate's from danger that the rest of humankind faces. This strategic method by the government in an effort to downplay and mitigate the warrant for release to provide self-care ... is a danger to the community from those of whom trust of fairness is bestowed.

The government touting of the BOP's positive effort outlined in it's COVID-19 Action Plan recognizably, makes the virus less conducive but, however, nevertheless is not effective from preventing the spread of the highly contagious disease.

For example, late November, 2020 and early December, 2020 FCI Morgantown was plagued with COVID-19 **outbreaks** in "Alexandra Unit" and every inmate with confirmed positive testing did **not** have a fever. Proving that the daily temperture testing of staff members, attorney's, contracting workers and visitors is not effective to prevent the spread of the virus from asymptomatic individuals.

Masking provided to inmates are not N-95 issued masks, which is the only high rated mask of protection from the virus. Scientist and experts have issued public diagrams and information containing the mathematical percentage of protection received from certain mask wearing. The clothe masks issued to inmates by the BOP are rated with only 30% protection. However, this 30% protection is only good for up to three to six minutes in the presence of the virus before infection of exposure occurs. Prisoners are forced to wear masks in an controlled environment or face punishment that will lead to certain sanctions and possible denial to CARES Act early

release or a request for compassionate release. The fact that inmate's are held to a higher percentage of mask wearing than the general public and yet the spread of the virus is still 5 times the rate of the general public per capita only reflects proof that mask wearing without social distancing and proper sanitizing is not effective.

Social distancing and sanitizing are both impossible measures to achieve in a communal prison environment. In fact, the only most important preventive measure of all listed in the BOP Action Response Plan to COVID-19 is social distancing and sanitizing, however, it is also the only part of the plan that is unobtainable.

Vaccination is a task that not only the general public is having difficulties of overcoming but the BOP as well. Dispite the record breaking speed of developing and administering the vaccine through emergency use of Operation Warp Speed. Many people in prison and the general public have different but all have  concerns over whether to receive or not receive the vaccine. Under normal circumstances to approve a safe and well study vaccine with proven data to support, it would take up to (7)-years to get FDA approval to administer. Regardless of whether or not the vaccine is taken by inmate or staff, no matter what the most recently data behind the vaccine, there is not scientific proof that a receiver's health and life will not have a further consequence to be discovered.

Center for Disease and Control have warned, "that research shows the **vaccine** may not be effective on people with immunocompromise conditions. Also the vaccine may not even immunize against variants and strains of the virus. Epidemiologist and virologist have discovered that the once 95% Pfizer, 94% Moderna efficacy of vaccine toward the early Alpha and Beta  varients are less effective against the new **Delta** variant. Research and studies show that the current vaccine's efficacy against Delta are reduce to 60% efficacy and estimated to be reduced to only 33% efficacy for those with immunocompromise conditions. In fact, the country Israel is the most vaccinated country in the world ahead of the U.S. but yet they are experiencing a great increase

in hospitalization and deaths due to the Delta variant. Israel Health Offical's issued a warning stating, "no amount of vaccination can stop the spread of COVID-19." Israel has vaccinated over 85% of it's population. It is reported that there is also another dangerous variant of concern called **Lambda**, which experts are warning may have the possibility of evading the current vaccines.

Leading epidemiologist and virologist such as Dr. Fauci and the CDC Director have warned that is it estimated we are two to three mutations away from a variant that will **evade** the current vaccines. The less people vaccinated along with more spread of virus will increase possible mutation of a much strong variant than the vaccine can offer protection from.

As of August 27, 2021, 58.2% of inmates were vaccinated, up 1.4 points from last week. Staff Still lags as 53.1%, up only 0.2 points from the week before. The Food and Drug Administration gave regular approval to the Pfizer vaccine last week, and the military has already ordered it's personnel to be vaccinated. BOP has **not** mandated vaccination among it's employee's.

However, on July 7, 2021-(Dov Lieber, author of Delta/Pfizer Shot Study) research in Israel states, "During the period that coincided with the Delta outbreak, 1271 of 1528 total new infections were fully vaccinate individuals, as were 23 of 37 hospitalization and 11 of 17 cases of severe illness." See (The Wall Street Journal, News Paper (July 7, 2021)).

On July 7, 2021-(Julie Wernau, author of Delta) Delta "is some 50% more transmissible than the Alpha variant that had been the most common strain in the U.S. since March, and scientists believe Delta is associated with more severe disease." See (The Wall Street Journal, News Paper (July 7, 2021)).

On July 16, 2021-(Alison Sider, author) states, "The so-called Delta variant, also known as B.1.B17.2 variant, is more infectious and appears to be somewhat more effective at evading vaccines." See (The Wall Street Journal, News Paper (July 16, 2021)).

The judges of this court have written extensively about this once in a lifetime pandemic.  On May 11, 2022, the United States reached more than one million deaths, a once unthinkable milestone.  And, the "Biden administration is preparing for the possibility that 100 million Americans will be infected..." (Amelia Nirenberg, "A Coming Fall Surge?", N.Y. Times (May 9, 2022)).  https://www. nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.  As the prison system and society in general believe that COVID-19 is now endemic and much abated, COVID-19 hospitalization and deaths are quickly rising with BQ.1 and its swarm of subvariants.

