IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

UNITED STATES OF AMERICA,

v.                                                    Case No. 15-20382

PAUL NICOLETTI

_____/

DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 USC §3582(c)(1)(A)

Now comes the Defendant, Paul Nicoletti, Pro Se, and states the following

as his court ordered Reply to the Plaintiff's Response Brief, ECF No. 266,

PageID 4399-4430, as filed on 2/21/23.

Plaintiff consumes the first eight pages of its Response regurgitating

points that Plaintiff hopes will inflame the court into an immediate denial

of the relief requested by Defendant.  Suffice it to say that Defendant takes

issue with each and every point raised by Plaintiff.  Nevertheless, Defendant

believes that this court will see through the smoke screen to the real issues

before the court.

One of the first real issues is contained on Page 9 of the Response, ECF

No. 266, PageID 4411, relating to Defendant's Home Confinement Eligibility

Date of January 22, 2024.  Plaintiff is confusing the Home Eligibility Date

with the March 2, 2026, Projected Release Date.  The Projected Release Date

is entirely different as it represents the date upon which Defendant is released

from BOP custody.  Whereas the Home Eligibility Date is the date upon which

Defendant should be placed on Home Confinement or in a Halfway House.  Both

Good Time and First Step Act Credits are applied to the date calculation.  It

should be noted that Plaintiff's PageID.4425, shows that Defendant's Home Detention

Eligibility Date is 9-2-25 (Note: Defendant has challenged this date as incorrect

since it fails to credit Defendant with 15 days per month.)

1

Defendant's position that he is eligible for Home Detention as of January 22, 2024, is based upon real science and actual long hand date calculations the court can quickly review. The date of January 22, 2024 is derrived from recent Bureau of Prison ("BOP") Policy Statements as well as Corrections dated February 6, 2023. A copy of the February 6, 2023, BOP Policy Correction is attached hereto as Exhibit 1. 28 CFR §523.44(a)(1) specifically allows for an eligible inmate to apply FSA Time Credits toward prerelease custody or supervised release. 28 CFR §523.44(c) provides that the BOP "will initially estimate an FSA Conditional Projected Release Date (PRD) by calculating the maximum number of potential Federal Time Credits that an inmate may earn during his or her sentence." (See Page 16 of Exhibit 1).

It is a well known fact that the BOP has miserably failed to properly follow the letter of the law in administering the First Step Act of 2018. Despite numerous attempts to do so, the BOP continues to make a mess of the FSA resulting in a slew of lawsuits, not to mention countless administrative proceedings. A copy of a recent article from Forbes Magazine is attached as Exhibit 2. The article illustrates many of the deficiencies in the FSA application by the BOP. Currently, Defendant is in the final phase of seeking administrative relief (BP-11), with regard to the BOP's failure to calculate Defendant's FSA Time Credits and the BOP's failure to issue the often promised PRD. Defendant is prepared to litigate via his §2241 Petition, the necessary criteria which will prove the Home Confinement Date of January 22, 2024, as an actual binding legal date that the court can rely upon. Defendant has prepared a chart that tracks the BOP Policy Statement as well as the Change Notice dated February 6, 2023. (See Exhibit 1). Defendant has attached the actual chart, which is marked as Exhibit 3. The chart begins on 8/31/21 (the date of Defendant's incarceration) and continues on a 30 day cycle until 8/19/25 (the date reflecting the maximum sentence reduction of 1 year). According to the chart, assuming that the inmate will remain in earning status throughout the remainder of the sentence, including while in prerelease custody.

2

The chart illustrates that Defendant will become eligible for Home Confinement on January 22, 2024. The foregoing date is not an estimate or approximation, it is the actual real date that should be reflected by the BOP, if the BOP did actually publish such a date, which they have failed to do. The BOP's failure to publish or calculate the PRD, in no way precludes the Defendant from preparing a logical and accurate chart depicting each month of Defendant's incarceration as well as the amount of credit and the reducing effect the credit has upon the Home Confinement Eligibility Date. The bottom line is that with the 15 day per month FSA Time Credit that continues all the way through Defendant's last day of incarceration 8/19/25, Defendant will earn enough FSA Time Credit to qualify for Home Confinement on January 22, 2024, as stated by the Defendant in his Emergency Motion for Compassionate Release.

As referenced earlier, Defendant currently has an Administrative Appeal to BOP's General Counsel (BP-11). Attached hereto is a copy of the BP-11, and is marked as Exhibit 4. Said Exhibit incorporated the exact same chart (Exhibit 3), which calculates a total of 730 FSA Credits, of which the BOP has only applied 130 days toward prerelease custody. The BP-11 further incorporates the Home Confinement Eligibility Date of 1-22-24. Demonstrating that the BP-11 is not a frivolous appeal, in response to the prior BP-10, the BOP stated the following as its response:

> The auto-calculation of FSA Time Credits is expected to be updated in January 2023, at which time all earned FTC will be applied accordingly.
>
> BP-10 Response dated 1-4-23, Remedy ID 1138759-R1

In summary, Defendant has a sound basis for the FTC Date calculation indicating that he is eligible for Home Confinement on January 22, 2024.

Defendant argues that he is particularly vulnerable and has an increased risk of severe complications from the COVID-19 virus based upon his medical conditions: 1) Hemochromatosis; 2) Hypothryroidism; 3) Hypertension (High Blood Pressure); 4) Obesity; 5) Hyperlipidemia; 6) Cervical Disc Disorder.

Defendant moves for release pursuant to 18 U.S.C. §3582(c)(1)(A), which provides that the court may grant a sentence reduction if (1) "extraordinary and compelling reasons warrant" a reduction, and (2) the reduction is consistent with the 18 U.S.C. §3553(a) factors.  While the statute directs the court to consider "applicable policy statements issued by the Sentencing Commission", there is no such policy statement for motions filed by incarcerated people. District courts are afforded discretion to consider a wide range of factors in assessing a motion for compassionate release, including "the present coronavirus pandemic".

**EXTRAORDINARY AND COMPELLING**

A. VACCINE_EVADING COVID-19 VARIANTS

A combination of Defendant's many health conditions and the threat posed by COVID-19 constitute extraordinary and compelling reasons.  While the majority of vaccinated individuals infected with the Omicron variant will only experience minor symptoms, "breakthrough" infections can still cause severe, possibly life-threatening illness in individuals who suffer from medical conditions that render them particularly vulnerable to the virus.  See United States v. Johnson, 2021 WL 5755047, at *5 (E.D.N.Y. Dec. 3, 2021)(concluding vaccinated defendant "could face serious illness and even death if infected with COVID-19 due to multiple underlying medical conditions.")

Another study of fully-vaccinated individuals by the CDC found that "...all persons with severe outcomes" including hospitalization and death had at least one "risk factor" and that 77.8% of those who died, had four or more risk factors.  Christina Yek et al., Risk Factors for Severe COVID-19 Outcomes Among Persons Aged 18 Years Who Completed a Primary COVID-19 Vaccination Series

-465 Health Care Facilities, United States, Dec. 2020 - Oct. 2021, 17 MMWR Morbidity Mortality Weekly Rep. 19, 19-21, (January 7, 2022). Note that the Defendant has four or more of the risk factors. CDC Director Rochelle Walensky cited this study as evidence that the "overwhelming number of [recent] deaths" from COVID-19 occur in people with multiple comorbidities. CDC Director Responds to Criticisms on COVID -19 Guidance, GOOD MORNING AMERICA (Jan. 10, 2022). These findings are cited by courts in their opinions. Many of the cases deciding that vaccination is dispositive against "extraordinary and compelling" predate the Omicron virus. See United States v. Pimentel-Garcia, No. 4:07-cr-00088 (D. Idaho, Oct. 4, 2022)(finding "[v]accination does not eliminate risk...[The Government] concentrated on statistics pertaining to the ealier Delta variant and citing numerous cases supporting its claim that because [Defendant] is vaccinated, [his] circumstances are not extraordinary or compelling. Many of the cases cited by the Government predate the emergence of the more contagious Omicron variants that result in breakthrough infections more often than the Delta variant.")

Defendant is also more at risk for severe COVID-19 infection in prison than would be if placed on Home Confinement. In Johnson, 2021 WL 5755047, at *4 (noting "the risk of breakthrough infection is greater among incarcerated inivduals than members of the general public.") Recent case law has developed holding that a Defendant's early release from imprisonment may be warranted where the Defendant is "unable to receive or benefit from a vaccine" or "remains vulnerable to severe infection, notwithstanding the vaccine." Or where the Defendant proffers "individualized facts based on concerns like Omicron breakthrough cases, long COVID, or the relative inefficacy of vaccines for certain vulnerable prison populations, like immunocompromised." United States v. Newton, 37 F.4th 1207 (7th Cir. June 15, 2022)(citing United States v. Rucker, 27 F.4th 563 (7th Cir. 2022)).

**DEFENDANT IS IMMUNOCOMPROMISED AND VULNERABLE, EVEN WITH VACCINATION**

Defendant remains vulnerable to severe infection, notwithstanding the vaccine, because of reduced vaccine efficacy and he is immunocompromised and incarcerated where breakthrough infection risk is greater than in the general public.  Many of the Defendant's health conditions render him immunocompromised and vulnerable and include: 1) Hemochromatosis, 2) Hypothyroidism, 3) Obesity, 4) Major Depressive Disorder, 5) Hypertension; each further explained in detail below.

**1) HEMOCHROMATOSIS MAKES DEFENDANT IMMUNOCOMPROMISED**

It is undisputed that Defendant has been diagnosed with Primary Hemochromatosis. Primary Hemochromatosis is designated as a chronic liver disease.  See Title II of the Social Security Act, 20 CFR 404.1520(c) and 20 CFR 416.920(c)(wherein the disease qualifies for Social Security Disability Insurance Benefits (DIB) according to Appendix 1 to Subpart P of Part 404–Listing of Impairments).  The disease can lead to primary biliary cirrhosis (PBC), autoimmune hepatitis. A recent medical study proved that patients with Hereditary Hemochromatosis (HH) "have an abnormal immune system. and it has been suggested that the immune system is involved in HH iron deregulation.  And now, research by a team of Portuguese scientists about to be published on the 1st of August Issue of the journal **Blood1**, shows that the HFE gene seems to be involved, not only in the iron regulation, but also in the immune system response...And in fact HH patients are also immuno-suppressed presenting, among other problems, low numbers of specific subsets of white blood cells, the immune system "responders" against intruders."  A copy of the Portuguese Science medical study is attached as Exhibit 5.  It is clear from other medical literature that Hemochromatosis "make people more susceptible to infection" for two reasons: 1) "the immune system uses iron to kill harmful bacteria, so some amount of iron is needed to fight infections; 2) Elevated levels of free iron stimulate the growth of bacteria and viruses, so too much iron can have the opposite effect and **increase** the risk of infections. See attached Exhibit 6 for further reference.

6

As indicated earlier, the Social Security Administration considers Hemochromatosis to be a Chronic Liver Disease, and as such, having a chronic liver disease can make you more likely to get very sick from COVID-19. See attached Exhibit 7. page 3 of 9. Exhibit 7 further states: "[S]ome people inherit problems with their immune systems. One example is called Primary Immunodeficiency. Being immunocompromised can make you more likely to get very sick from COVID-19 or be sick for a longer period of time. See page 5 of 9, id.

**2) HYPOTHYROIDISM MAKES DEFENDANT IMMUNOCOMPROMISED**

It is well known in the medical community that Hyprothyroidism is caused by an autoimmune disorder which gradually "reduces thyroid function" requiring Defendant to be on Levothyroxine as a thyroid substitute. Attached as Exhibit 8, is a page from a medical reference book documenting the autoimmune disorder as well as its symptoms.

**3) HYPERTENSION MAKES DEFENDANT IMMONOCOMPROMISED**

Bureau of Prisons (BOP) medical records confirm that Defendant has hypertension with some blood pressure readings, in the stage 2 hypertension range, with the three most recent readings, having a systolic pressure above 145 mm Hg and diastolic readings above 95 mm Hg. These elevated readings are depite at least two blood pressure lowering medications being administered.

Hypertension is associated with inflammation, which in turn, is a dysregulation of the body's immune system. The virus also causes inflammation in the body, which in some people, rise to dangerous levels. Hypertension as a comorbidity is explained by dysfunction of the endothelium, which is involved in the regulation of pro-inflammatory immune response and blood clotting. See Sardu, et al., Hypertension, Thrombosis, Kidney Failure, and Diabetes: Is COVID-19 an Endothelial Disease: A Comprehensive Evaluation of Clinical and Basic Evidence, Journal of Clinical Medicine (May 11, 2020) at https://www. mdpi.com/2077-0383/9/5/1147.

7

Also, "The Court addresses at length the relationship between hypertension and COVID-19..." See <u>United States v. Salvagno</u>, No. 5:02-CR-51 (collecting cases). Finding "[p]eople with hypertension face at least a two-fold risk of death from COVID-19 compared to non-hypertensive individuals." id.