The Center for Disease Control and Prevention (CDC) advises that people with certain conditions are likely to get severely ill from COVID-19 and the comorbidities, the greater the severity.  (See "People with Certain Medical Conditions, CDC" at https://bit.ly/38S4NfY).  Here, all 5 of Defendant's medical conditions are on this list, placing him at high risk of death or from complications.  At 63 years old, CDC data shows that individuals, such as Defendant, between the ages of 50 and 64, have a hospitalization rate four time higher than those between the control group ages 18 and 29, and are 30 times more likely to die of the virus.  (See "Risk for COVID-19 Infection, Hospitalization, and Death", CDC, last updated March 28,2022, https://www.cdc.gov /coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html).  Defendant is even more vulnerable to COVID-19 because he's imprisoned.  See Coreas v. Bounds, TDC-20-0780, 451 F.Supp. 3d 407, 2020 WL 1663133, at *2 (D Md. Apr. 3 2020)("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19.")

While the majority of vaccinated individuals infected with the Omicron variant will only experience minor symptoms, "breakthrough" infections can still cause severe, possibly life threatening illness in individuals who suffer from medical conditions that render them particularly vulnerable to the virus.  See United States v. Salemo, No. 11-cr-65 (JSR), 2021 WL 4060354, at *6 (S.D.N.Y. September 7, 2021) (noting vaccinated defendant with underlying

medical conditions remained at high risk for "a severe case of COVID-19"

if infected); See also United States v. Johnson, No. 98-cr-860-7 (ARR),

2021 WL 5755047, at *5 (E.D.N.Y. Dec. 3, 2021)(concluding vaccinated defendant

"coulf face serious illness and even death if infected with COVID-19" due

to multiple underlying medical conditions").

Another study of fully vaccinated individuals by the CDC found that

"...all persons with severe outcomes" including hospitalization and death

had at least one "risk factor", -age, immunosuppression, or an underlying

comorbidity, including diabetes - and that 77.8% of those who died had four

or more risk factors.  Note the Defendant has five of the risk factors.

CDC Director Rochelle Walensky cited this study as evidence that the "overwhelming

number of [recent] deaths" from COVID-19 occur in people with multiple

comorbidities.

These findings are noted by the courts.  Johnson, 2021 WL 5755047,

at *4 (noting "[t]he risk of breakthrough infection is greater among incarcerated

individuals than members of the general public").  "For that reason, some

courts have continued to find the risk of COVID-19 germane to their analysis

of extraordinary and compelling circumstances, even when...the defendant

is vaccinated." See id. at *5 (collecting cases).  "The court can not agree

that [movant's] vaccination status considered without context, weighs against

a reduced sentence."  See United States v. Mansourov, 2021 WL 6063235, at

*3 (D. Conn. Dec. 22, 2021).  "[a]n incarcerated person's vaccination status

does not serve as a total bar" to finding that extraordinary and compelling

reasons exist.  See id. *3.  And in United States v. Brunetti, 2022 WL 92753,

at *12 (S.D.N.Y. Jan . 10, 2022)(stating "The court disagrees with the Government's

assertion that Brunetti's vaccination status, considered in isolation, "substantially

weak[ens]" his claim that his medical conditions constitute extraordinary

and compelling reasons warranting release.")

Less than half of FCI Morgantown staff is vaccinated and the numbers are nearly the same for the facility inmate population. It is of no doubt that the Delta variant will mutate into a much stronger variant. Officers who had tested positive are still allowed to work on the compound without being required to quarantine for the CDC stipulated timeframe before recovery, in part because BOP employee's are quitting in droves. That's the question Business Insider asked the third week of August, 2021. About 3,700 staffers left the BOP from March 2020 to July 3, 2021, according to agency data. That translates to the equivalent of more than 8.4 employees departing every day during that period.

The COVID-19 pandemic and augmentation have strained prison workers, which could cause more of them to quit as staffing conditions continue to erode, union representative said.

The BOP's number is not without controversy. Joe Gulley, union president at USP Leavenworth, told Buisness Insider the number of staff who had COVID-19 was at least 20 times higher than officially reported. "The Warden lied because he wanted his bosses and the public to think he was doing a good job," Gulley said in a statement. "His only concern was that everyone outside of USP Leavenworth believed he was controlling COVID and keeping everyone safe so he could get his next promotion." The same is here at FCI Morgantown and reported at many other BOP facilities by staff and inmates.

The BOP said it tested an average of 24 inmates a day for COVID-19 over the last 10 days til date of around August 15-25, 2021. That's only 63% of the number of COVID-19 positive inmates the BOP reports. In fact, it is only 10% of the testing the BOP was doing in a similar period last December. One <u>cannot</u> <u>find</u> what one <u>does</u> <u>not</u> look for!

14

Courts have recognized the increased susceptibility to COVID-19, where the defendant has received both doses of the vaccine, especially when there has been a shift in the scientific concensus. See e.g. United States v. White, No. 15-cr-20040-01, 2021 U.S.Dist. LEXIS 47351, at *5 (E.D.Mich. Mar.15, 2021). And unfortunately, it appears that the proliferation of COVID-19 variants has begun to usher in such a shift. See e.g. United States v. Wardlow, No. 19-20254, 2021 U.S. Dist. LEXIS 81161, at *8 (E.D.Mich. April 28, 2021)(noting that "it is as yet not known fully whether the present vaccines provide the same level of protection as with previous variants" and granting release in spite of vaccination). Over the last several months, there have been disturbing examples of people becoming infected with and spreading the so called "Delta" variant, despite being vaccinated. See Apoorva Mandavilli, C.D.C. Internal Report Calls Delta Variant as Contagious as Chickenpox, N.Y. Times (July 30, 2021).