In summary, the confluence of Defendant's immunocompromising conditions taken additively and synergistically, leads to the conclusion that he has medical vulnerabilities to severe COVID-19 infection, notwithstanding the vaccine. The court's assessment of "extraordinary and compelling reasons" should be driven by the prevailing scientific view that Defendant's immunocompromising conditions mean that vaccination is not a panacea. Because Defendant is "unable to ... benefit from a vaccine," 6th Circuit caselaw does not foreclose him from being able to show extraordinary and compelling reasons warranting a sentence modification. <u>United States v. Lemons</u>, 15 F.4th 747,751 (6th Cir, 2021).

## 4) OBESITY MAKES DEFENDANT IMMUNOCOMPROMISED

Based on Defendant's medical records, is diagnosed as having obesity with a BMI of 30.5%. According to the CDC, a BMI over 30% puts a person in the highest category of obesity. See Defining Adult Obesity, CDC, 22 https://www.cdc.gov/obesity/adult/defining.html (last visited Jan. 29, 2021). Obesity causes serious complications for people infected with COVID-19. These include "impaired immune function, decreases in lung capacity, and a tripled risk of hospitalization. id. Studies have even shown that "obesity may be linked to lower vaccine responses for numerous diseases." id. "Blood tests show that obese people and people with related metabolic risk factors such as high blood pressure...experience a state of chronic mild inflammation. Chronic inflammation seems to interfere with the immune response to vaccines, possibly subjecting obese people to preventable illnesses even after vaccination." See Sarah Varney, America's Obesity Epidemic Threatens Effectiveness of Any COVID-19 Vaccine," Kaiser Health News.

## 5) MAJOR DEPRESSIVE DISORDER MAKES DEFENDANT IMMUNOCOMPROMISED

Defendant has been diagnosed with Major Depressive Disorder as documented within Defendant's medical file.  It is clear that the courts do not regard the CDC website as the only appropriate source of scientific information bearing the identification of risk factors or immunocompromisations.  United States v. Salvagno, No. 5:02-CR-51, at *31 (N.D.N.Y. June 22, 2020).(Stating that the Court does not confine itself to the CDC website, because the CDC is not the only reliable source of information about COVID-19, there is a lack of consensus regarding COVID -19 risk factors, the CDC itself does not purport to represent consensus views of science surrounding COVID-19, and the CDC frequently alters its online guidance in significant ways".  Mira Zein,M.D.,M.P.H., who is a Clinical Assistant Professor at Stanford University School of Medicine explains, "Depression, anxiety, and PTSD, have all been found to directly stimulate production of pro-inflammatory cytokines, as well as downregulate cellular immunity leading to increased risk of acute immunity due to mental health disorders can put detainees "at increased risk of contracting and suffering from more severe form of COVID-19.  See Doe v. Barr, 2020 WL 1820667, at *4 (N.D.Cal. April 12, 2020.) (explaining that anxiety and depression "can lead to decreased immune response and increased risk of infections.)

Defendant has been prescribed Mirtazapine Tablets (Remeron) for the major depressive disorder.  One of the many side effects of taking Remeron is "Decreased White Blood Cells" called neutrophils, which are needed to fight infections.  A copy of the Medication Guide for Remeron is attached as Exhibit 9.  The Medication Guide evidences the fact that Defendant is immunocompromised based upon the fact that he has major depressive Disorder and based on the fact that he takes Remeron, which makes Defendant more susceptible to infections such as COVID-19.

9

## SENTENCING FACTORS IN 18 U.S.C. §3553(a)

The Defendant has absolutely no prior history of violence. At 63 years old, Defendant statistically unlikely to recidivate. His "minimum" PATTERN scores corroborates this conclusion. The time he has served to date is the first, and therefore necessarily the longest, prison sentence he has ever served. See United States v. McMullin, No. 11-cr-20345, 2020 WL 5944466, at *4 (E.D.Mich. Oct. 7, 2020)("This period of incarceration, far greater than any he had been sentenced previously, was the wake-up call McMullin needed.") Defendant knows his offense was serious. He accepts responsibility for his mistakes and fully appreciates and lives each day with the harm from his actions. He is sincerely remorseful, which is best illustrated by his spotless institutional record. Defendant's rehabilitative efforts in custody demonstrate that he is not a danger to the community (as the court previously determined) and that further incarceration is unnecessary to promote specific deterrence.

Defendant's extraordinary and compelling rehabilitative efforts are best evidenced by his work assignment as the Town Driver. A copy of the Town Driver Position Description and Standard is attached as Exhibit 10. According to the Position Description, the Town Driver "is responsible for transporting inmates via government vehicle to and from medical appointments, the bus station, airport in the Morgantown area, and the RRC in Clarksburg, WV. You will assist the CSO's in retrieving the daily mail at the USPS." Clearly, the Twon Driver is the only position of public trust to which the Warden has appointed Defendant. Lastly, the Town Driver "is a skilled position, will have minimal supervision, and has an institution wide impact on the daily operation of the factility." It is clear that Defendant has become a "trusted" inmate and that he continues to excel as the only Town Driver at the FCI Morgantown facility.

The Defendant takes responsibility for his poor decision making that led to his conviction for events that occurred in 2005.  Defendant realizes that his acts caused economic damages to the victim bank in the form of increased fees and costs whichwere presumably passed on the the consumer. He also realizes that economic damages have been caused to his family based upon his incarceration and the lack of financial resources from his lack of gainful employment in the legal community.  Defendant's wife was forced to go back into the workforce to make ends meet.  Defendant also realizes that there has been an emotional impact based on the fact that Defendant's wife for all practical purposes lost her husband, and Defendant's four children essentially lost their father.  Not to mention the fact that Defendant's elderly mother has effectively lost her son.  Defendant now realizes the devastation he has caused not only to his personal life but also to his professional life as well.  Without a doubt, Defendant has learned his lesson by being incarcerated and he is ready to return to "regular" life as a productive citizen.

Defendant has a realistic release plan in that he has been married to his wife since 1983.  He plans to return to living with his loving partner while residing in the couple's marital home.  Defendant plans to return to work with his previous employer where he will be provided with a generous health insurance package that will help Defendant cope with his medical needs.  When court supervision would allow, Defendant plans to spend time with his wife, children, and grand-children, trying to fill the void that has been caused by his absence.

WHEREFORE, Defendant requests that this court grant the following relief: 1) Reduce Defendant's custodial sentence to "Time Served" with additional home confinement; 2) Direct the BOP to transfer Defendant to home confinement as soon as possible; 3) Grant such other and further relief as may be appropriate under the circumstances.

Respectfully Submitted,

_____
Paul Nicoletti No. 55819-039
FCI Morgantown
P.O. Box 1000
Morgantown, WV 26507



**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI:         CPD/CPB
NUMBER:   5410.01 CN-1
DATE:       February 6, 2023

# First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

    /s/
*Approved*:  Colette S. Peters
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following changes to Program Statement 5410.01, **First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)**, dated November 18, 2022.

*The highlighted text has been added to Section 5. RISK AND NEED ASSESSMENT:*
If an inmate fails to complete a recommended EBRR or PA to address an identified need area, staff will enter the applicable fail or withdraw code into SENTRY, and the inmate will **not** be considered to have opted out, and therefore, in non-earning status.

An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration **at a BOP institution**. As defined in the Program Statement **Inmate Classification and Program Review**, the unit team will document the inmate's progress toward recommended goals and update the Individualized Need Plan, as appropriate.  The inmate will receive a copy of their updated Individualized Need Plan which will include the reassessed risk level, need areas, and program recommendations. **Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments.  For inmates in prerelease placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

*The highlighted text has been added to Section 6. HOW TO EARN FTCs:*
**For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while the inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release**

Ex 1

or prerelease custody. For those inmates who have not completed two assessments prior to transfer to prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.

*The highlighted text has been added to Section 8. TRACKING AND EARNING OF FTCs:* FSA Time Credit Assessments (FTC Worksheets) will be automatically uploaded to the Inmate Central File during each auto-calculation. Inmates will be provided a copy of the most recent FTC Worksheet during regularly scheduled program reviews.

*The highlighted text in has been changed (either added or struck through) in Section 10. APPLICATION OF FTCs:*

~~While inmates with unresolved pending charges and/or detainers may earn FTCs, if otherwise eligible, they will be unable to apply them to prerelease custody or release to supervision unless the charges and/or detainers are resolved. An inmate with an unresolved immigration status will be treated as if he/she has unresolved pending charges with regard to the application of FTCs.~~

To apply FTCs to prerelease placement, an inmate ordinarily must otherwise be eligible to participate in prerelease custody consistent with limitations as outlined in the Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure**, separate from any FSA eligibility criteria, and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement. ~~For inmates with minimum or low risk who have not yet maintained two consecutive assessments, they will need to submit a BP-A0148, Inmates Request to Staff, during their regularly scheduled Program Review in order to have their early application of FTCs considered. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.~~

Once an inmate has been transferred to prerelease custody pursuant to the procedures outlined in this section, the inmate will maintain the recidivism risk level the inmate had at the time of the transfer, unless the inmate benefits from a lower recidivism risk level based on the passage of time or the inmate's actions result in a higher risk rating. If an inmate is removed from prerelease custody for a violation, and is returned to a BOP institution, the inmate's recidivism risk level will be reassessed pursuant to the procedures outlined in Section 5 of this Program Statement.

For inmates who meet the following criteria, up to 365 days of earned FTCs will be automatically applied to early release:

- ~~Has no detainers or unresolved pending charges, to include unresolved immigration status and~~

- **Is not the subject of a final order of removal under immigration laws, and**

**As used in this Section, "last risk and needs assessment" refers to the final risk and needs assessment conducted while the inmate was at a BOP institution, prior to the inmate's transfer to supervised release or prerelease custody.**

*The highlighted text has been added to the REFERENCES section:*

**7310.04** CN-1  **Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/1998)**



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI:          CPD/CPB
NUMBER:   5410.01
DATE:        November 18, 2022

# First Step Act of 2018 - Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

*/s/*
*Approved*: Colette S. Peters
Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

**§ 523.40 Purpose.**

**(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115-391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."**

**(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).**

The purpose of this policy is to establish Bureau of Prisons (Bureau) criteria and procedures for awarding time credits pursuant to 18 U.S.C § 3632(d)(4) and 18 U.S.C § 3624(g) to eligible inmates under the provisions of First Step Act of 2018 (FSA) codified in part in Title 18 U.S.C. § 3632.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

a. **Program Objectives**.  The expected results of this Program Statement are to:

- Inform inmates and staff of the process for earning, documenting, applying, forfeiting, and restoring after forfeiture FSA Time Credits (FTCs) in accordance with the FSA.
- Inform inmates and staff of the circumstances which would preclude an inmate from earning and/or applying FTCs.
- Identify the process for applying FTCs in combination with the Residential Drug Abuse Treatment Program (RDAP) early release benefit under 18 U.S.C. § 3621(e).

b. **Institution Supplement**.  None required. Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. BACKGROUND

The FSA provides eligible inmates may earn FTCs for successfully participating and completing approved **EBRR programs or PA**s.  The FSA prohibits inmates from receiving credit prior to its enactment, prior to the commencement of the inmate's sentence, or if the inmate is serving a sentence for a disqualifying offense or has a disqualifying prior conviction. The FSA allows qualifying inmates to apply FTCs toward prerelease community-based placement (i.e., Residential Reentry Center (RRC) and/or home confinement (HC)). Further, at the discretion of the Director of the Federal Bureau of Prisons (Director), the FSA allows for FTC to be applied toward early release to supervision.

## 3. DEFINITIONS OF TERMS

**§ 523.41 Definitions.**

**(a)** *Evidence-Based Recidivism Reduction (EBRR) Program.* **An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:**

> **(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;**
> **(2) Family relationship building, structured parent-child interaction, and parenting skills;**
> **(3) Classes on morals or ethics;**

**(4) Academic classes;**
**(5) Cognitive behavioral treatment;**
**(6) Mentoring;**
**(7) Substance abuse treatment;**
**(8) Vocational training;**
**(9) Faith-based classes or services;**
**(10) Civic engagement and reintegrative community services;**
**(11) Inmate work and employment opportunities;**
**(12) Victim impact classes or other restorative justice programs; and**
**(13) Trauma counseling and trauma-informed support programs.**

A list of approved EBRR programs is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division's intranet pages. The list will be updated as programs/activities are added.

**(b) *Productive Activity (PA)*. A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.**

Productive activities include a variety of groups, programs, classes and individual activities which can be either structured or unstructured. These pro-social activities contribute to an inmate's overall positive institutional adjustment, to include maintaining clear institution conduct, and include, but are not limited to:

- Structured, curriculum-based group programs and classes
- Productive, free-time activities (e.g., recreation, hobby crafts, or religious services)
- Family interaction activities (e.g., social visiting)
- Personal growth and development classes (e.g., adult continuing education classes)
- Institution work programs
- Community service projects
- Participation in an Inmate Financial Responsibility plan

The Bureau has approved a group of specific, structured, curriculum-based PAs which are available to assist the inmate in addressing identified needs. The list is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division intranet pages. The list will be updated as programs/activities are added.