The Government will oppose Defendant's motion and argue that the Bureau of Prisons has taken steps to curtail the spread of COVID-19. This argument is meritless as stated in Pomante. The court held:

> Even if the Court were to accept the argument that the BOP and FCI Morgantown are taking precautions to ensure the safety of prisoners, Defendant's risk of contracting COVID-19 is not speculative. Until the BOP increases testing capacity, a lack of confirmed cases has very little bearing on the amount of actual cases in a federal prison. See Sadie Gurman, More Than 70% of Inmates Tested in Federal Prison Have Coronavirus, The Wall Street Journal (Apr. 30, 2020)
>
> United States v. Dennis Pomante, 2020 U.S. Dist. LEXIS 85626, at *9, (6th Cir. 2020)

Nicoletti argues that the unusually harsh conditions he has faced during the entirety of his incarceration and his increased susceptibility to severe illness from COVID-19, constitute extraordinary and compelling reasons for release.

## DEFENDANT'S MEDICAL HISTORY

At the time of Defendant's incarceration in August of 2021, Defendant was reasonably healthy with few complaints considering his 62 years of age. He suffered from hypothyroidism, hyperlipidemia, and major depressive disorder (depression). Defendant's medical condition was stable with regard to cervical disc disorder caused by a neck fracture before incarceration, as a result of receiving CT Guided Facet Injections from a Neurosurgeon, twice a year.

On January 12, 2022, Defendant contracted COVID-19, while an inmate at FCI Morgantown. Defendant was placed in isolation while his flue-like symptoms ran their course. Subsequently, Defendant began having medical symptoms of a serious nature which involved severe fatigue, and other serious medical conditions. It was during that time, when Defendant was diagnosed with Hypertension and placed on three blood pressure lowering medications. At the same time, Defendant was diagnosed with a rare blood disorder known as Hemochromatosis. Eventually, blood treatments were commenced, which tended to have an impact on excess Ferritin Levels in Defendant's blood. The Defendant was scheduled for phlebotomies which were to occur every couple of weeks, by visits to the Mon Health Cancer Center. After the blood draws, Defendant felt weak and his activities were restricted during the time which Defendant's blood chemistry was returning to normal. Phlebotomies continue to this very date, with blood draws being less often than early on in the treatment. Defendant still suffers from osteoarthritis in his neck, knees, and hands.

Subsequent to Defendant being diagnosed with COVID-19, Defendant was treated for extreme fatigue, nausea, and related complications. During said treatment it was discovered that Defendant had abnormal bloodwork and that the Ferritin Level was more than ten times higher than what it should be in a normal patient. After several hematology consultations it was determined that Defendant had a rare blood disorder known as Primary Hemochromatosis, which is hereditary. Primary hemochroma- tosis is a blood disorder where too much iron builds up in your body. Sometimes it is referred to as "iron overload" disease. Normally the intestines absord just the right amount of iron from the foods you eat. But in hemochromatosis, your body absorbs too much, and it has no way to get rid of it. So your body stores the excess iron in your joints and in organs like your liver, heart, and pancreas. This damages them and if not treated, hemochromatosis can cause your organs to fail and stop functioning.

The primary medical treatment is a Phlebotomy, which involves taking blood and iron from the body. At first, around one pint of blood is removed once or twice a week. When iron levels return to near normal, blood drains can be extended to every 2-4 months. There is no known cure for the rare blood disease, as the phlebotomy is the only available treatment for the disorder. A person with hemochromatosis has a higher risk of cancer and is more susceptible to the risk of infection.

The 5-year survival rate after diagnosis in **untreated** patients with the fully developed disease was found to be 18% and the 10-year survival rate was 6%. The principal cause of death in such patients related to liver complications, hepatic failure and portal hypertension (30%) and malignant hepatoma (30%), an additional 1/3 died from cardiac failure. It should be noted that phlebotomy therapy **does not** result in improvement in arthropathy in diagnosed patients.

17

Symptoms of Hemochromatosis usually begin between the ages of 40 and 60 but can occur earlier.  Arthritis, which occurs in 20-40% of patients, usually begins after the age of 50 and may be the first clinical feature of hemochromatosis.  The arthropathy is an inflammatory osteoarthritis-like disorder affecting the small joints of the hands, followed later by larger joints such as knees, ankles, shoulders, and hips.  The second and third metacarpophalangeal joints of both hands are often the first joints affected; they can provide an important clue to the possibility of hemochromatosis.  Patients experience stiffness and pain.  The affected joints are enlarged and mildly tender.  Radiographs show irregular narrowing of the joint space, subchondral sclerosis, and subchondral cysts.  There is juxtaarticular pro- liferation of bone, with frequent hook like osteophytes.  In approximately half the patients, there is evidence of calcium pyrophosphate deposition disease.  Excess iron may damage the articular cartilage in several ways as well. [Harrison's Principles of Internal Medicine, 15th Edition, Arthropathy of Hemochromatosis, Page 2014.]

It is critical to note that Defendant's Medical Records reflect a medical history of hand surgeries to address the second and third metacarpophalangeal joints of the right hand.  Further, Defendant's medical records also show the presence of hook like osteophytes as a need for the hand surgery.  Defendant's medical history also reflects knee surgeries on both knees due to inflammatory arthritis and joint disorders.  Defendant's medical history includes a diagnosis for cervical disc disorder and recent MRI's show mild to severe joint space narrowing due to arthritis.  It is also important to note that with regard to the cervical disc disorder diagnosis, the BOP has been unable to provide neurosurgery treatment in the form of CT Guided Facet Injections, similar to those injections that the Defendant was having performed twice a year prior to incarceration.  The only treatment for the cervical disc disorder has been the prescription of a weak pain medication known as Meloxicam.  Defendant continues to suffer constant stabbing neck pain on a daily basis.