**(c) *Successful participation.***

**(1) An eligible inmate must be "successfully participating" in EBRR Programs or**

**PAs to earn FSA Time Credits for those EBRR Programs or PAs.**
**(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.**

An inmate will remain in FTC earning status while on any waitlist for EBRR Programs or PAs recommended based on the inmate's needs assessment, not to exceed two assessment periods, as long as the inmate has not refused or declined to participate. Active participation in at least one EBRR Program or PA by the inmate supersedes this requirement. Exceptions to the two-assessment period time frame can be granted by the Regional Director upon request from the Warden. However, should an inmate refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined, or opted out, for the entire waitlist period. The waitlist period is defined in terms of the corresponding need area(s). When an inmate declines participation after being on a waitlist, the auto-calculation application will first identify any need areas associated with the declined program and then identify the oldest waitlist associated with the need area(s). Any credits earned since the oldest waitlist associated with the need area, without intervening participation, will be rescinded to reflect the inmate's refusal.

**(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.**
**(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:**
  **(i) Placement in a Special Housing Unit;**

Inmates in Disciplinary Segregation status will not be considered to be "successfully participating." Inmates in restrictive housing for Administrative Detention shall obtain FTCs if they otherwise remain in earning status under the policy.

  **(ii) Designation status outside the institution (*e.g.*, for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);**
  **(iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.*, on state or Federal writ, transfer to state custody for service of sentence, etc.);**

In the case of placement or transfers outside the institution (e.g., furlough, writ, escorted trip, outside hospital placement, etc.), an inmate will continue to earn FTCs if they are in the institution for any part of the day. An inmate must be out of the institution for the entire 24-hour day before the inmate reverts to non-earning status. Upon return to the institution, the inmate's earning status will resume.

**(iv) Placement in mental health/psychiatric holds; or**
**(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).**

An inmate is considered to be opting out, and therefore, is not in earning status, if the inmate refuses or declines to participate in any EBRR programs or structured, curriculum-based PAs recommended based on an identified need. Further, an inmate is considered to be opting out if the inmate refuses to participate in or fails to complete any portion of the Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13), the Bureau's assessment system. See the Program Statement **First Step Act Needs Assessment**.

**(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.**

An inmate's refusal to complete any portion of the SPARC-13 or to participate in EBRR programs or structured, curriculum-based PAs recommended to address an identified need is documented in SENTRY using FSA-specific assignments. See the Program Statement **First Step Act Needs Assessment.**

**(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation. (*see* this part: 28 C.F.R. part 541)**
**(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).**

Note: C.F.R. citation added due to typographical error in published regulations.

**(d)** *Eligible inmate —*

**(1)** *Eligible to earn FSA Time Credits.* **An inmate who is** *eligible to earn* **FSA Time Credits is an** *eligible inmate* **for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is** *eligible to earn* **FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.**

**(2)** *Exception.* **If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not** *eligible to earn* **FSA Time Credits.**

Federal inmates in state custody are not eligible to earn FTCs. Additionally, state boarders, treaty transfers inmates, and military inmates sentenced pursuant to the Uniform Code of Military Justice who are serving their sentence in Bureau custody are not eligible to earn FTCs.

Inmates sentenced under the Code of District of Columbia (DC Code) cannot earn FTCs unless or until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility). If and when the earning of FTCs is authorized for inmates sentenced under DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under DC Code.

## 4. DETERMINATION OF ELIGIBILITY

At the inmate's Initial Classification, the unit team will conduct a review of the inmate's current conviction(s) as well as prior criminal convictions to determine the inmate's eligibility to earn FTCs.

For the current offense(s) review, the unit team will review the Judgement & Commitment (J&C) Order and the Presentence Investigation Report (PSR) for sentencing enhancements, if necessary, to determine if the inmate is ineligible. The list of FTC ineligible offenses, identified by statute, based on the inmate's current offense(s) is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch intranet page. If an inmate is determined to be ineligible based on the current offense(s), no review of prior offenses is required.

For the prior conviction review, an inmate is ineligible to earn FTCs if:

- The current offense is determined to be a "serious violent felony" not already specifically listed by the statute, and

- The inmate was sentenced to a term of imprisonment of more than a year for the current offense, and
- The inmate served a term of imprisonment of more than a year for a previous federal or state offense consisting of murder, voluntary manslaughter, assault with intent to commit murder, aggravated sexual abuse and sexual abuse, abusive sexual contact, kidnapping, carjacking, arson, or terrorism.

Additional criteria regarding the prior offense include:

- The conviction must have been based on an adult conviction. Juvenile adjudications are not considered, and
- If the prior conviction is a state offense, the state offense must match the specific federal offense listed above element-by-element.

For purposes of this review only, "serious violent felony" offense is defined by 18 U.S.C. § 3559(c)(2)(F):

> (i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in section 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); or attempt, conspiracy, or solicitation to commit any of the above offenses; and

> (ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense[.]

Due to the complexity of the prior offense review, questions regarding whether an offense is disqualifying may be referred to an institution's local Consolidated Legal Center (CLC) for guidance.

An inmate's eligibility status will be documented on the inmate's Individualized Needs Plan in the Insight case management system, and the inmate will receive a copy. The unit team will also enter the appropriate FSA eligibility assignment into SENTRY.

## 5.  RISK AND NEED ASSESSMENT

All sentenced inmates, regardless of eligibility status, will receive both a risk and need assessment.  The Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) is the recidivism risk assessment tool and part of the Bureau's FSA-approved Risk and Needs Assessment System.  The PATTERN tool is completed during the inmate's Initial Classification and is used to assign each incoming inmate an initial recidivism risk level of Minimum, Low, Medium, or High.  The Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) is the Bureau's needs assessment system and the other half of the Bureau's FSA-approved Risk and Needs Assessment System.  It is used to assess the inmate in 13 need areas which can be targeted to reduce the inmate's risk of recidivating.  See the Program Statement **First Step Act Needs Assessment.**

After the inmate's arrival to their designated facility for service of their sentence and during the initial admission and orientation phase, the PATTERN and SPARC-13 assessments will be completed.  While PATTERN is completed during the inmate's Initial Classification, the SPARC-13 is a multi-part, multi-department assessment process.  Ordinarily, the Initial Classification is completed within 28 days of the inmate's arrival, but completing the PATTERN tool requires the inmate's sentence computation to be completed.  If the sentence computation is incomplete, the Initial Classification should be delayed pending its completion, and the basis for delay should be annotated on the inmate's Program Review Report.  The SPARC-13 is ordinarily completed within the 30 days of an inmate's arrival, however, portions of the SPARC-13 assessment require the inmate's active participation.  Failure on the inmate's part to complete the survey assessments timely will delay completion and negatively impact the inmate's ability to begin earning FTCs as the inmate will be considered "opted out," and therefore is in non-earning status regardless of eligibility to earn FTCs.

Using SPARC-13, staff will recommend and document EBRR programs and/or PAs for inmates consistent with the requirements of the Program Statement **First Step Act Needs Assessment.** If the inmate declines to participate in an EBRR program or PA which has been recommended based on an identified needs area, the department staff assessing the need area will enter a program decline code indicating the inmate's opt out status; otherwise, the inmate will be placed in the program or on a waitlist with the applicable assignment keyed into SENTRY by the department staff assessing the need area.

Should an inmate later refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined for the entire period on the waitlist.  Any credits earned during the waitlist period will be rescinded to reflect the inmate's refusal.

If an inmate fails to complete a recommended EBRR or PA to address an identified need area, staff will enter the applicable fail or withdraw code into SENTRY, and the inmate will **not** be considered to have opted out, and, therefore, in non-earning status. Inmates with cognitive or physical disabilities may require more time or additional accommodations to complete an EBRR program or PA. The Program Statement **Management of Inmates with Disabilities** provides guidance on developing local accommodations. If questions about the impact of a disability on earning FTC arise, staff may contact the Women and Special Populations Branch in the Reentry Services Division.

During the inmate's Initial Classification, the unit team will develop an Individualized Need Plan for the inmate based on the results of the inmate's needs assessment and related recommendations provided by the departments that assessed the need area as documented in SENTRY and Insight Feedback. Recommendations may include EBRR programs and/or structured curriculum-based PAs designed to address the inmate's identified need areas and based on the inmate's ability to complete the program/activity.

Additional groups, programs, classes, or unstructured activities may be recommended to assist the inmate in establishing positive institutional adjustment and involvement in pro-social activities. The inmate's risk level, needs assessment results, and program recommendations will be documented on the inmate's Insight Individualized Need Plan, and the inmate will receive a copy.

An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration **at a BOP institution**. As defined in the Program Statement **Inmate Classification and Program Review**, the unit team will document the inmate's progress toward recommended goals and update the Individualized Need Plan, as appropriate. The inmate will receive a copy of their updated Individualized Need Plan which will include the reassessed risk level, need areas, and program recommendations. **Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments. For inmates in pre-release placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

6. **HOW TO EARN FTCs**

**§ 523.42 Earning First Step Act Time Credits.**

(a) *When an eligible inmate begins earning FSA Time Credits.* **An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the**

sentence will be served).

Because the ability to accrue time credits begins after the inmate's current term of incarceration begins (e.g., the date the inmate arrives at or voluntary surrenders to their initially designated Bureau facility to serve their sentence), an inmate cannot earn FTCs during pretrial confinement, nor can they earn credits based on a prior incarceration.  Further, an inmate cannot earn FTC when not in Bureau custody, including when in U.S. Marshals Service custody prior to arriving at their designated facility, regardless of where they are housed, or once released to their supervised release term.

**(b)** *Dates of participation in EBRRs or PAs.*

> **(1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.**
>
> **(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.**
>
> **(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.**

**(c)** *Amount of FSA Time Credits that may be earned.*

> **(1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.**
>
> **(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:**
>
> > **(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and**
> >
> > **(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.**

The calculation of FTCs is fully automated and based on the number of 30-day periods in earning status.  Additionally, the eligibility to earn FTCs is distinct from the ability to apply/use FTCs.

**For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while the inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release or prerelease custody. For those inmates who have not completed two assessments prior to transfer to prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

## 7. LIMITATIONS ON EARNING OF FTCs

Despite being eligible to earn FTCs, there are situations where an inmate is unable or unwilling to participate in EBRR programs or PAs, and therefore cannot earn FTCs. Such circumstances may include, but are not limited to, the following:

- Placement in Disciplinary Segregation status);
- Designation status outside the institution (e.g., an outside medical trip or escorted trip, in-transit or at an in-transit facility, a furlough for the full day, etc.);
- Placement in the custody of another jurisdiction (e.g., on state or federal writ, transfer to state custody for service of sentence, transfer to another federal agency, etc.);
- Placement in mental health/psychiatric holds;
- Detention as a material witness or for civil contempt;
- Placement in civil commitment; or
- "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

If an inmate refuses to participate in required programs (e.g., Inmate Financial Responsibility (FRP), Drug Education, etc.), the inmate will not earn FTC. While these programs are voluntary, the refusal to participate can result in the loss of certain benefits including the inability to earn FTCs.

## 8. TRACKING AND EARNING OF FTCs

FTCs are awarded based on the inmate's eligibility to earn credit, completion of the PATTERN and SPARC-13 assessments, and ongoing participation in programs designed to reduce the risk of recidivating. Once an inmate is in earning status, they will remain in earning status unless or until the limitations outlined in the previous section of this Program Statement are applied.

FTCs are auto-calculated based on 30-day increments in earning status. Partial credit will not be awarded. FTCs will be credited on a monthly basis agency-wide, as well as during the inmate's regularly scheduled Program Reviews, based on a completed 30-day period. No FTCs will post to the inmate's record if he/she has not accrued 30 days in earning status. Rather, any days in FTC earning status will carry over to the next monthly cycle, and the inmate will receive all

applicable FTCs at that time.

For example: If the first monthly posting of FTCs for an inmate occurs only five days after completing their initial assessments and going into earning status, no FTCs will post to the inmate's record as they have not yet accrued 30 days in earning status. Rather, the five days will carry over to the next monthly cycle, and the inmate will receive the FTCs at the end of the second month. If later, the inmate goes into FRP Refuse or declines a recommended needs-related program and goes into opt out status, the inmate is no longer in earning status, and therefore, stops accruing days toward FTCs and no FTCs will post to the inmate's record. Once the inmate returns to earning status, they will resume accruing days toward the earning of FTCs.