The Sixth Circuit has clarified "how district courts following the enactment of the First Step Act, should analyze defendant-filed motions seeking release under §3582(c)(1)(A)."  United States v. Hampton, 985 F. 3d 530, 2021 WL 164831, at *1(6th Cir. 2021).

> In resolving those motions, district courts now face two questions: (1) whether extraordinary and compelling circumstances merit a sentence reduction; and (2) whether the applicable §3553(a) factors warrant such a reduction. A third consideration, the §1B1.13 policy statement, is no longer a requirement courts must address in ruling on defendant-filed motions.  id.(citations omitted).

Pursuant to the COVID-19 pandemic, it appears to the court that Defendant's age and health condition places him in the "highest risk category for complications and death from the disease if infected." See, e.g. Zuckerman, 2020 U.S. Dist. LEXIS 59588, 2020 WL 1659880, at *4; Basank v. Decker, 449 F. Supp. 3d 205, 2020 U.S. Dist. LEXIS 53191, 2020 WL 1481503, at *3(S.D.N.Y. Mar. 26, 2020)("The Court takes judicial notice that, for people of advanced age, with underlying health problems, COVID-19 causes severe medical conditions and has increased lethality."(citation omitted).United States v. Dennis Pomante, 2020 U.S.Dist. LEXIS 85626, at *8(6th Cir. 2020).

There can be no dispute that the Defendant's age (63) in and of itself, makes him more susceptible to complications from COVID-19.  Together with the Defendant's unique and rare medical condition known as Hemochromatosis, high blood pressure, osteoarthritis, hyperlipidemia, and obesity, the Defendant has a significantly higher chance of dying from complications from COVID-19.  Defendant argues that the risk category cannot get any higher since there is no known cure for Hemochromatosis and that the 10-year survival rate is only 6% in untreated patients.

19

Courts do not regard the CDC website as the only appropriate source
of scientific information bearing the identification of risk factors or
immunocompromisations.  In United States v. Segars, 16-CR-20222, 2020 WL
3172734, at *3 (E.D. Mich. June 15, 2020)(noting that "[t]he rapidly changing
nature of science surrounding this novel virus displaces the CDC as the
sole medical authority on COVID-19 risk factors."); In United States v.
Salvagno, 125 A.F.T.R. 2d (RIA) 2020-2558, 5:02-cr-51 (LEK)(N.D.N.Y. June
22, 2020)(stating "[T]he Court does not confine itself to the CDC website,
because the CDC is not the only reliable source of information about COVID-19...".

Mira Zein, M.D.,M.P.H., who is a Clinical Assistant Professor at Stanford
University School of Medicine explains, "Depression, anxiety, and PTSD have
all been found to directly stimulate production of pro-inflammatory cytokines,
as well as down regulate cellular immunity leading to increased risk of
acute or prolonged infection, and delayed wound healing."  She concludes
that weakened immunity due to mental health disorders can put detainees
"at increased risk of contracting and suffering from more severe forms of
COVID-19."  See Doe v. Barr, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020) also
explaining that anxiety and depression "can lead to decreased immune response
and increased risk of infections."  See id. at *4.  See United States v.
Lavy, 2020 WL 3218110, at *5 (D.Kan. Jan 15, 2020)(finding based on scientific
studies that major bipolar disorder and major conditions are not listed
on the CDC's non-exclusive list of contributors to immunocompromisation).

Bureau of Prisons (BOP) medical records confirm that Defendant has
hypertension and that prior to incarceration, Defendant had normal blood
pressure.  For hypertension Defendant takes Lisinopril, an ACE inhibitor,
and Hydrochlorothiazide to treat the condition, with blood pressure readings
in the stage 2 hypertension range, with some systolic pressure readings
above 140 mm Hg and some diastolic pressure readings above 95 mm Hg.

In fact, as of 1-27-23, based upon higher than usual blood pressure reading, the dosage of Lisinopril was increased in an attempt to gain control of the high blood pressure readings.  While it is true that high blood pressure is a common ailment, what is uncommon about Defendant's condition is that Defendant is required to take three prescription medications for it and still has elevated numbers.  A small dose of aspirin was prescribed to reduce the chances of having a stroke from the high blood pressure. The severity of Defendant's hypertension is indicative of his increased immunocompromisation and risk for illness or death.  Hypertension is associated with inflammation, which in turn, is a dysregulation of the body's immune system.  The virus also causes inflammation in the body, which in some people, rise to dangerous levels.  Hypertension as a comorbidity is explained by dysfunction of the endothelium, which is involved in the regulation of pro-inflammatory immune response and blood clotting.  See Sardu, et al., Hypertension, Thrombosis, Kidney Failure, and Diabetes: Is COVID-19 an Endothelial Disease: A Comprehensive Evaluation of Clinical and Basic Evidence, Journal oc Clinical Medicine (May 11, 2020).  In Salvagno, No. 5:02-cr-51 (LEK) (collecting cases), the Court reviews in detail the scientific literature and cases regarding hypertension and COVID-19.

(D) "OTHER REASON"

Eighteen U.S.C. §3582(c)(1)(A) allows a court to modify a term of imprisonment where "extraordinary and compelling reasons warrant [modification]." "Although relief under the statute is commonly referred to as <u>compassionate release</u>, 'such relief is not limited to immediate release, but includes a reduction in sentence."