**FSA Time Credit Assessments (FTC Worksheets) will be automatically uploaded to the inmate Central File during each auto-calculation. Inmates will be provided a copy of the most recent FTC Worksheet during regularly scheduled program reviews.**

**9.  LOSS AND RESTORATION OF FTCs**

**§ 523.43 Loss of FSA Time Credits.**

**(a) *Procedure for loss of FSA Time Credits.* An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in 28 CFR part 541.**

Per the FSA, only earned time credits can be lost, and future time credits cannot be impacted. For purposes of inmate discipline, time credits are considered officially "earned" during the monthly auto-calculation or at the time of the inmate's last Program Review assessment, whichever was most recent. A sanction of loss of FSA time credits by the Discipline Hearing Officer (DHO) may only be imposed when an inmate is found to have committed a prohibited act. Loss of FTCs cannot be entered as a suspended sanction. See the Program Statement **Inmate Discipline Program**.

**(b) *How to appeal loss of FSA Time Credits.* Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).**

**(c) *Restoration of FSA Time Credits.* An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.**

The authority to restore any portion of the offender's lost FTCs is delegated to the Warden and may not be delegated lower than the Associate Warden level. The inmate may request restoration of FTCs during a regularly scheduled Program Review and only after having maintained clear conduct for two consecutive risk and needs assessments. The Unit Manager will submit a request using BP-A1156, Restoration of Federal Time Credits, along with the unit team's recommendation, through the DHO to the Warden (or designee) for final decision. If the recommendation to restore FTCs is approved, the Unit Manager or Acting Unit Manager will process the restoration approval into the inmate's record and update via Insight or Insight Feedback.

Whether denied or approved, a copy of the decision will be provided to the inmate. If denied, the inmate will be advised that they may reapply for FTC restoration six months from the date of denial, if clear conduct is maintained. A copy will be maintained in the inmate's J&C and electronic inmate central file (e-ICF), with other sentence computation documents.

## 10. APPLICATION OF FTCs

### § 523.44 Application of FSA Time Credits.

**(a)** *How Time Credits may be applied.* **For any inmate eligible to earn FSA Time Credits under this subpart who is:**

> **(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.**
> **(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.**
> **(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115-391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.**

Inmates sentenced under the DC Code can neither earn nor apply FTCs unless and until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility) and defines the criteria which authorizes the application of FTC (i.e., any circumstances, if any, which preclude application). If and when the earning and application of

FTCs is authorized for inmates sentenced under the DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under the DC Code.

~~While inmates with unresolved pending charges and/or detainers may earn FTCs, if otherwise eligible, they will be unable to apply them to prerelease custody or release to supervision unless the charges and/or detainers are resolved. An inmate with an unresolved immigration status will be treated as if he/she has unresolved pending charges with regard to the application of FTCs.~~

(b) *Consideration for application of FSA Time Credits.* **Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:**

> **(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;**
>
> **(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and**
>
> **(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.**

(c) *Prerelease custody.* **The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:**

> **(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or**
>
> **(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:**
>
>> **(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;**
>>
>> **(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and**
>>
>> **(iii) The prisoner is unlikely to recidivate.**

To apply FTCs to prerelease placement, an inmate **ordinarily** must otherwise be eligible to participate in prerelease custody **consistent with limitations as outlined in the Program Statement Community Corrections Center (CCC) Utilization and Transfer Procedure**, separate from any FSA eligibility criteria, and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement.

~~For inmates with minimum or low risk who have not yet maintained two consecutive assessments, they will need to submit a BP-A0148, Inmates Request to Staff, during their regularly scheduled Program Review in order to have their early application of FTCs considered. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.~~

Inmates with high or medium PATTERN recidivism risk levels are exceptions to the routine application of this policy with regard to awarding FTCs toward early transfer to prerelease custody and/or supervised release. The Warden will consult with the Regional Director before approving an inmate under section (c)(2), unless an exemption is granted by the Regional Director consistent with the Program Statement **Directives Management Manual**. Ordinarily, inmates considered inappropriate for early transfer to prerelease custody or supervised release under section (c)(2) include, but are not limited to, inmates who:

- Have a high or medium PATTERN recidivism risk level
- Have a current or prior offense listed in the Program Statement **Categorization of Offenses**. Early transfers for such inmates are considered only in highly unusual circumstances. Ordinarily, an inmate is precluded from receiving an early transfer if he/she has an offense listed in either the Section titled "Offenses categorized as crimes of violence", or the Section titled, "Offenses that at the Director's discretion shall preclude an inmate's receiving certain Bureau program benefits".
- Has a Public Safety Factor (PSF) that the Designation and Sentence Computation Center (DSCC) Administrator has not waived.
- Have a history of community-based supervision (i.e., probation, parole, supervised release, halfway house, home confinement, etc.) non-compliance to include technical violations, escape, absconding/eluding, and/or new criminal conduct.
- Inmates who have been found to have committed 100 OR 200 level prohibited acts during the current term of incarceration, or the prohibited acts of using drugs or alcohol, drug possession, possession of drug paraphernalia, or introduction of drugs into Bureau institutions within the last three years from the date of the incident.

Additionally, inmates with high or medium PATTERN recidivism risk levels must demonstrate a good faith effort to lower their recidivism risk by:

- Maintaining clear conduct for at least three years from the date of the request.
- Successfully completing at least one of the Bureau's residential EBRR programs recommended based on an identified need area within the past five years, if any have been assigned.
- Is otherwise compliant with all the other requirements of this Program Statement with regard to successful program participation.

Inmates may initiate a request under (c)(2) by submitting a BP-A0148, Inmate Request to Staff, during their regularly scheduled Program Review. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.

For Minimum and Low PATTERN risk inmates, consistent with the methodology described in Sections 6 and 7 of this policy, the Bureau will initially estimate an FSA conditional Projected Release Date (PRD) by calculating the maximum number of potential FTC that an inmate may earn during his or her sentence. The Bureau will make an initial projection based on the inmate's PATTERN risk level. (For inmates currently in custody as of the effective date of this policy, the PATTERN risk level will be presumed to be the current level). This FSA PRD is subject to change during the inmate's incarceration, and it will be adjusted if the inmate's PATTERN score changes or if the inmate enters non-earning status.

FTC will not be applied towards an inmate's release date unless earned. Medium and High PATTERN risk inmates may earn FTC, but will not receive an estimated FSA PRD.

RRC and/or HC referrals will ordinarily be submitted to the respective Residential Reentry Management (RRM) office 12 months in advance of the inmate's PRD or at least 60 days prior to the projected RRC/HC placement date, whichever is greater. The RRC and/or HC recommendation will include the total number of days recommended based on the Five Factor Review (see 18 U.S.C. § 3621(b)), required under the Second Chance Act, plus the remaining number of FTC days not applied to supervised release at the time of the referral. When determining the FTC days available to be applied toward RRC/HC placement, the Bureau will assume that the inmate will remain in earning status from the referral date until the transfer to prerelease custody. There is no expectation the RRC/HC placement date will be modified once the referral has been submitted to the RRM office.

**Once an inmate has been transferred to prerelease custody pursuant to the procedures outlined in this section, the inmate will maintain the recidivism risk level the inmate had at the time of the transfer, unless the inmate benefits from a lower recidivism risk level based on the passage of time or the inmate's actions result in a higher risk rating. If an inmate is removed from prerelease custody for a violation, and is returned to a BOP institution, the inmate's recidivism risk level will be reassessed pursuant to the procedures outlined in Section 5 of this Program Statement.**

Prerelease placement is dependent on, but not limited to, the inmate's release residence, program requirements, and available contract bed space and funding.

**(d)** *Transfer to supervised release.* **The Bureau may apply FSA Time Credits toward early**

transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:

> (1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;
>
> (2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and
>
> (3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

For inmates who meet the following criteria, up to 365 days of earned FTCs will be automatically applied to early release:

- Has a term of supervised release to follow the term of incarceration
- Has a low or minimum PATTERN risk level
- Has maintained a low or minimum PATTERN risk level for at least two consecutive assessments conducted during regularly scheduled Program Reviews
- ~~Has no detainers or pending charges, to include unresolved immigration status and~~
- ~~Is not the subject of a final order of removal under immigration laws, and~~
- Has not opted out or refused to participate in any required program, and therefore, is in earning status.

As explained in Section 10(b), the Bureau will calculate an inmate's PRD by assuming that an inmate will remain in earning status throughout his or her sentence, including while in prerelease custody. If an inmate on prerelease custody has already earned the maximum 365 days of credit toward supervised release, the PRD will be adjusted only if the inmate loses earned FTCs consistent with Section 9. If an inmate is returned to prison for a violation during prerelease custody or any other reason, their projected FTCs may be adjusted depending on any failure to remain in earning status.

**As used in this Section, "last risk and needs assessment" refers to the final risk and needs assessment conducted while the inmate was at a BOP institution, prior to the inmate's transfer to supervised release or prerelease custody.**

## 11. RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM EARLY RELEASE BENEFIT AND FTCs

Inmates who successfully complete the Residential Drug Abuse Treatment Program (RDAP) and are eligible for early release pursuant to 18 U.S.C. § 3621(e) may also earn FTCs which could be applied towards an additional reduction to their Projected Release Date (PRD). Eligibility to

apply earned FTCs is separate and unrelated to the eligibility requirements under 3621(e).

An inmate must complete all required components of RDAP, including the community-based treatment component, in order to receive the early release benefit pursuant to 18 U.S.C. § 3621(e). The 3621(e) benefit will be applied first to the inmate's sentence computation, followed by the application of FTCs, however, an inmate must have sufficient time remaining to serve to complete all required components of the RDAP program (i.e., 120-day community-based treatment).

In the event an inmate has insufficient time remaining to serve after completing the RDAP program to receive both the early release benefit under 3621(e) and the full 365 days toward early release of earned FTCs, the number of FTC days applied will be reduced to allow for, at a minimum, the 120-day community-based placement as required under 3621(e).

Regardless of whether the inmate is receiving the 3621(e) release benefit alone or in conjunction with FTCs, the inmate will have a conditional release method entered into SENTRY until the inmate receives a community-based placement date with, at a minimum, the required 120 days and the unit team has submitted a completed BP-A0628, Notification of RRC Placement Date, to the Designation and Sentence Computation Center (DSCC).

Inmates who release early pursuant to section 3621(e) and who also earn FTCs will be keyed with the release method which identifies that both benefits have been applied. The Correctional Systems t intranet page provides a list of FSA release method codes and descriptions for staff.

12. ADMINISTRATIVE REMEDIES.

Inmates who wish to seek review of any issue relating to this Program Statement may use the procedures outlined in the Program Statement **Administrative Remedy Program**.

## REFERENCES

*U.S. Codes or Regulations Referenced*
8 U.S.C. § 1101
18 U.S.C. § 3624
18 U.S.C. § 3632
28 C.F.R. § 541
28 C.F.R. § 542

*Program Statements*
1221.66 CN-1    Directives Management Manual (7/21/1998)

**BETA**

FORBES > MONEY > PERSONAL FINANCE

# Working Out The Bugs On The Bureau Of Prisons' First Step Act Calculator

**Walter Pavlo** Contributor ⓘ

*I write and consult on federal criminal law and criminal justice.*

[ Follow ]

💬 1                                      Jan 12, 2023, 08:30pm EST

Listen to article 7 minutes



Senators Dick Durbin and Chuck Grassley were instrumental in passage of the First Step Act. CQ-ROLL CALL, INC VIA GETTY IMAGES

This week, many federal prisoners found out that their First Step Act (FSA) credits, which had been incorrectly calculated by the

Ex 2


Bureau of Prisons (BOP), were finally corrected. Thousands of low and minimum security prisoners were released as a result of their participation in programs and productive activities because they earned credits under FSA. However, not everyone was happy with the new calculation and there is still a lot of confusion.

**BETA**

There have been a number of missteps by the BOP in implementing a way to calculate FSA credits. On January 19, 2022, the Final Rule on FSA Credits was published in the Federal Register. Despite the BOP's own input on that document, it was not prepared to implement a sweeping automated calculator for thousands of prisoners affected by that rule. As a result, BOP implemented an interim calculation procedure which evaluated inmates with less than 24 months from release and provided them a "manual" calculation until a new, automated, computer program was in place. There were to be no additional manual calculations until that new auto-calculator was completed, which was estimated to be August 30, 2022. Between February 2022 and August 2022, many prisoners received their calculation of FSA credits and hoped that the new auto-calculator would reveal they had even more.

In August 2022, the auto-calculator was rolled out by the BOP, and it encountered several issues which led to it finally being released in mid-October 2022. At that time, the BOP had also unilaterally implemented its own interpretation of the FSA with the introduction of the "18-month" rule that stated those with 18 months or less remaining on their sentence could not use FSA credits that could be applied to an earlier transfer to supervised release (reduced sentence). The BOP allowed prisoners who had received their manual credits, but who would not otherwise receive credits because of the 18-month rule, to keep them. For many prisoners, it was under 100 days of credits. This revised rule was put in place despite the BOP releasing many inmates during the

course of 2022 who would not otherwise have been released because of this 18-month rule change.