Motions brought by defendants on their own are not held or limited to the United States Sentencing Commission examples of "extraordinary and compelling" examples. Congress amended 18 U.S.C. §3582(c)(1)(A) to allow a prisoner to file a motion for compassionate release. The First Step Act modified §3582(c)(1)(A) with the intent of "increasing the use of transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5194, 5239 (capitalization omitted); see also <u>Ebbers</u>, 432 F. Supp. 3d at 430.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" <u>United States v. Braxton</u>, Cr. No. JKB-09-478, 2020 U.S. Dist. LEXIS 147379, 2020 WL 4748536 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment," upon a finding of "extraordinary and compelling reasons." 18 U.S.C. §3582(c)(1)(A).

Numerous district courts in both this Circuit and others have found that a court "need not choose between immediate, unconditional release or no relief at all" and have, accordingly, granted sentence reductions that did not result in immediate release. <u>See, e.g.</u>, <u>United States v. Johnson</u>, No. RDB-07-0153, ECF No. 183, 2020 U.S. Dist. LEXIS 190921 (D. Md. Oct. 14, 2020)(reduction sentence from 360 months to 300 months); <u>Braxton</u>, 2020 U.S. Dist LEXIS 147379, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); <u>United States v. Marks</u>,

455 F. Supp. 3d 17, 2020 WL 1908911, at *17 (W.D.N.Y. 2020)(reducing sentence from 40 years to 20 years); United States v. Arey, 461 F. Supp. 3d 343, 2020 WL 2464796 (W.D. Va. 2020)(reducing sentence but denying immediate release); United States v. Day, 474 F. Supp. 3d 790, 2020 U.S. Dist. LEXIS 133589 (E.D. Va 2020)(same); see also United States v. Zullo, 976 F.3d 228, 237 (2nd Cir. 2020)("It bears remembering that compassionate release is a misnomer. 18 U.S.C. §3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's sentence...").

In this section **(D) "OTHER REASONS,"** the defendant will demonstrate that a reduction in sentence is warranted for the following reasons:

**(MOTION FOR A DOWNWARD DEPARTURE UNDER §5K2.0)**

**Grounds for Departure**

For all circumstances described and demonstrated in this motion for compassionate release pursuant to **(D)-"Other Reasons"** defendant seeks relief in pursuant of: **§4A1.3** (Departures Based on Inadequacy of Criminal History Category (Policy Statement)).

**§4A1.3 (b)(1)** Standard for Downward Departure.– If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendants criminal history or the likelihood that the defendant will committ other crimes, a downward departure may be warranted.

In addition, 28 U.S.C. §994(e) requires the Commission to assure that it's guidelines and policy statement reflect the general inappropriateness of considering the defendant's education, vocational skills, employment record, family ties and responsibilities, and community ties in determining whether a term of imprisonment should be imposed or the length of a term of imprisonment.", and inserting: See **§5H1.6** (Family Ties and Responsibilities (Policy Statement)); also see U.S.S.G. **§5H1.7** (Role in the Offense (Policy Statement)); also see U.S.S.G. **§5H1.8** (Criminal History (Policy Statement)).

### 3. THE RELEVANT §3553(a) SENTENCING FACTORS WARRANT REDUCING DEFENDANT'S SENTENCING TO TIME SERVED

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted and whether the defendant's release would be a danger to the community. 18 U.S.C. §3582(c)(1)(A)(i). Section 3553(a)'s primary directive is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2." Section 3553(a), paragraph 2 states that such purpose are:

1. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
2. To afford adequate deterrence to criminal conduct;
3. To protect the public from further crimes of the defendant; and
4. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Ibid. In a compassionate release case, which is not a re-sentencing of the defendant, or a re-evaluation to the defendant's original sentence, the inquiry is whether these factors outweigh the "extraordinary and compelling reason's warranting compassionate release, and whether compassionate release would undermine the goals of the original sentence.

Defendant presented extraordinary and compelling circumstances regarding his serious health conditions and the current impact of the COVID-19 pandemic combined with "Other Reasons" to support his request for compassionate release. Continued incarceration is not necessary to protect the community from the past crimes of the Defendant given his age, characteristics, and debilitating medical conditions. The compassionate release statute permits the District Court to reduce a defendant's sentence upon consideration of the §3553(a) factors, and upon a finding that there are extraordinary and compelling reasons that warrant such a reduction. See U.S.C. §3582(c)(1)(A); U.S.S.G. §1B1.13. The need to avoid unwarranted disparities in

sentences is also an important relevant factor. See 18 U.S.C. §3553(a).

Sixty Three year old Defendant does not present a threat to the community if he were to be released. Defendant has a stable residence to return home to, located in Troy, Michigan.   He has a great support system of family and friends to help aide his welfair until allowed to work. Defendant has employment ready or will seek employment through local temporary services once allowed to work. Upon release he will obtain medical insurance and seek health care form his family Primary HealthCare Provider and for emergency he will seek care at the local hospital.