**BETA**

Senators Chuck Grassley and Dick Durbin wrote Attorney General Merrick Garland about their concern over the 18-month rule. When the BOP program statement on FSA came out in December 2022, the 18-month rule was nowhere in the document and had subsequently been dropped. That meant that prisoners who were excluded under the 18-month rule were now eligible again to receive FSA credits. With the release of the program statement, the BOP also provided an announcement that its next auto-calculator would be ready in January 2023. Again, many prisoners waited on this new calculation. That new calculation was initiated by the BOP on January 9, 2023.

While many prisoners were release this week because of the new calculation, many of them would have gone home earlier if the BOP had correctly implemented the FSA calculator much earlier. Then news started to spread around the prison population that many prisoners had the credits they believed they had earned suddenly disappear. The issue that is causing much of this problem is two-fold; a correct interpretation of the FSA that most everyone forgot about and yet another error in the FSA calculator.

MORE FROM FORBES ADVISOR

**Best Travel Insurance Companies**

By **Amy Danise** Editor

**Best Covid-19 Travel Insurance Plans**

By **Amy Danise** Editor

FSA credits can only be applied when the amount of credits earned equals or exceeds the amount of time remaining in the sentence. Those prisoners who had credits that suddenly disappeared really still have them, they just cannot be applied yet because they have more days remaining on their sentence than they do FSA credits.

The other issue is that the BOP's model did not detect the second risk assessment score (known as PATTERN), so prisoners received only 10 credits for each month of programming rather than 15 after the second PATTERN score. It is a problem that the BOP is going to correct but there is no timeline for that fix.

Each one of these days matters to prisoners, but they also matter to tax payers. It costs over $120/day to house a prisoner in federal prison and it costs nothing if they are released from prison. There are thousands of prisoner affected by this delay and each one has any number of days that they are due. This represents tens of thousands of prison days that are costing taxpayers money.

While those in prison have issues, those in prerelease custody (halfway houses and home confinement) have bigger issues. On January 6 the BOP also made another unilateral decision by stating that those in prerelease custody were going to have their calculation treated differently by not calculating them at all. The BOP stated that:

"Individuals in community placements as of December 31, 2022, will remain, even if their Needs Assessment was not completed or they previously declined a program while in secure custody.

Individuals in community placements will retain prospectively estimated FTCs despite declined programs prior to implementation

**BETA**

of the automatic calculation or any incomplete Needs Assessment prior to community placement."

**BETA**

This is not even a BOP policy but just a statement on the BOP.gov website. Prisoners in this situation have indeed earned FSA credits but they have not been applied because the BOP does not have a calculator to do so. These individuals will languish in BOP custody, albeit in a better situation than being in prison, but for months more than necessary. This has penalized many prisoners who have and continue to live by the rules earning FSA credits with the expectation of having those credits applied.

To address this situation, the BOP's own administrative remedy process will not suffice as time is of the essence and the result of what the BOP considers a timely response will result in many overstaying their prison sentence. However, the BOP can address this situation. First, it obviously has an ability to conduct a manual calculation as it did for all prisoners just after the January 2022 final rule. This is appropriate since the current version of the auto-calculation has no means of being able to even apply the FSAs that prisoners in this situation have earned. In situations where there are special circumstances, the BOP stated in the Final Rule:

"The Bureau will strive to reach an equitable result when calculating time in program participation and circumstances both beyond and within the inmate's control. Accordingly, unless the inmate formally declines recommended programming addressing his or her unique needs, or is not participating in any activities, the assumption is the the eligible inmates will be earning Time Credits and fully participating in recommended programming."

This is one of those situations.

*Follow me on Twitter or LinkedIn. Check out my website or some of my other work here.*

**BETA**

 **Walter Pavlo**

[ **Follow** ]

I founded Prisonology, an expert network firm of retired Bureau of Prisons professionals, to work with defendants and… **Read More**

Editorial Standards           Reprints & Permissions

ADVERTISEMENT

## Join Our Conversation   1 Comment

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here

Commenting as **Guest**   🔔   Log in   Sign up

| What do you think? |

Sort by **Best** ⌄

**TD**   **Tameca Dubose**     •••
23 January, 2023

My fiance Derrick Dubose suppose to been in a halfway house earlier part of last year his date is approaching in April 23 no halfway house or programming 10 years in April and nothing was done to help him he is a diabetic and has other health issues Thanks for listening My Name tameca by the way …

**See more**

Reply · 👍 · Share

Case 2:15-cr-20382-VAR-MKM   ECF No. 27.0, PageID.5021   Filed 03/10/23   Page 40 of 64

**BETA**

| 30 Day Earning Period | FSA TIME CREDITS | OCT 8-19-26 FSA RELEASE DATE | 1-19-26 (7mos) H/C ELIGIBILITY DATE |
|---|---|---|---|
| 8-31-21 to 9-29-21 | 15 | 8-4-26 | 1-4-26 |
| 9-30-21 to 10-29-21 | 15 | 7-20-26 | 12-20-25 |
| 10-30-21 to 11-28-21 | 15 | 7-5-26 | 12-5-25 |
| 11-29-21 to 12-28-21 | 15 | 6-20-26 | 11-20-25 |
| 12-29-21 to 1-27-22 | 15 | 6-5-26 | 11-5-25 |
| 1-28-22 to 2-26-22 | 15 | 5-21-26 | 10-21-25 |
| 2-27-22 to 3-28-22 | 15 | 5-6-26 | 10-6-25 |
| 3-29-22 to 4-27-22 | 15 | 4-21-26 | 9-21-25 |
| 4-28-22 to 5-27-22 | 15 | 4-6-26 | 9-6-25 |
| 5-28-22 to 6-26-22 | 15 | 3-22-26 | 8-22-25 |
| 6-27-22 to 7-26-22 | 15 | 3-7-26 | 8-7-25 |
| 7-27-22 to 8-25-22 | 15 | 2-20-26 | 7-23-25 |
| 8-26-22 to 9-24-22 | 15 | 2-5-26 | 7-8-25 |
|  | 195 |  |  |

Ex 3

| | | | |
|---|---|---|---|
| 6-23-25 | 2-5-26 | 15 | 9-25-22 to 10-24-22 |
| 6-8-25 | 1-18-26 | 15 | 10-25-22 to 11-23-22 |
| 5-24-25 | 1-3-26 | 15 | 11-24-22 to 12-23-22 |
| 5-9-25 | 12-19-25 | 15 | 12-24-22 to 1-22-23 |
| 4-24-25 | 12-4-25 | 15 | 1-23-23 to 2-21-23 |
| 4-9-25 | 11-19-25 | 15 | 2-22-23 to 3-23-23 |
| 3-25-25 | 11-4-25 | 15 | 3-24-23 to 4-22-23 |
| 3-10-25 | 10-20-25 | 15 | 4-23-23 to 5-22-23 |
| 2-23-25 | 10-5-25 | 15 | 5-23-23 to 6-21-23 |
| 2-8-25 | 9-20-25 | 15 | 6-22-23 to 7-21-23 |
| 1-24-25 | 9-5-25 | 15 | 7-22-23 to 8-20-23 |
| 1-9-25 | 8-21-25 | 15 | 8-21-23 to 9-19-23 |
| 12-25-24 | 8-19-25 | 15 | 9-20-23 to 10-19-23 |
| | | 195 | |

| | | | |
|---|---|---|---|
| 12-10-24 | 8-19-25 | 15 | 10-20-23 to 11-18-23 |
| 11-25-24 | 8-19-25 | 15 | 11-19-23 to 12-18-23 |
| 11-10-24 | 8-19-25 | 15 | 12-19-23 to 1-17-24 |
| 10-26-24 | 8-19-25 | 15 | 1-18-24 to 2-16-24 |
| 10-11-24 | 8-19-25 | 15 | 2-17-24 to 3-17-24 |
| 9-26-24 | 8-19-25 | 15 | 3-18-24 to 4-16-24 |
| 9-11-24 | 8-19-25 | 15 | 4-17-24 to 5-16-24 |
| 8-27-24 | 8-19-25 | 15 | 5-17-24 to 6-15-24 |
| 8-12-24 | 8-19-25 | 15 | 6-16-24 to 7-15-24 |
| 7-28-24 | 8-19-25 | 15 | 7-16-24 to 8-14-24 |
| 7-13-24 | 8-19-25 | 15 | 8-15-24 to 9-13-24 |
| 6-29-24 | 8-19-25 | 15 | 9-14-24 to 10-13-24 |
| 6-14-24 | 8-19-25 | 15 | 10-14-24 to 11-12-24 |

195

| | | | |
|---|---|---|---|
| 5-30-24 | 8-10-25 | 15 | 11-13-24 to 12-12-24 |
| 5-15-24 | 8-19-25 | 15 | 12-13-24 to 1-11-25 |
| 4-30-24 | 8-19-25 | 15 | 1-12-25 to 2-10-25 |
| 4-15-24 | 8-19-25 | 15 | 2-11-25 to 3-12-25 |
| 3-31-24 | 8-19-25 | 15 | 3-13-25 to 4-11-25 |
| 3-16-24 | 8-19-25 | 15 | 4-12-25 to 5-11-25 |
| 3-1-24 | 8-19-25 | 15 | 5-12-25 to 6-10-25 |
| 2-15-24 | 8-19-25 | 15 | 6-11-25 to 7-10-25 |
| 1-31-24 | 8-19-25 | 15 | 7-11-25 to 8-9-25 |
| ▮ (redacted) | | 10 | 8-10-25 to 8-19-25 |

145

BP-11

**U.S. Department of Justice**

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: Nicoletti, Paul _____ 55819-039 ____ Alex ____ FCI Morgantown
　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　　UNIT　　INSTITUTION

**Part A—REASON FOR APPEAL**

1. Inmate has calculated total FSA Credits which show 730 FSA Credits. See Exhibit A.

2. RRC/HC Eligibility Date is 1-22-24, as indicated on last page of Ex. A

3. Of the 730 FSA Credits, the BOP has only applied 130 days toward release, leaving 600 days as unapplied.

4. BOP has not made referral to RRC/HC based upon eligibility date of 1-22-24.

5. Elderly Offender date (Issue #3) needs to reflect FSA & GCT Credits.

2/2/23 _____　　　　　Paul J Nutto _____
DATE　　　　　　　　　　　　　SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____ DATE　　　　　　　　　　　　　　　GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE　　　　　　　　　CASE NUMBER: _____

**Part C—RECEIPT**

　　　　　　　　　　　　　　　　　　　　　　CASE NUMBER: _____

Return to: Nicoletti, Paul J _____ 55819-039 ____ Alex ____ G-Morgantown
　　　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　　UNIT

SUBJECT: FSA Credits not applied

**Ex 4**

_____ DATE　　　　　　　　　　SIGNATURE OF RECIPIENT OF CENTRAL OF

# Portuguese Science

**In collaboration with the National Agency for Scientific and Technologic Culture (Ciência Viva)**
**Financed by the Fundação para a Ciência e Tecnologia (FCT)**

    

*portuguese version*



*Home*

**Articles published**

**c.v.**

**Contact us**

## The immune system in hemochromatosis – more than meets the eye? (07/2005)

**Hereditary haemochromatosis (HH) is a disease characterised by excessive absorbance and storage of iron in the body, which results from a mutation in HFE, a gene involved in iron regulation.** ████████████████████

████████████████████████████████████

████████████████ **The discovery not only helps to understand better the mechanism behind the disease, but proves, for the first time, the existence of a molecular link between iron homeostasis and the IS, suggesting what a few scientists have proposed before - that the IS might be involved in more functions in the body beside the fight against infection.**

Hereditary hemochromatosis is the most common genetic illness among people of North European ancestry where it affects as many as 1 in 200-300 individuals. The disease results in excessive storage of iron in the body tissues leading to damage, and if not treated, organ failure and even death. Symptoms vary from mild to life-threatening heart and liver disease, arthritis or even diabetes mellitus depending on the damaged organ.

An interesting characteristic of the disease is that individuals with the same HFE mutations can, nevertheless, present a large range of disease severities, what shows that other factors ████ HFE ████████████ in disease outcome ████████████████████████████████████

████████ the IS "responders" against intruders ████████████████ indicate that these immunodeficient ████████████████████████████ mutated HFE gene, in ████ excessive ████████████████ ████████████████████████████████████

But now Sérgio F. De Almeida, Isabel F. Carvalho, Maria De Sousa and colleagues at the Institute for Molecular and Cell Biology (IBMC) and ICBAS, Oporto, Portugal and The Netherlands Cancer Institute in Amsterdam, might have put together the first piece of the puzzle.