As this Honorable Court is aware, criminal conduct tends to diminish with age, a relationship that is widely referenced at the "age-crime curve." This construct is supported by the age-crime statistics contained in the Uniform Crime Reports published annually by the Federal Bureau of Investigation. Prior to this offense, Defendant had never spent even one day in prison or in jail.     . Defendant self-surrendered as he was trusted to report back and forth from court even after pleaing guilty with full knowledge that he was going to prison for a very long period of his life.                        .   . Defendant post-incarceration has been served as a model inmate with impeccable conduct and no infractions of incident reports. He has completed a substantial amount of positive programming ready and willing to rehabilitate himself. In the consideration of all the §3553(a) factors discussed herein, described in the Defendant's final presentence report, and discussed at the Defendant's original sentencing hearing, a reduction in Defendant's custodial term should be granted. This instant offense is the longest term of imprisonment Defendant has ever served, further supporting his request for a reduction of his sentence under these unique circumstances. Reducing Defendant's sentence would not diminish the seriousness of his offense nor undercut the deterrent effect of the sentence upon othe potential offenders. This Court is permitted to consider the "amount of time" that a defendant has served on a sentence when deciding whether to grant a sentence reduction as one of the §3553(a) factors. Kincaid, 802 Fed.Appx. at

188; see 18 U.S.C. §3553(a)(2)(A).

In addition, Defendant could remain under the supervision of the Court if he were to be permitted to serve the remainder of his custodial sentence on home confinement. The Court's supervision could ensure that Defendant remains a law abiding citizen, while still getting the medical care that he needs.

According to the Centers for Disease Control ("CDC"), adults of any age with Overweight/Obesity, Smoker (current or former) are at increased risk of severe illness from COVID-19 See (CDC Coronavirus Disease 2019 (COVID-19)(8/26/2021) available at: https://www.cdc.gov/coronavirus/2019-ncov/need-precautions/peoples-with-medical-conditions.html). Individuals 50-64 years of age account for 15.1% of the total death toll from COVID-19 in the United States.

This Honorable Court is well aware of the current COVID-19 pandemic, with the United States suffering over 600,000 deaths. The CDC has issued guidance that individuals at higher risk of contracting COVID-19 take immediate preventative actions, including avoiding crowded areas and staying home as much as possible. The condition in prisons do not allow for an inmate to take the recommended preventive actions and create an ideal environment for the transmission of contagious disease. See (Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Disease 45(8):1047-1055, available at https://doi.org/10.1086/521910.

Because there is no effective treatment should Defendant contract COVID-19 while incarcerated, his health and safety require protection from infection. While in prison he will not be able to protect himself though social distancing, but will instead be exposed to "an ideal environment for viral spread."

Not all inmate face the heightened risk of severe illness or death that comes along with having certain medical conditions and facing an increased risk of contracting COVID-19 in a prison environment. It is that combination, the prison environment itself coupled with the totality of Defendant's unique health conditions that increase his risk and establish extraordinary and compelling reasons,

The Sentencing Commission has provided guidance about what constitutes "extraordinary and compelling" reasons in Section 1B1.13 of the Sentencing Guidelines. U.S.S.G. §1B1.13.  These reasons are classified in four categories: (1) the defendant's medical condition; (2) the defendant's age; (3) family circumstances; and (4) additional reasons "other than, or in combination with" the first three elements. Id. at cmt.n.1(A)-(D).  Here, the Defendant is sixty

63     years of age, with a longstanding diagnosis of high cholesterol, together with high blood pressure and  BMI of 30.5%.  It is undisputed that the combination of these factors, all of which can be documented within the Defendant's medical history, present an extraordinarily high risk of death from the COVID-19 virus. Even assuming that Defendant's conditions independently do not fit in the CDC's definition of severity, which is not the case here, "his conditions still exacerbate each other, placing him in a much more vulnerable position than a healthy person, if he were to get COVID-19."  United States v. Gardner, No. 14-cr-20735-001, 2020 U.S.Dist. LEXIS 129160, 2020 WL 4200979, at *6 (E.D. Mich. July 22, 2020.  In sum, Defendant suffers from a number of medical conditions, which are identified by the DDC as exacerbating the risk of serious harm if the Defendant contracts COVID-19.  The lack of widespread testing should exasperate this court's concern about the Defendant's likelihood of contracting COVID-19. See United States v. Agomuoh, No. 16-20196, 2020 U.S.Dist. LEXIS 86562 (E.D. Mich. May 18, 2020).

This once in a century COVID Pandemic was not foreseen at the time of defendant's sentencing, resulting into an over-representation of the seriousness of offense in light of his pre-existing illness related to the virus. Considering the amount of time remaining to complete defendant's sentence and the very dangerous risk the defendant is subjected to, extreme action is needed to extricate defendant from COVID-19 in a prison environment. The punishment imposed by the court combined with the extreme living conditions created by the virus and the BOP action response plan have subjected the defendant to the loss of privileges and restrictions that are inhumane to endue. The Defendant has endured such restrictions for nearly two years. Someday, legal scholars may look back on the COVID era compassionate release as having introduced more disparity in sentencing than any event in federal criminal law.

A sentencing commission study tallied compassionate releases by district, released in March 2022, reported that 25.7% of the 7014 compassionate release motions filed in 2020, were granted. In the Eastern District of Michigan, 34.5% of the compassionate release motions filed in 2020, were granted. From the State of Michigan, in the federal court, 66 cases out of 81 cases, where a motion for compassionate release was filed, were based upon COVID-19 as a basis for granting the motions.