The team of scientists decided to compare the blood of HH patients carrying the C282Y mutation - which is responsible for 80% of the HH cases - with the blood of healthy controls. To their surprise, they found that in the patients' blood, a key component of the immune resp████████ molecule, was found to be unstable and therefore non-f████████

*Ex 5*

molecules (I and II) are crucial for the immune response where they bind and "present" disease-inducing-intruders to white blood cells, the "responders" of the IS. When the complex intruder-MHC engages with a "fitting" white blood cell, this leads to the activation of the immune response.

Confirming the hypothesis that this immune abnormality resulted from the mutated HFE gene, patients with two mutated copies of the gene had a much higher number of non-functional MHC-I molecules than patients with one mutated and one normal copy

To Dr. Hal Drakesmith, a molecular biologist working on hemochromatosis at Oxford University, this is no doubt an important discovery "we only had observational studies on a possible crosstalk between iron metabolism and the IS in HH, this is the first molecular biology data showing a very clear effect... the fact that the work is done with cells, straight from the individual, gives further credibility to the results and makes us believe that there is definitely something going on..." he says.

For Prof. De Sousa this work is the beggining of the end in a long path trying to prove that the IS has a role in iron regulation. "Already in 1978 I got tired of believing that the IS was only for what the books said, how could all the species that do not have a complex IS survive?", she says. And while studying  cell migration in the body she realised that in some diseases, where lymphocytes accumulate in "wrong" places, these places had very high iron concentrations. "Iron , or potential iron toxicity coming from the red blood cell circulation, seemed a good reason for having a circulation of lymphocytes", she says.

The truth is that the more complex a biological system becomes, more energy it needs for its sustainance, and as result, organisms only tend to become more complex if that gives them survival advantage. And if simpler IS could fight infection efficiently, as De Sousa says, then more complex IS, like the ones in mammals, might in fact have additional functions as important for survival.

And now, almost thirthy years after, the puzzle seems to start to take shape with Almeida, Carvalho, De Sousa and colleagues' latest  results, which provide the first molecular evidence of a direct link between iron homeostasis and the IS.

 "The importance of this paper is that HFE, a protein generally thought to affect iron metabolism now is shown to have a clear immunological function through MHC class I" says De Sousa.

If De Sousa's theory proves to be correct - that the IS is involved in maintaining iron homeostasis - this will challenge one of the better guarded dogmas of immunology/biology - that this biological system evolved in order to fight infection and will no doubt raise much discussion. Dogmas are after all difficult to change. But whatever happens, this is no doubt a very interesting story and one worthwhile to keep an eye on.
Piece researched and written by: Catarina Amorim ( catarina.amorim@linacre.ox.ac.uk)

─────────────────────────────

1 *Blood* (2005) 1st August
" HFE cross-talks with the MHC class I antigen presentation pathway"

Original paper's authors
S. F. de Almeida,-
Maria de Sousa mdesousa@ibmc.up.pt

**Link to the original paper**

 **http://www.bloodjournal.org/cgi/reprint/2004-12-4640v1**

*In collaboration with the Observatório da Ciência e do Ensino Superior (OCES)*
*Financed by the Fundação para a Ciência e Tecnologia (FCT)*

▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮

Both iron overload and iron deficiency appear to make people more susceptible to infection (19 ●, 20 ●).

There are two reasons for this (21 ●):

1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮



Several studies indicate that iron supplementation may increase the frequency and severity of infections, although a few studies found no effects (22 ●, 23 ●, 24 ●, 25 ●, 26 ●, 27 ●).



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮.

For patients at a high risk of infection, iron supplementation should be a well-grounded decision. All potential risks should be taken into account.

**BOTTOM LINE:**

ADVERTISEMENT

✕

Ex 6





COVID-19

# People with Certain Medical Conditions

Updated Feb. 10, 2023

**As of January 26, 2023, EVUSHELD™ is not currently authorized for emergency use because it is unlikely to be active against the majority of SARS-CoV-2 variants circulating in the United States.**

If you or your family member are at high risk for severe illness, wear a mask or respirator with greater protection in public indoor spaces if you are in an area with a high COVID-19 Community Level. Talk with your healthcare provider about wearing a mask in a medium COVID-19 Community Level.

If you have symptoms consistent with COVID-19 and you are aged 50 years or older OR are at high risk of getting very sick, you may be eligible for treatment. Contact your healthcare provider and start treatment within the first few days of symptoms. You can also visit a Test to Treat ☑ location. Treatment can reduce your risk of hospitalization by more than 50% and also reduces the risk of death.



This information is intended for a general audience. Healthcare professionals should see Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19 for more detailed information.

## What You Need To Know

- A person with any of the medical conditions listed below is more likely to get very sick with COVID-19. If you have one of these conditions, talk with your healthcare provider about how best to protect yourself from severe illness from COVID-19.
- The list below does not include all possible conditions that put you at higher risk of severe illness from COVID-19. If you have questions about a condition not included on this list, talk to your healthcare provider about how best to manage your condition and protect yourself from COVID-19.
- Staying up to date with COVID-19 vaccines and following preventive measures for COVID-19 are important. This is especially important if you are older or have severe health conditions or more than one health condition, including those on the list below.
- Approved and authorized COVID-19 vaccines (primary series and booster) are safe and effective.
- Some people who are immunocompromised, or people with weakened immune systems, may be eligible for an additional primary dose of COVID-19 vaccine.

Ex 7



# Overview

Based on the current evidence, a person with any of the conditions listed below is more likely to get very sick from COVID-19. This means that a person with one or more of these conditions who gets very sick from COVID-19 (has severe illness from COVID-19) is more likely to:

- Be hospitalized
- Need intensive care
- Require a ventilator to help them breathe
- Die

In addition:

- Older adults are at highest risk of getting very sick from COVID-19. More than 81% of COVID-19 deaths occur in people over age 65. The number of deaths among people over age 65 is 97 times higher than the number of deaths among people ages 18-29 years.
- A person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases.
- Some people are at increased risk of getting very sick or dying from COVID-19 because of where they live or work, or because they can't get health care. This includes many people from racial and ethnic minority groups and people with disabilities.
  - Studies have shown people from racial and ethnic minority groups are also dying from COVID-19 at younger ages. People in racial and ethnic minority groups are often younger when they develop chronic medical conditions and may be more likely to have more than one medical condition.
  - People with disabilities are more likely than those without disabilities to have chronic health conditions, live in shared group (also called "congregate") settings, and face more barriers in accessing health care. Studies have shown that some people with certain disabilities are more likely to get COVID-19 and have worse outcomes.

Staying up to date with COVID-19 vaccines and taking COVID-19 prevention actions are important. This is especially important if you are older or have severe health conditions or more than one health condition, including those on this list. Learn more about how CDC develops COVID-19 vaccination recommendations. If you have a medical condition, learn more about Actions You Can Take.

# Medical Conditions

- The conditions on this list are in alphabetical order. They are **not in order of risk**.
- CDC completed a review for each medical condition on this list. This was done to ensure that these conditions met criteria for inclusion on this list. CDC conducts ongoing reviews of additional underlying conditions. If other medical conditions have enough evidence, they might be added to the list.
- Because we are learning more about COVID-19 every day, this list **does not** include all medical conditions that place a person at higher risk of severe illness from COVID-19. Rare medical conditions, including many conditions that mostly affect children, may not be included on the list below. We will update the list as we learn more.
- A person with a condition that is not listed may still be at greater risk of getting very sick from COVID-19 than other people who do not have the condition. It is important that you **talk with your healthcare provider about your risk**.

# Cancer

Having cancer can make you more likely to get very sick from COVID-19. Treatments for many types of cancer can weaken your body's ability to fight off disease. At this time, based on available studies, having a history of cancer may increase your risk.

Get more information:

- Cancer
- COVID-19: What People with Cancer Should Know – National Cancer Institute 

## Chronic kidney disease

Having chronic kidney disease of any stage can make you more likely to get very sick from COVID-19.

Get more information:

- Chronic kidney disease
- National Kidney Foundation: Kidney disease and COVID-19

Get more information:

- Liver Disease
- American Liver Foundation: Your Liver & COVID-19

## Chronic lung diseases

Having a chronic lung disease can make you more likely to get very sick from COVID-19. Chronic lung diseases can include:

- Asthma, if it's moderate to severe
- Bronchiectasis (thickening of the lungs' airways)
- Bronchopulmonary dysplasia (chronic lung disease affecting newborns)
- Chronic obstructive pulmonary disease (COPD), including emphysema and chronic bronchitis
- Having damaged or scarred lung tissue known as interstitial lung disease (including idiopathic pulmonary fibrosis)
- Pulmonary embolism (blood clot in the lungs)
- Pulmonary hypertension (high blood pressure in the lungs)

Get more information:

- COPD
- Asthma
- People with Moderate to Severe Asthma
- American Lung Association: Controlling Chronic Lung Diseases Amid COVID-19

## Cystic fibrosis

Having cystic fibrosis, with or without lung or other solid organ transplant (like kidney, liver, intestines, heart, and pancreas) can make you more likely to get very sick from COVID-19.

Get more information:

- Cystic fibrosis
- CF and Coronavirus (COVID-19) | Cystic Fibrosis Foundation (cff.org)

## Dementia or other neurological conditions

Having neurological conditions, such as dementia, can make you more likely to get very sick from COVID-19.

Get more information:

- Dementia
- Alzheimer's Association: COVID-19, Alzheimer's and Dementia ☐↗

## Diabetes (type 1 or type 2)

Having either type 1 or type 2 diabetes can make you more likely to get very sick from COVID-19.

Get more information:

- Diabetes
- American Diabetes Association: How COVID-19 Impacts People with Diabetes ☐↗

## Disabilities

People with some types of disabilities may be more likely to get very sick from COVID-19 because of underlying medical conditions, living in congregate settings, or systemic health and social inequities, including:

- People with any type of disability that makes it more difficult to do certain activities or interact with the world around them, including people who need help with self-care or daily activities
- People with attention-deficit/hyperactivity disorder (ADHD)
- People with cerebral palsy
- People with birth defects
- People with intellectual and developmental disabilities
- People with learning disabilities
- People with spinal cord injuries ☐↗
- People with Down syndrome

Get more information:

- People with Disabilities | COVID-19

## Heart conditions

Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19.

Get more information:

- Heart Disease
- American Heart Association: COVID-19 ☐↗
- NHLBI Information & Resources on COVID-19 ☐↗

## HIV infection

Having HIV (Human Immunodeficiency Virus) can make you more likely to get very sick from COVID-19.

Get more information:

- HIV Infection
- Interim Guidance for COVID-19 and Persons with HIV [↗]

## Immunocompromised condition or weakened immune system

Some people are immunocompromised or have a weakened immune system because of a medical condition or a treatment for a condition. This includes people who have cancer and are on chemotherapy, or who have had a solid organ transplant, like a kidney transplant or heart transplant, and are taking medication to keep their transplant. Other people have to use certain types of medicines for a long time, like corticosteroids, that weaken their immune system. Such long-term uses can lead to secondary or acquired immunodeficiency. ~~Other people have a weakened immune system because of a life-long condition. For example, some people inherit problems with their immune system. One example is called Primary immunodeficiency. Being immunocompromised can make you more likely to get very sick from COVID-19 or be sick for a longer period of time.~~

~~People who are immunocompromised or are taking medicines that weaken their immune system may not be protected even if they are up to date on their vaccines. Talk with~~ your healthcare provider about wearing a mask in a medium COVID-19 Community Level and what additional precautions may be necessary in medium or high COVID-19 Community Levels.

After completing the primary vaccination series, some people who are moderately or severely immunocompromised should get an additional primary dose and a booster. Because the immune response following COVID-19 vaccination may differ in people who are moderately or severely immunocompromised, specific guidance has been developed.

Get more information:

- Types of Primary Immune Deficiency Diseases [↗]
- Jeffrey Modell Foundation [↗]
- Immune Deficiency Foundation [↗]
- Primary Immunodeficiency (PI)

## Mental health conditions

Having mood disorders, including depression, and schizophrenia spectrum disorders can make you more likely to get very sick from COVID-19.

Get more information:

- National Institute of Mental Health (NIMH) Shareable Resources on Coping with COVID-19 [↗]
- National Institute of Mental Health (NIMH) Depression [↗]
- Mood Disorders [↗]

## Overweight and obesity

Overweight (defined as a body mass index (BMI) is 25 kg/m² or higher, but under 30 kg/m²), obesity (BMI is 30 kg/m² or higher, but under 40 kg/m²), or severe obesity (BMI is 40 kg/m² or higher), can make you more likely to get very sick from COVID-19. The risk of severe illness from COVID-19 increases sharply with higher BMI.

Get more information:

- Overweight & Obesity
- Obesity, Race/Ethnicity, and COVID-19
- Obesity Action Coalition: COVID-19 and Obesity [↗]

## Physical inactivity

People who do little or no physical activity are more likely to get very sick from COVID-19 than those who are physically active. Being physically active is important to being healthy. Get more information on physical activity and health, physical activity recommendations, how to become more active, and how to create activity-friendly communities:

- Physical Activity
- *Physical Activity Guidelines for Americans*, 2nd edition ⬀
- Move Your Way® ⬀
- Active People, Healthy Nation [SM]: Strategies to Increase Physical Activity
- National Center on Health, Physical Activity and Disability – Building Healthy Inclusive Communities ⬀

## Pregnancy

Pregnant and recently pregnant people (for at least 42 days following end of pregnancy) are more likely to get very sick from COVID-19 compared with non-pregnant people.