The numbers are jarring, siad one defense attorney. Your geography remains as one of the most relevant factors in determining the sentence you receive or the severity of the punishment. In a country that guarantees equal protection under the law, I think that should raise some constitutional questions. Defendant has demonstrated that a downward departure is warranted to eliminate sentencing disparities and the over-representation of seriousness of the offense.

jurisdiction of Defendant's Personal § 3553 (a) Factors

In 1977, the Defendant was awarded the Distinguished Service Award for outstanding community service by the Mayor of Royal Oak, Michigan, Pecky D. Lewis. Nicoletti is a family man and has been married since April 15, 1983, with four successful college graduated children. (PSR ¶ 35) Perhaps most important is that Nicoletti had a criminal history score of zero, as this was his only offense. (PSR ¶ 29) Nicoletti's father died in 2016 from a stroke and he has a close relationship with his mother and served as her sole caregiver. (PSR ¶34) Nicoletti was a model citizen with no history of substance or alcohol abuse whatsoever. (PSR ¶40)

The instant offense did not involve violence and were Nicoletti's first ever, criminal offense. While on pre-trial release, Nicoletti's conduct was so good, that the court and the Government allowed Nicoletti to repeatedly adjourn his BOP Report date, and to travel to various locations in order to visit family members. He continued to have good behavior in prison, maintaining perfect conduct. With regard to 18 USC 3553(a) factors for the court to consider, given Nicoletti's non-existent criminal history and spotless record on pre-trial release and in prison, Nicoletti suggests that the incarceration he has served thus far to be sufficient to promote deterrence and would not be minimized by the court granting him compassionate release. It is important to bear in mind that the other Co-Defendants were not incarcerated at all and the court should try to avoid unwarranted sentence disparities in accordance with §3663(a)(4)(A)(6).

This court specifically determined that Nicoletti does not pose a danger to the community. On June 3, 2020, this court ruled: "The Government could not possibly believe that Nicoletti poses a danger when it consented to multiple extensions for Nicoletti to surrender. The court finds Nicoletti does not present a danger to the safety to persons or the community." Case No. 15-20382, 2020 U.S. Dist. LEXIS 97196. 18 USC § 3142(g)

Accordingly, Defendant has demonstrated that extraordinary and compelling circumstances warrant compassionate release.

**Education and employment**

     While an inmate at FCI Morgantown since August of 2021, Defendant has been a
model inmate.  Currently, Defendant holds the only work assignment that is allowed
to work outside the prison facility on a daily basis.  He is employed as the Town
Driver, which is classified as a position of public trust and the assignment must
be approved by the Warden of the facility.  As the Town Driver, Defendant is charged
with the responsibility of driving other inmates to/from medical appointments, as well
as transporting other inmates to the bus stop upon release from custody.

     In addition to being the Town Driver, Defendant is also the Compound Photographer,
responsible for taking all inmate photos while on the compound.  These duties
include taking inmate photos while at the visitation center during weekend visitation
sessions.  Defendant is the only Compound Photographer.

     Prior to the two above work assignments, Defendant was a paid Welding Instructor
at the Welding Shop.  He was responsible for instructing students in the art of
Stick Welding. MIG Welding, and TIG Welding.  During the same time, Defendant was
participating in the Welding Apprenticeship Program in the proactive advancement
of the skilled trade.  Prior to the Welding Shop, Defendant was assigned to Facilities,
where Defendant worked in the Carpentry Division, charged with fabricating instit-
utional office furniture, shelving units, and other related wooden furniture.  At
the same time, Defendant was also assigned to Food Services where he worked as
a Food Server, and as a Cook, where he also completed the Cook Apprenticeship
Program.  At the same time Defendant was working in the Food Services Department,
he was working in the Landscape Department as the Clerk of the Department
overseeing a landscaping crew of more than a dozen inmates.

     Defendant has gone overboard with rehabilitation and learning new skills
that will facilitate his re-entry into society and greatly assist in successful
completion of supervised probation where he will need to maintain employment
on a continual basis.

## EVIDENCE BASED RECIDIVISM REDUCTION PROGRAMS

While incarcerated, Defendant has successfully completed the following educational programs offered to inmates at FCI Morgantown:

> Welding Apprenticeship
>
> Food Services Cook Apprenticeship
>
> National Parenting Program Part I
>
> National Parenting Program Part II
>
> Victim Impact Class
>
> Crochet Class

While incarcerated, Defendant has participated in the Financial Responsibility Payment Plan (FRP).  The FRP is automatically deducted from Defendant's monthly wages.  Currently, the FRP Payment amount is $50.00 per month and said payments commenced starting on 10-27-21, and have been made in a timely manner each and every month, despite the fact that Defendant has to work two work assignments in order to make enough money to cover the FRP payment, which amounts to nearly 75% of the amount Defendant earns each month.

This court and others have granted compassionate release to high-risk inmates with similar and in some cases greater, time or percentage remaining. United States v. Delgado, No. 18-cr-17, 2020 WL 2464685 (D.Conn. Apr. 30, 2020)(Obesity and sleep apnea; FCI Danbury: roughly 7.5 years remaining on initial 10 year sentence (75%) and same period remaining until projected release date (75%)); Williams-Bethea, 2020 WL 2848098 (age 50, hypertension and obesity; FCI Danbury; 29 months remaining on initial 40 month sentence (73%) and 23 months until projected release date (68%)); United States v. Echevarria, 17-cr-44, 2020 WL 2113604 (D.Conn. May 4, 2020)(age 48 and asthma; FCI Allenwood (no reported cases); 39 months remaining on initial 48 month sentence (81%)).