Get more information:

- Pregnant and Recently Pregnant People
- Toolkit for Pregnant People and New Parents
- Investigating the Impact of COVID-19 during Pregnancy

## Sickle cell disease or thalassemia

Having hemoglobin blood disorders like sickle cell disease or thalassemia (inherited red blood cell disorders) can make you more likely to get very sick from COVID-19.

Get more information:

- Sickle Cell Disease
- Thalassemia

## Smoking, current or former

Being a current or former cigarette smoker can make you more likely to get very sick from COVID-19. If you currently smoke, quit. If you used to smoke, don't start again. If you've never smoked, don't start.

Get more information:

- Smoking & Tobacco Use
- Tips From Former Smokers
- Health Benefits of Quitting Smoking

## Solid organ or blood stem cell transplant

Having had a solid organ or blood stem cell transplant, which includes bone marrow transplants, can make you more likely to get very sick from COVID-19.

Get more information:

- Transplant Safety
- COVID-19 Resources for Transplant Community ⬀

## Stroke or cerebrovascular disease

Having cerebrovascular disease, such as having a stroke which affects blood flow to the brain, can make you more likely to get very sick from COVID-19.

Get more information:

- Stroke
- COVID19 Stroke Podcast Series for Patients and Caregivers ⤢

## Substance use disorders

Having a substance use disorder (such as alcohol, opioid, or cocaine use disorder) can make you more likely to get very sick from COVID-19.

Get more information:

- How to Recognize a Substance Use Disorder ⤢
- Drug Overdose

## Tuberculosis

Having tuberculosis (TB) can make you more likely to get very sick from COVID-19.

Get more information:

- Basic TB Facts
- Public Health Emergencies

# Additional Information on Children and Teens

People of all ages, including children, can get very sick from COVID-19. Children with underlying medical conditions are at increased risk for getting very sick compared to children without underlying medical conditions.

Current evidence suggests that children with medical complexity, with genetic, neurologic, or metabolic conditions, or with congenital heart disease can be at increased risk for getting very sick from COVID-19. Like adults, children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or who are immunocompromised can also be at increased risk for getting very sick from COVID-19. Check out COVID-19 Vaccines for Children and Teens for more information on vaccination information for children.

- COVID-19 Vaccines for Children and Teens

# Actions You Can Take

It is important to protect yourself and others by taking COVID-19 prevention actions:

- Stay up to date with your COVID-19 vaccines
- Improve ventilation
- Get tested if you have symptoms
- Follow recommendations for what to do if you have been exposed
- Stay home if you have suspected or confirmed COVID-19
- Seek treatment if you have COVID-19 and are at high risk of getting very sick

- Avoid contact with people who have suspected or confirmed COVID-19
- Wear a mask or respirator
- Increase space and distance

**Please** contact your state, tribal, local, or territorial health department for more information on COVID-19 vaccination in your area. It is also important for people with medical conditions and their healthcare providers to work together and manage those conditions carefully and safely. Stay up to date with your COVID-19 vaccines. If you have a medical condition, the following are actions you can take based on your medical conditions and other risk factors.

### Build Your Personal COVID-19 Plan



Put together your COVID-19 plan so you have all the information you need on hand if you get sick with COVID-19. Download, edit and save, and share your plan with your family, friends, and healthcare provider.

File Details: 561 KB, 3 pages

View PDF in English ■    |    Other Languages

## Seek care when needed

- Call your healthcare provider if you have any concerns about your medical conditions or if you get sick and think that you may have COVID-19. Discuss steps you can take to manage your health and risks. **If you need emergency help, call 911 right away.**
- Do not delay getting care for your medical condition because of COVID-19. Emergency departments, urgent care, clinics, and your healthcare provider have infection prevention plans to help protect you from getting COVID-19 if you need care.

## Continue medications and preventive care

- Continue your medicines and do not change your treatment plan without talking to your healthcare provider.
- Have at least a 30-day supply of prescription and non-prescription medicines. Talk to a healthcare provider, insurer, or pharmacist about getting an extra supply (i.e., more than 30 days) of prescription medicines, if possible, to reduce your trips to the pharmacy.
- Follow your current treatment plan (e.g., Asthma Action Plan, dialysis schedule, blood sugar testing, nutrition, and exercise recommendations) to keep your medical condition(s) under control.
- When possible, keep your appointments (e.g., vaccinations and blood pressure checks) with your healthcare provider. Check with your healthcare provider about safety precautions for office visits and ask about telemedicine or virtual healthcare appointment options.
- Learn about stress and coping. You may feel increased stress during this pandemic. Fear and anxiety can be overwhelming and cause strong emotions. It can be helpful to talk with a professional like a counselor, therapist, psychologist, or psychiatrist. Ask your primary care provider if you would like to speak with a professional. Getting regular exercise and being physically active is also a great way to reduce stress.

## Accommodate dietary needs and avoid triggers

- Have non-perishable food choices such as canned goods available that meet your needs based on your medical condition (e.g., kidney diet and KCER 3-Day Emergency Diet Plan ☑ , diabetic diet).

- Know the triggers for your condition and avoid when possible (e.g., avoid asthma triggers by having another member of your household clean and disinfect your house for you or avoid possible sickle cell disease triggers to prevent pain crises).

Last Updated Feb. 10, 2023

Table 330-5   Signs and Symptoms of Hypothyroidism
(Descending Order of Frequency)

| Symptoms | Signs |
|---|---|
| Tiredness, weakness | Dry coarse skin; cool peripheral extremities |
| Dry skin | Puffy face, hands and feet (myxedema) |
| Feeling cold | Diffuse alopecia |
| Hair loss | Bradycardia |
| Difficulty concentrating and poor memory | Peripheral edema |
| Constipation | Delayed tendon reflex relaxation |
| Weight gain with poor appetite | Carpal tunnel syndrome |
| Dyspnea | Serous cavity effusions |
| Hoarse voice | |
| Menorrhagia (later oligomenorrhea or amenorrhea) | |
| Paresthesias | |
| Impaired hearing | |

**Diagnosis and Treatment**   Because of the severe neurologic consequences of untreated congenital hypothyroidism, neonatal screening programs have been established in developed countries (Chap. 68). These are generally based on measurement of TSH or $T_4$ levels in heel-prick blood specimens. When the diagnosis is confirmed, $T_4$ is instituted at a dose of 10 to 15 $\mu$g/kg per day and the dosage is adjusted by close monitoring of TSH levels. $T_4$ requirements are relatively great during the first year of life, and a high circulating $T_4$ level is usually needed to normalize TSH. Early treatment with $T_4$ results in normal IQ levels, but subtle neurodevelopmental abnormalities may be detected in those with the most severe hypothyroidism at diagnosis or when treatment is suboptimal.

**Classification**   Autoimmune hypothyroidism may be associated with a goiter (Hashimoto's, or *goitrous thyroiditis*) or, at the later stages of the disease, minimal residual thyroid tissue (*atrophic thyroiditis*). ~~Because the autoimmune process gradually reduces thyroid function, there is a phase of compensation during which normal thyroid hormone levels are maintained by a rise in TSH.~~ Though some patients may have minor symptoms, this state is called *subclinical hypothyroidism*. Later, free $T_4$ levels fall and TSH levels rise further; symptoms become more readily apparent at this stage (usually TSH > 10 mU/L), which is referred to as *clinical hypothyroidism (overt hypothyroidism)*.

**Prevalence**   The mean annual incidence rate of autoimmune hypothyroidism is up to 4 per 1000 women and 1 per 1000 men. It is more common in certain populations, such as the Japanese, probably as a consequence of genetic factors and chronic exposure to a high-iodine diet. The mean age at diagnosis is about 60 years, and the prevalence of overt hypothyroidism increases with age. Subclinical hypothyroidism is found in 6 to 8% of women (10% over the age of 60) and 3% of men. The annual risk of developing clinical hypothyroidism is about 4% when subclinical hypothyroidism is associated with positive TPO antibodies.

**Pathogenesis**   In Hashimoto's thyroiditis, there is a marked lymphocytic infiltration of the thyroid with germinal center formation, atrophy of the thyroid follicles accompanied by oxyphil metaplasia, absence of colloid, and mild to moderate fibrosis. In atrophic thyroiditis, the fibrosis is much more extensive, lymphocyte infiltration is less pronounced, and thyroid follicles are almost completely absent. Atrophic thyroiditis likely represents the end stage of Hashimoto's thyroiditis rather than a distinct disorder. Autoimmune thyroiditis is similar in both types of hypothyroidism, though TSH-R blocking antibodies may be more frequent in Asian patients with atrophic thyroiditis. The mechanisms that result in thyroid follicular destruction are predominantly T cell mediated, but antibodies may also contribute to thyroid dysfunction by complement fixation or inhibition of thyroid cell function (see "Autoimmune Basis of Thyroid Disease," above).

**Clinical Manifestations**   The main clinical features of hypothyroidism are summarized in Table 330-5. The onset is usually insidious, and the patient may become aware of symptoms only when euthy-

roidism is restored. Patients with Hashimoto's thyroiditis may present because of goiter rather than symptoms of hypothyroidism. The goiter may not be large but is usually irregular and firm in consistency. It is often possible to palpate a pyramidal lobe, normally a vestigial remnant of thyroglossal duct. Rarely, uncomplicated Hashimoto's thyroiditis is associated with pain.

Patients with atrophic thyroiditis, or the late stage of Hashimoto's thyroiditis, present with symptoms and signs of hypothyroidism. The skin is dry, and there is decreased sweating, thinning of the epidermis, and hyperkeratosis of the stratum corneum. Increased dermal glycosaminoglycan content traps water, giving rise to skin thickening without pitting (*myxedema*). Typical features include a puffy face with edematous eyelids and nonpitting pretibial edema (Fig. 330-4). There is pallor, often with a yellow tinge due to carotene accumulation. Nail growth is retarded, and hair is dry, brittle, difficult to manage, and falls out easily. In addition to diffuse alopecia, there is thinning of the outer third of the eyebrows.

Other common features include constipation and weight gain (despite a poor appetite). In contrast to popular perception, the weight gain is usually modest and due mainly to fluid retention in the myxedematous tissues. Libido is decreased in both sexes, and there may be oligomenorrhea or amenorrhea in long-standing disease, but menorrhagia is also common. Fertility is reduced and the incidence of miscarriage is increased. Prolactin levels are often modestly increased (Chap. 328) and may contribute to alterations in libido and fertility as well as causing galactorrhea.

Myocardial contractility and pulse rate are reduced, leading to a reduced stroke volume and bradycardia. Increased peripheral resistance may be accompanied by hypertension, particularly diastolic. Blood flow is diverted from the skin, producing the cool extremities. Pericardial effusions occur in up to 30% of patients but rarely compromise cardiac function. Though alterations in myosin heavy chain isoform expression have been documented, cardiomyopathy is unusual. Fluid may also accumulate in other serous cavities and in the middle ear, giving rise to conductive deafness. Pulmonary function is generally normal, but dyspnea may be due to pleural effusion, impaired respiratory muscle function, diminished ventilatory drive, or sleep apnea.

Carpal tunnel and other entrapment syndromes are common, as is impairment of muscle function with stiffness, cramps, and pain. On examination, there may be slow relaxation of tendon reflexes and pseudomyotonia. Memory and concentration are impaired. Rare neurologic problems include reversible cerebellar ataxia, dementia, psychosis, and myxedema coma. *Hashimoto's encephalopathy* is a rare and distinctive syndrome associated with myoclonus and slow-wave activity on electroencephalography, which can progress to confusion, coma, and



**FIGURE 330-4**   Facial appearance in hy thickened, pale skin.



| |
|---|
| MEDICATION GUIDE<br>REMERON® (rĕm' - ĕ – rŏn)<br>(mirtazapine)<br>Tablets |

**What is the most important information I should know about REMERON®?**
REMERON and other antidepressant medicines may cause serious side effects, including:
**1. Suicidal thoughts or actions:**
- **REMERON and other antidepressant medicines may increase suicidal thoughts or actions in some children, teenagers, or young adults within the first few months of treatment or when the dose is changed.**
- Depression or other serious mental illnesses are the most important causes of suicidal thoughts or actions.
- Watch for these changes and call your healthcare provider right away if you notice:
  - New or sudden changes in mood, behavior, actions, thoughts, or feelings, especially if severe.
  - Pay particular attention to such changes when REMERON is started or when the dose is changed.