Like most everyone in or out of prison, Defendant worries about his health conditions, primarily his hemochromatosis and high blood pressure as well as the scare of contracting COVID-19 for yet another time, but unlike those not imprisoned, his high risk and fears are heightened due to the congregate living conditions and inability for self-care and/or lack of medical care. Defendant fears infection and what that may bring knowing that any inmate or staff he comes in contact with could be carrying the beginning of his death sentence. This court should grant Defendant's request for a sentence modification in the form of a Compassionate Release. ("By the end of 2020, one in every five persons incarcerated in the United States had tested positive for COVID-19. At least 275,000 imprisons persons across the country have been infected; more than 1,700 have died. A court's refusal to reduce an incarcerated person's sentence could result in death. United States v. Matthews, 846 F.App'x 362, 363-64 (6th Cir. 2021)").

32

Detention during the pandemic has been "more punitive" than before, essentially doing "extra time" on what would ordinarily be served. During this time, Defendant has endured restrictions from periodic lockdowns and movements; closed or restricted visitation with plexiglass partitions; limited programming; and the omnipresent dangers from the pandemic. Courts have held that the harsh conditions of pandemic confinement are an extraordinary and compelling reason warranting a sentence modification. See, e.g., United States v. Hatcher, No. 18-cr-454, 2021 WL 1535310, at *3 (S.D.N.Y. April 19, 2021); United States v. Romero, No. 15-cr-455, 2021 WL 1518622, at *4 (S.D.N.Y. April 16, 2021); United States v. Mcrae, 17-cr-643, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021)("[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.").

And finally, Defendant's request for sentence reduction is not as much as it would seem. His First Step Act projected release date to Home Confinement is scheduled for January 22, 2024, approximately 11 months from the date of this submission, which in reality is a modest sentence reduction based upon the 18 months that Defendant has already been incarcerated. And, the Defendant's punishment will continue; his freedom will be substantially restricted during the term of home confinement; he will thereafter be subjected to two years of supervised probation and he will be monitored by the court during that time. With respect to sentencing disparities, the court should be well aware of the fact that co-conspirators were not sentenced to spend any time in prison, as a result of their plea bargains.

Defendant has absolutely no history of violence and this court has previously determined that Defendant is not a threat to society. Defendant is older and wiser now, at 63 years old, and statistically is unlikely to recidivate. U.S.S.C., The Effects of Aging on Recidivism Among Federal Offenders, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2017/20171207_Recidivism-Age.pdf. ("[A]ge is...a strong factor influencing the likelihood of committing crime[.]") His low Pattern score corroborates this conclusion.

Defendant has used the last 18 months of incarceration to rehabilitate himself for the future. Defendant began his rehabilitation journey at Food Services as an apprentice cook and line server, progressing to Landscaping as the Clerk, then at Facilities in the construction department as a carpenter, then to Welding, as an apprenticeship and as an instructor, teaching other inmates how to weld. Finally, Defendant was selected as Town Driver where he drives inmates to medical appointments as far away as Pennsylvania. Lastly, the Defendant volunteers his services as the only Compound Photographer that takes photos of inmates and their families at visitation. Defendant works seven days a week and has little to no free time whatsoever.

Defendant's health problems continue to cause significant suffering and his inability to receive treatment or sufficient management of his illnesses from the BOP is concerning. Release would mean that Defendant could obtain treatment for his uncontrolled arthritis due to Hemochromatosis, and Defendant could better care for his Hypertension and other medical conditions.

See, e.g., United States v. McRae, 2021 U.S. Dist. LEXIS 8777, at *12 (S.D.N.Y. Jan. 15, 2021)(noting that "a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus, exacts a price on a prisoner beyond that imposed by an ordinary day in prison"); see also Keri Blakinger, What Happens When More than 300,000 Prisoners Are Locked Down, Marshall Project (Apr. 15, 2020), ("Experts say the widespread use of such restrictions is extraordinary, in scale and in length...Studies show long-term social isolation comes with a higher chance of dying prematurely, in part because of the physical effects of stress.")  Although these extraordinary punitive conditions might, by themselves, be insufficient to justify compassionate release, Nicoletti suggests that they support a finding of extraordinary compelling circumstances when viewed alongside Nicoletti's heightened susceptibility to severe illness from COVID-19.

Defendant's request for compassionate release is not unreasonable, the Court should grant him the relief of a sentence reduction given the totality of the circumstances and the §3553(a) factors argued herein.  This Court should grant Defendant release or at the very least, a reduction in sentence for "other reason" demonstrated in this motion.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests this Court to Order him released based on Compassionate Release; or based on a reduction in sentence as an alternate basis and allow Defendant to be placed on Home Confinement for the duration of his custodial sentence which is set to allow Defendant to be placed in Home Confinement in January of 2024.

Respectfully Submitted,

## CERTIFICATE OF SERVICE

I hereby certify that on  1/31/23        a copy of the foregoing Emergency

Motion For Compassionate Release/Reduction In Sentence Pursuant To 18 U.S.C.

§3582(c)(1)(A) was filed with this Honorable Court and mailed to the United States

Attorney Office via U.S. Postal Mail Service at the institutional facility of FCI

Morgantown to the addresses listed below:


U.S. District Court For

Theodore Levin United States Courthouse
231 West Lafayette, 5th Floor
Detroit, MI 48226


By: _____

   Paul Nicoletti
   Federal Correctional Institution
   Morgantown
   P.O. Box 1000
   Morgantown, WV 26597

DOLLAR

DOLLAR

DOLLAR

RECEIVED
FEB 07 2023
CLERK'S OFFICE
U.S. DISTRICT COURT

Theodore Levin U.S. Courthouse
231 West Lafayette
5th Floor
Detroit, MI 48226

U.S. MARSHALS

Paul Nicoletti  Reg. No. 55819-039
Federal Correctional Institution Morgantown
P.O. Box 1000
Morgantown, WV 26507