Keep all follow-up visits with your healthcare provider and call between visits if you are worried about symptoms.
**Call your healthcare provider right away if you have any of the following symptoms, or call 911 if an emergency, especially if they are new, worse, or worry you:**
- attempts to commit suicide
- acting on dangerous impulses
- acting aggressive or violent
- thoughts about suicide or dying
- new or worse depression
- new or worse anxiety or panic attacks
- feeling agitated, restless, angry or irritable
- trouble sleeping
- an increase in activity or talking more than what is normal for you
- other unusual changes in behavior or mood

**Call your healthcare provider right away if you have any of the following symptoms, or call 911 if an emergency. REMERON may be associated with these serious side effects:**
**2. Manic episodes:**
- greatly increased energy
- reckless behavior
- talking more or faster than usual
- severe trouble sleeping
- unusually grand ideas
- racing thoughts
- excessive happiness or irritability

**3. Decreased White Blood Cells** called neutrophils, which are needed to fight infections. Tell your doctor if you have any indication of infection such as fever, chills, sore throat, or mouth or nose sores, especially symptoms which are flu-like.
**4. Serotonin Syndrome. This condition can be life-threatening and may include:**
- agitation, hallucinations, coma or other changes in mental status
- racing heartbeat, high or low blood pressure
- nausea, vomiting, or diarrhea
- coordination problems or muscle twitching (overactive reflexes)
- sweating or fever
- muscle rigidity

**5. Visual problems**
- eye pain
- changes in vision
- swelling or redness in or around the eye

Only some people are at risk for these problems. You may want to undergo an eye examination to see if you are at risk and receive preventative treatment if you are.
**6. Seizures**
**7. Low salt (sodium) levels in the blood.**
Elderly people may be at greater risk for this. Symptoms may include:
- headache
- confusion, problems concentrating or thinking or memory problems
- weakness or feeling unsteady

**8. Sleepiness.** It is best to take **REMERON** close to bedtime.
**9. Severe skin reactions:** Call your doctor right away if you have any or all of the following symptoms:
- severe rash with skin swelling (including on the palms of the hands and soles of the feet)
- painful reddening of the skin, blisters, or ulcers on the body or in the mouth
**10. Severe allergic reactions: trouble breathing, swelling of the face, tongue, eyes or mouth**
- rash, itchy welts (hives) or blisters, alone or with fever or joint pain
**11. Increases in appetite or weight.** Children and adolescents should have height and weight monitored during treatment.
**12. Increased cholesterol and triglyceride levels in your blood**
**Do not stop REMERON without first talking to your healthcare provider.** Stopping REMERON too quickly may cause potentially serious symptoms including:
- dizziness
- fatigue
- tingling sensation
- abnormal dreams
- confusion
- nausea, vomiting
- agitation
- headache
- sweating
- anxiety
- shaking

**What is REMERON?**
REMERON is a prescription medicine used to treat depression. It is important to talk with your hea

Ex 9

risks of treating depression and also the risks of not treating it. You should discuss all treatment choices with your healthcare provider.

Talk to your healthcare provider if you do not think that your condition is getting better with REMERON treatment.

## Who should not take REMERON?

**Do not take REMERON:**

- if you are allergic to mirtazapine or any of the ingredients in REMERON. See the end of this Medication Guide for a complete list of ingredients in REMERON.
- if you take a monoamine oxidase inhibitor (MAOI). Ask your healthcare provider or pharmacist if you are not sure if you take an MAOI, including the antibiotic linezolid.
- Do not take an MAOI within 2 weeks of stopping REMERON unless directed to do so by your healthcare provider.
- Do not start REMERON if you stopped taking an MAOI in the last 2 weeks unless directed to do so by your healthcare provider.

**People who take REMERON close in time to an MAOI may have serious or even life-threatening side effects. Get medical help right away if you have any of these symptoms:**

- o  high fever
- o  rapid changes in heart rate or blood pressure
- o  uncontrolled muscle spasms
- o  confusion
- o  stiff muscles
- o  loss of consciousness (pass out)

## What should I tell my healthcare provider before taking REMERON?

**Before you take REMERON, tell your healthcare provider about all of your medical conditions, including if you:**

- are taking certain drugs such as:
  - o  Triptans used to treat migraine headache
  - o  Medicines used to treat mood, anxiety, psychotic or thought disorders, including tricyclics, lithium, SSRIs, SNRIs, or antipsychotics
  - o  Tramadol used to treat pain
  - o  Over-the-counter supplements such as tryptophan or St. John's wort
  - o  Phenytoin, carbamazepine, or rifampicin (these drugs can decrease your blood level of REMERON)
  - o  Cimetidine or ketoconazole (these drugs can increase your blood level of REMERON)
  - o  Medicines that may affect your hearts rhythm (such as certain antibiotics and some antipsychotics)
- have or had:
  - o  liver problems
  - o  kidney problems
  - o  heart problems or certain conditions that may change your heart rhythm
  - o  seizures or convulsions
  - o  bipolar disorder or mania
  - o  a tendency to get dizzy or faint
- are pregnant or plan to become pregnant. It is not known if REMERON will harm your unborn baby. Talk to your healthcare provider about the benefits and risks of treating depression during pregnancy
- are breastfeeding or plan to breastfeed. Some REMERON may pass into your breast milk. Talk to your healthcare provider about the best way to feed your baby while taking REMERON

**Tell your healthcare provider about all the medicines that you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. REMERON and some medicines may interact with each other, may not work as well, or may cause serious side effects.

Your healthcare provider or pharmacist can tell you if it is safe to take REMERON with your other medicines. Do not start or stop any medicine while taking REMERON without talking to your healthcare provider first. If you take REMERON, you should not take any other medicines that contain mirtazapine including REMERONSolTab®.

## How should I take REMERON?

- Take REMERON exactly as prescribed. Your healthcare provider may need to change the dose of REMERON until it is the right dose for you.
- Take REMERON at the same time each day, preferably in the evening at bedtime.
- Swallow REMERON as directed.
- It is common for antidepressant medicines such as REMERON to take up to a few weeks before you start to feel better. Do not stop taking REMERON if you do not feel results right away.
- Do not stop taking or change the dose of REMERON without first talking to your doctor, even if you feel better.
- REMERON may be taken with or without food.
- If you miss a dose of REMERON, take the missed dose as soon as you remember. If it is almost time for the next dose, skip the missed dose and take your next dose at the regular time. Do not take two doses of REMERON at the same time.
- **If you take too much REMERON,** call your healthcare provider or poison control center right away, or get emergency treatment. The signs of an overdose of REMERON (without other medicines or alcohol) include:
  - o  confusion
  - o  memory problems
  - o  drowsiness
  - o  increased heart rate.

  The symptoms of a possible overdose may include changes to your heart rhythm (fast, irregular heartbeat) or fainting, which could be symptoms of a life-threatening condition known as Torsades de Pointes.

## What should I avoid while taking REMERON?

- REMERON can cause sleepiness or may affect your ability to make decisions, think clearly, or react quickly. You should not drive, operate heavy machinery, or do other dangerous activities until you know how REMERON affects you.
- Avoid drinking alcohol or taking diazepam (a medicine used for anxiety, insomnia and seizures, for example) or similar medicines while taking REMERON. If you are uncertain about whether certain medication can be taken with REMERON, please discuss with your doctor.

**What are the possible side effects of REMERON?**
REMERON may cause serious side effects:
- See "What is the most important information I should know about REMERON?"

The most common side effects of REMERON include:

| | | |
|---|---|---|
| • sleepiness | • increased appetite | • weight gain | • abnormal dreams |
| • constipation | • dizziness | • dry mouth | |

These are not all the possible side effects of REMERON.

**Call your doctor for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088.**

**How should I store REMERON?**
- Store REMERON at room temperature between 68°F to 77°F (20°C to 25°C).
- Keep REMERON away from light.
- Keep REMERON bottle closed tightly.

**Keep REMERON and all medicines out of the reach of children.**

**General information about the safe and effective use of REMERON.**
Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. Do not use REMERON for a condition for which it was not prescribed. Do not give REMERON to other people, even if they have the same symptoms that you have. It may harm them. You can ask your pharmacist or healthcare provider for information about REMERON that is written for healthcare professionals.

**What are the ingredients in REMERON?**
**Active ingredient:** mirtazapine
**Inactive ingredients:**
- **15 mg tablets:** Starch (corn), hydroxypropyl cellulose, magnesium stearate, colloidal silicon dioxide, lactose, hypromellose, polyethylene glycol 8000, titanium dioxide, ferric oxide (yellow).
- **30 mg tablets:** Starch (corn), hydroxypropyl cellulose, magnesium stearate, colloidal silicon dioxide, lactose, hypromellose, polyethylene glycol 8000, titanium dioxide, ferric oxide (yellow), ferric oxide (red).
- **45 mg tablets:** Starch (corn), hydroxypropyl cellulose, magnesium stearate, colloidal silicon dioxide, lactose, hypromellose, polyethylene glycol 8000, titanium dioxide.

Manufactured by: N.V. Organon, Oss, The Netherlands, a subsidiary of **Merck & Co., Inc.**, Whitehouse Station, NJ 08889, USA

Manufactured for: Merck Sharp & Dohme Corp., a subsidiary of
**MERCK & CO., INC.,** Whitehouse Station, NJ 08889, USA

For patent information: www.merck.com/product/patent/home.html
Copyright © 2016 Merck Sharp & Dohme B.V., a subsidiary of **Merck & Co.,** Inc. All rights reserved.

**For more information about REMERON call 1-800-526-4099 or go to www.REMERON.com.**

usmg-mk8246-t-XXXXrXXX

This Medication Guide has been approved by the U.S. Food and Drug Administration                    Revised  07/2016

RP-S574.052 **POSITION DESCRIPTION AND STANDARD** (BP-S574.052)
OCT 96

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| 1. Department | 2. Detail | 3. Grade |
|---|---|---|
| Correctional Systems | Town Driver | 1 |

4. Title (Dictionary of Occupational Titles)
TOWN DRIVER

5. **Introduction (Define job and its functions within the Department)**
Town driver is responsible for transporting inmates via government vehicle in the Morgantown area, not to exceed 50 mile radius, but occasionally you will drive outside the radius when approved.  A valid driver's license is required.  In addition, responsible for maintaining the cleanliness of the CSD.  This is a skilled position, will have minimal supervision, and has an institution wide impact on the daily operations of the facility.

6. **Major duties / Responsibilities (Itemize duties and responsibilities.  Relate specific standards as to the quality, quantity, and technical skill required.)**
Under supervision of CSD Officers, you will transport inmates via government vehicle to and from medical appointments, the bus station, airport in the Morgantown area, and the RRC in Clarksburg, WV. You will assist the CSO's in receiving the daily mail at the USPS. You will not have any unauthorized contact with the public and will report any contact immediately to your work supervisor. In the event you are stopped by law enforcement or are involved in an accident, you will contact the institution immediately. You will provide constant janitorial attention to the entire CSD. The janitorial duties include floor maintenance, dusting, window cleaning, trash removal, office sanitation, supply pickup, loading and unloading mail truck, and any other duties as assigned. You will check out an Institution cellular phone before each trip and return it immediately upon returning to the Institution.  Cellular phone is to be used only in case of an emergency or to receive calls from the Institution.

7. **Safety and Personal Appearance Standards (List any special safety or personal appearance requirements of the position.)**
You must be clean and presentable in appearance. You are required to wear appropriate clothing when working including safety shoes. Safety shoes will be provided to you by CSD staff. Vehicle must not be moving when using cellular phone.

8. **Job Controls (Work schedule information; identify immediate supervisory position, do not use individual names.)**
Immediate Supervisor is the Correctional Systems Officers. Normal work schedule hours are 6:30 a.m. to 3:00 p.m. Normal work days will be five (5) days on with two (2) consecutive days off in a seven (7) day work week starting on Sunday. On occasion, you will be requested to transport inmates outside of the normal work schedule, and be requested to pick-up inmates outside of the normal work schedule. This time will be compensated based upon actual time worked.

Position Description Prepared by: M. Tennant, SCSS

| 9a. Work Supervisor (Printed Name/Signature) | 9b. Department Head (Printed Name/Signature) |
|---|---|
| B. Wright, CSO | M. Tennant, SCSS |

10. Date Position Description Approved by Performance Pay Committee: _____

10a. Printed Name/Signature of
Performance Pay Committee Representative

| 11. Inmate Printed Name/Signature | Register Number | Date |
|---|---|---|
| Nicholas Paul | 55819-039 | 11/14/22 |

12. Printed Name/Signature of Staff Witness

(This form may be replicated via WP)                    Replaces BP-

**Ex 10**

(?) Nicoletti Reg No. 55819-039
Federal Correctional Institution
P.O. Box 1000
Morgantown, WV 26507




CERTIFIED MAIL

7019 2280 0000 1496 1170







United States District Court
Theodore Levin United States Courthouse
231 West Lafayette Blvd - Room 564
Detroit, Michigan 48226

U.S. POSTAGE